1  BOTTINI & BOTTINI, INC.
2  Francis A. Bottini, Jr. (175783)
   fbottini@bottinilaw.com
3  Albert Y. Chang (296065)
   achang@bottinilaw.com
4  7817 Ivanhoe Avenue, Suite 102
5  La Jolla, California  92037
   Telephone:   (858) 914-2001
6  Facsimile:   (858) 914-2002

7
8  *Counsel for Plaintiff*

9            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
10

11  JOHN WILLIAMS, derivatively on behalf )   Case No.
    of Live Nation Entertainment, Inc.,      )
12                                            )   **VERIFIED SHAREHOLDER**
                                Plaintiff,    )   **DERIVATIVE COMPLAINT FOR:**
13                                            )
                    vs.                       )   1. **Breaches of Fiduciary Duties;**
14                                            )   2. **Abuse of Control**
    MAVERICK CARTER, GREGORY B.               )   3. **Unjust Enrichment;**
15  MAFFEI, PING FU, MICHAEL                  )   4. **Aiding and Abetting Breaches**
    RAPINO, JEFFREY T. HINSON,                )      **of Fiduciary Duties; and**
16  CHAD HOLLINGSWORTH,                       )   5. **Violations of Section 14(a) of**
    RANDALL T. MAYS, LATRIECE                 )      **the Securities Exchange Act of**
17                                            )      **1934.**
    WATKINS, RICH PAUL, DANA                  )
18  WALDEN, JAMES S. KAHAN, JIMMY )
    IOVINE, JOE BERCHTOLD, BRIAN              )
19  CAPO, JOHN HOPMANS, MICHAEL               )
20  ROWLES, DANIEL M. WALL, and               )
    TIMOTHY J. LEIWEKE,                       )   DEMAND FOR JURY TRIAL
21                                            )
                            Defendants,       )
22                                            )
                    and                       )
23                                            )
    LIVE NATION ENTERTAINMENT,                )
24  INC.,                                     )
25                          Nominal Defendant.)
                                              )
26  ───────────────────────────────────────  )

27

28

Plaintiff, derivatively on behalf of Live Nation Entertainment, Inc. (hereafter "Live Nation," or the "Company"), submits this Verified Shareholder Derivative Complaint against the members of the Company's Board of Directors (the "Board") (collectively, the "Individual Defendants") for breaches of their fiduciary duties, abuse of control, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934. Plaintiff also brings a claim for aiding and abetting breaches of fiduciary duties against Defendant Leiweke. Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on his investigation and the investigation of his counsel, including a review of legal and regulatory filings, press releases, media reports about Live Nation, the allegations in the complaint filed on May 23, 2024 by the United States Department of Justice and multiple State Attorney Generals in *USA et al. v. Live Nation Entertainment, Inc.*, Case No. 24-cv-03973 (S.D.N.Y.), and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

In support of these derivative claims, Plaintiff alleges as follows:

## I.     NATURE OF THE ACTION

1.     This is a shareholder derivative action to remedy the wrongdoing committed by Defendants between July 30, 2010 and the present (the "Relevant Period").

2.     Live Nation operates in the following main industries within the live entertainment business: live music events, music venue operations, the provision of management and other services to artists and athletes, ticketing services and sponsorship and advertising sales.

3.     Ticketmaster, now a wholly-owned subsidiary of Live Nation, was founded by a group of Arizona State University college staffers and a businessman in

1

1976 as a company that sold ticketing hardware. By 1985, the company had moved its headquarters to Los Angeles, switched to computerized ticketing, and ran operations beyond the U.S. in Europe and Canada.

4.     In 1982, Ticketmaster named Fred Rosen as its new CEO. Rosen, who told the Los Angeles Times in 1985 that his competitors were "asleep at the switch," was an aggressive businessman and proud of it.  He was so good at dominating the ticket industry (and consequently became practically the only game in town) that Pearl Jam rebelled in 1994 with a campaign known as "TicketBastard."  The band wanted to offer summer tour tickets to fans for under $20 and asked Ticketmaster to charge less than $2 in service fees.  Ticketmaster refused and Pearl Jam canceled its tour and took its case to Congress.  Ticketmaster prevailed, but not before the band accused the company of sending private investigators to snoop around Pearl Jam's affairs. In the early 2000s, Ticketmaster acquired various competitors, which helped the company further dominate ticketing for the live entertainment market.

5.     In 2009-2010, Defendant Michael Rapino, Live Nation's CEO, shepherded the merger of Live Nation with Ticketmaster.  Despite strong objections to the merger on antitrust grounds, the merger was eventually approved, but Live Nation was forced to agree to certain significant restrictions to attempt to alleviate the anticipated anticompetitive features of the merger, most notably a consent decree.

6.     The 2010 consent decree was entered as a Final Judgment in the Department of Justice's case against Ticketmaster and Live Nation on July 30, 2010. A true and correct copy of the 2010 Consent Decree is attached hereto as Exhibit A. Among other things, the 2010 Consent Decree stated that Live Nation and Ticketmaster may not:

> 1.   Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2. Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services; or

3. Condition or threaten to Condition the provision of Primary Ticketing Services to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for the Provision of Live Entertainment Events.

*See* Ex. A at Section IX.A.1-3.

7.      At the time of the Live Nation/Ticketmaster merger, Irving Azoff was Ticketmaster's Chairman and CEO.  After the merger, Azoff was named Chairman of Live Nation.  But he quit soon thereafter, on December 31, 2012, stating that managing a publicly-traded company was "bull@%*!."[1]  In 2015, Azoff co-founded Oak View Group with Defendant Timothy Leiweke.  When he quit Live Nation, however, he stated that he looked forward to working with "my friend" Michael Rapino and his other friends at Live Nation.[2]  Rapino similarly stated at the time that "Irving has been a valuable partner and friend for the past few years," said Rapino, President and CEO of Live Nation Entertainment.  "We will certainly miss him . . .  I look forward to continuing to work with Irving on his artists' tours for years to come."[3]

8.      When he unexpectedly resigned from Live Nation in 2012, Azoff also "revealed his frustration that he couldn't use his position to lower ticket prices, kill

---

[1] *See* Sharon Waxman, "Irving Azoff on Why He Left Live Nation: Running a Public Company 'Sucks' (Exclusive)," THE WRAP, Dec. 31, 2012, available at https://www.thewrap.com/irving-azoff-why-he-left-livenation-running-public-company-sucks-exclusive-71021/ , last visited May 28, 2024.

[2] *See* https://www.livenationentertainment.com/2012/12/irving-azoff-resigns-as-live-nation-entertainment-chairman-and-front-line-ceo/, last visited May 28, 2024.

[3] *Id.*

service fees and create a long-planned online market to bundle tickets with T-shirts and downloads." Azoff told the Rolling Stone that "It was frustrating to be in that position. I thought I could push a button and get it done. Couldn't get it done."[4] Azoff also said at the time that, in hindsight, he would not have pushed for the multibillion-dollar merger between Live Nation and Ticketmaster.

9.      In the years following the Live Nation/Ticketmaster merger, Live Nation's officers and directors continued to cause Live Nation to engage in anticompetitive conduct and antitrust violations in defiance of the consent decree.

10.      Live Nation's Board of Directors breached their fiduciary duties by knowingly allowing the anticompetitive misconduct to occur and by failing to cause Live Nation to comply with the consent decree.

11.      In addition, as demonstrated herein, Live Nation's board of directors misrepresented to the Company's shareholders and the investing public that Live Nation was cooperating with federal investigators, when in fact the opposite was true: Live Nation was actively attempting to thwart the federal investigations and was not cooperating with them. The Board's failure to cause the Company to cooperate and failure to adhere to the terms of the 2010 consent decree directly led the United States Department of Justice and multiple State Attorney Generals in May 2024 to seek damages and a breakup of the Company.

12.      As a result of the failure of Live Nation's officers and directors to ensure compliance with the 2010 Consent Decree, the DOJ filed a Motion to Modify Final Judgment and Enter Amended Final Judgment on January 8, 2020, a true and correct copy of which is attached hereto as Exhibit B. The Motion to Modify Final Judgment stated that Live Nation and Ticketmaster had "repeatedly violated the Final Judgment [2010 Consent Decree] since at least 2012." As a result of the continuing violations, Live Nation and Ticketmaster were forced to agree to "(i) extend certain provisions

---

[4] *See* Steve Knoffer, "Irving Azoff's Live Nation Exit Leaves Many Questions Unanswered," ROLLING STONE, Jan. 4, 2013.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by five and one half years, to December 31, 2025; (ii) clarify the parties' obligations under Section IX of the Final Judgment; (iii) strengthen the compliance provisions, including appointment of an independent monitor and imposition of certain monitoring, notice and reporting obligations on Defendants; (iv) add new provisions intended to make future investigation and enforcement of the Final Judgment more effective; and (v) order Defendants to pay the United States' fees and costs associated with investigation and prosecuting this Motion." *See* Exhibit B at pp. 1-2.

13. The January 8, 2020 motion was granted and an Amended Final Judgment was entered on January 28, 2020. *See* Exhibit C. The Amended Final Judgment required Live Nation to pay, and it paid, $3 million to the government to reimburse the government for its costs in bringing the motion. *See id.* at p. 40.

14. Even after the Amended Judgment was entered, however, Live Nation's Board of Directors still failed to cause the Company to cease and desist violating the 2010 Consent Decree and the antitrust laws. The DOJ filed suit to break up Live Nation and Ticketmaster on May 23, 2024.

15. The DOJ's complaint details many internal emails and correspondence between Live Nation and others demonstrating the brazen antitrust violations. For example, in 2021 Live Nation "threatened commercial retaliation" against the private equity firm Silver Lake, which had an investment in TEG, an Australian ticketing and promotions company that was involved in a highly anticipated benefit show by Kanye West and Drake at the L.A. Coliseum. Silver Lake had also invested in Oak View Group, a venue management company with close ties to Live Nation.

16. According to the government, Defendant Michael Rapino complained to an Oak View Group executive that he viewed TEG as a competitor, and Oak View Group relayed to the investor that Live Nation was "not happy." Rapino then told Silver Lake he was "all in" with Oak View Group, "where the big play lies with venues — why insult me with this investment in ticketing/promotions etc."

5

17.     StubHub and TEG had recently entered into an agreement pursuant to which Ticketmaster would sell some tickets through StubHub. According to the DOJ's complaint, Live Nation sought to "frustrate" TEG by blocking those tickets, and as a result "hundreds of StubHub's customers were refused entry to the event."

18.     Live Nation then "threatened to pull its support from Oak View Group," and Irving Azoff, a powerful artist manager who was a co-founder of Oak View Group and, prior to that, Chairman and CEO of Ticketmaster, refused to allow TEG to promote shows with any of the artists he managed. Azoff told Rapino he would demand that Silver Lake sell TEG, and Rapino replied, "Love ya." According to the complaint, Silver Lake sought to sell TEG — and offered it to Live Nation.

19.     Live Nation initially viewed Oak View Group as one of its biggest competitor threats. But instead of competing, the companies colluded with each other to avoid competition and agree on a mutually beneficial scheme to violate the antitrust laws and increase profits at the expense of consumers.

20.     Oak View Group and its CEO, Defendant Leiweke, aided and abetted the Individual Defendants' breaches of fiduciary duty, operating as an "agent" for Live Nation and even calling his company Oak View Group a "pimp" and a "hammer" for Live Nation and sometimes delivering threats on behalf of Live Nation to venues that were considering dropping Ticketmaster for another ticket provider.

## II.     JURISDICTION AND VENUE

21.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between plaintiff and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder. The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22.     Venue is proper in the Central District of California under 28 U.S.C. §§ 1391 and 1401 because Live Nation maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of herein occurred in this District.

23.     Each defendant has minimum contacts with this District, as they have entered into contracts in this District, or have frequently traveled here, on Live Nation's business, or have authorized acts and actions that have had a sufficient impact in this District or on Live Nation's shareholders and investors residing here to justify the exercise of jurisdiction over them.

### III.   PARTIES

#### A. Plaintiff

24.     Plaintiff is a current shareholder of Live Nation.   Plaintiff has continuously held his Live Nation stock at all relevant times.

#### B. Nominal Defendant

25.     Nominal Defendant Live Nation is a Delaware company headquartered and operating at 9348 Civic Center Drive, Beverly Hills, California, 90210. Live Nation's shares trade on the NYSE under the ticker symbol "LYV." Live Nation is a citizen of California and Delaware.

#### C. The Individual Defendants

26.     Defendant Maverick Carter ("Carter") is a director of Live Nation and has been a director of the Company at all relevant times since 2018. Carter is also the long-time business manager of LeBron James and the CEO of SpringHill Entertainment.   Carter is a member of the Board's Nominating and Corporate Governance Committee. Carter lives in Los Angeles and is a citizen of California.

27.     Defendant Gregory B. Maffei ("Maffei") is a Director of the Company. He has served as a director since 2011 and as Chairman of the Board since 2013. He serves on the Board's Executive Committee.

7

28.     Defendant Ping Fu ("Fu") has served as a member of the Board since 2018 and serves as a member of the Board's Audit Committee.

29.     Defendant Michael Rapino ("Rapino") has served at all relevant times, and since approximately 2005, as the Company's Chief Executive Officer ("CEO"), President, and Director.   Rapino orchestrated the merger of Live Nation with Ticketmaster in 2010 and directly engaged in a substantial amount of the unlawful anticompetitive conduct alleged herein.  Rapino is a member of the Board's Executive Committee.  Rapino lives in Los Angeles and is a citizen of California.  Rapino was handsomely rewarded for his unlawful conduct in violation of the antitrust laws, receiving over $176 million in compensation between 2021 and 2023 alone:

| Name and Principal Position | Year | Salary ($) (1) | Bonus ($) (2) | Stock Awards ($) (3) | Option Awards ($) (3) | Non-Equity Incentive Plan Compensation ($) (4) | All Other Compensation ($) (5) | Total ($) * |
|---|---|---|---|---|---|---|---|---|
| **Michael Rapino** | 2023 | 3,000,000 | — | — | — | 18,700,000 | 1,738,317 | 23,438,317 |
| President, Chief Executive | 2022 | 3,000,000 | 6,000,000 | 116,741,758 | — | 12,000,000 | 1,263,807 | 139,005,565 |
| Officer and Director | 2021 | 2,562,500 | — | 10,584,334 | — | — | 695,630 | 13,842,464 |

30.     Defendant Jeffrey T. Hinson ("Hinson") has served as a member of the Board since 2005 and serves as Chair of the Audit Committee.

31.     Defendant Chad Hollingsworth ("Hollingsworth") has served as a member of the Board since 2020 and serves as Chair of the Compensation Committee.

32.     Defendant Randall T. Mays ("Mays") has served as a member of the Board since 2005 and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

33.     Defendant Latriece Watkins ("Watkins") has served as a member of the Board since 2021 and serves as a member of the Compensation Committee.

34.     Defendant Rich Paul ("Paul") has served as a member of the Board since April 2023.

35.     Defendant Dana Walden ("Walden") served as a member of the Board

8

from June 2017 until June 2023.

36. Defendant James S. Kahan ("Kahan") is a director of the Company and has been a director since 2007. He also serves on the Company's Audit Committee.

37. Defendant Jimmy Iovine ("Iovine") is a director of Live Nation and has served as such since 2014. Iovine also serves on the Board's Compensation Committee.

38. Defendant Joe Berchtold ("Berchtold") is the Company's President and Chief Financial Officer and is a citizen and resident of California.

39. Defendant Brian Capo ("Capo") is the Company's Chief Accounting Officer and is a citizen and resident of California.

40. Defendant John Hopmans ("Hopmans") is the Company's Executive Vice President and is a citizen and resident of California.

41. Defendant Michael Rowles ("Rowles") is the Company's General Counsel and Secretary and is a citizen and resident of California.

42. Defendant Daniel M. Wall ("Wall") is Live Nation's Executive Vice President for Corporate and Regulatory Affairs and is a citizen and resident of California.

43. Defendants Carter, Maffei, Fu, Rapino, Hinson, Hollingsworth, Mays, Paul, Watkins, Walden, Kahan and Iovine are sometimes referred to herein as the "Director Defendants."

44. The Defendants referenced in ¶¶ 26-42 are sometimes referred to herein, collectively, as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Live Nation Entertainment's reports to the U.S. Securities and Exchange Commission ("SEC"), press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants made specific false and misleading statements and/or reviewed and

9

approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

45.     Each Individual Defendant's primary liability and controlling person liability arises from the following facts, among others: (i) the Individual Defendants were high-level executives at the Company during the Relevant Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and were advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

**D. Defendant Leiweke**

46.     Defendant Timothy J. Leiweke ("Leiweke") is the Chief Executive Officer of Oak View Group, LLC, a professional sports and commercial real estate company.

47.     Live Nation, the Individual Defendants, and Leiweke are sometimes collectively referred to herein as the "Defendants."

10

## IV. THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A. General Duties as Directors and Officers

48.     By reason of their positions as Live Nation's officers and directors and because of their ability to control Live Nation's business and corporate affairs, the Individual Defendants owed Live Nation and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage Live Nation in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Live Nation and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

49.     Each director and officer owes to Live Nation and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of fair dealing, in the administration of Live Nation's affairs and in the use and preservation of its property and assets.

50.     The Individual Defendants, because of their positions of control and authority as directors and officers of Live Nation, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the Individual Defendants, as Live Nation's officers and directors, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     ensure that Live Nation was operated in a diligent, honest, and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of Delaware and the United States;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's

11

assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Live Nation conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Live Nation and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Live Nation's operations would comply with all laws and its financial statements filed with the SEC and disseminated to the public and Live Nation's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.     Each Individual Defendant, by virtue of his or her position as a director or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management

and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The Individual Defendants' misconduct complained of herein involves a knowing and culpable violation of their obligations as Live Nation's directors and officers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Live Nation's Board at all relevant times.

53.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.  Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

54.    At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

**B. Compliance with the Generally Accepted Accounting Principles**

55.    In issuing its financial statements, Live Nation was required to comply with the Generally Accepted Accounting Principles ("GAAP") — a common set of

13

accounting principles, standards, and procedures recognized by the accounting profession and used to compile financial statements.

56.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. § 210.10-01(a).

57.     During the Relevant Period, Live Nation stated in its annual reports on Forms 10-K that its financial statements were prepared in accordance with accounting principles generally accepted in the United States of America.

58.     In reality, however, the Individual Defendants failed to ensure that Live Nation adhered to GAAP during the Relevant Period.

**C. The Duty of Reasonable and Prudent Supervision**

59.     The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants are required to, among other things:

> (a)     refrain from acting upon material inside corporate information to benefit themselves;

> (b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

14

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)    remain informed as to how Live Nation conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)    ensure that Live Nation was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.    BREACHES OF FIDUCIARY DUTIES

60.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Live Nation and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Live Nation, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Live Nation, the absence of good faith on their part, or a reckless disregard for their duties to Live Nation and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Live Nation.

61.    The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to

15

make false and/or misleading statements and/or failing to disclose that:

(a)     the Company was not in compliance with the 2010 Consent Decree;

(b)     the Company's executives, including Defendant Rapino, were using Live Nation's market power to coerce, intimidate, and retaliate against venue operators who declined to use Ticketmaster;

(c)     that the Company's business model was premised on such unlawful conduct and violations of the 2010 Consent Decree and violations of the antitrust laws;

(d)     that, as a result, the Company's revenue and financial results were overstated;

(e)     that the Company's financial statements were not prepared in accordance with GAAP;

(f)     the Company lacked adequate internal controls and lacked the controls necessary to ensure compliance with the 2010 Consent Decree and Amended Final Judgment dated January 28, 2020, and/or that the Company's executives were intentionally overriding the controls that existed; and

(g)     as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

62.    In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of a securities class action lawsuit that alleges violations of federal securities laws, which lawsuit has already survived a motion to dismiss. In addition, the Defendants' breaches of fiduciary duty and aiding and abetting misconduct have resulted in the U.S. Department of Justice and multiple Attorneys General suing the Company for antitrust violations and failure to comply with the Amended Final Judgment dated January 28, 2020. As a result, Live Nation

16

has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI. CONTROL, ACCESS, AND AUTHORITY

63.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Live Nation.

64.     Because of their advisory, executive, managerial, and directorial positions with Live Nation, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Live Nation.

65.     Each of the Individual Defendants was the agent of each of the other Defendants and of Live Nation, and was at all times acting within the course and scope of such agency.

## VII. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

66.     In committing the wrongful acts alleged herein, the Individual Defendants and Defendant Leiweke have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

67.     During all times relevant hereto, the Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (a) the Company was continuing to violate the 2010 Consent Decree with the DOJ and multiple state Attorney Generals; (b) the Company's executives continued to violate the 2010 Consent Decree for over at least a decade, leading the DOJ and State Attorney Generals to force Live Nation and its subsidiary Ticketmaster to agree to additional restrictions in the Amended Final Judgment dated January 28, 2020; (c)

17

as a result, the Company's business model was premised on violations of the antitrust laws and willful disregard of the 2010 Consent Decree and Amended Final Judgment dated January 28, 2020; (d) as a result, Live Nation's revenues and financial results were overstated; (e) the Company's financial statements were not prepared in accordance with GAAP; (f) the Company lacked adequate internal and financial controls; and (g) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and Defendant Leiweke collectively and individually took the actions set forth herein.

68.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue false or misleading financial statements that failed to disclose the Company's inadequate internal controls and violations of law.

69.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and unjust enrichment; (b) disguise and misrepresent the Company's future business prospects; (c) disguise the Company's repeated and continuing violations of the 2010 Consent Decree and 2020 Amended Final Judgment and Oak View's active participation and assistance in such violations; and (d) engage in monopolistic conduct in violation of federal and state antitrust and unfair competition laws.

70.   The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, by falsely representing that Live Nation was in compliance with the 2010 Consent Decree and 2020 Amended Final Judgment, by engaging in efforts to monopolize the relevant markets, and by

18

purposefully, recklessly, or negligently causing the Company to release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

71.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.  FACTUAL ALLEGATIONS

### A. Live Nation Merges With Ticketmaster, But is Forced to Agree to a Consent Decree Due to the DOJ's Concerns About Anticompetitive Conduct

72.     Live Nation Entertainment, Inc. (NYSE:  LVY) is a publicly-traded corporation which provides concert promotion and ticketing services.

73.     Live Nation has market power in the concert promotion business since it is the largest concert promoter in the United States. As a promoter, Live Nation contracts with artists to arrange and market their concerts, assuming the associated financial risks or gains from the concerts' success or failure, and frequently selects the venue at which to stage concerts.

74.     Ticketmaster has market power in the ticketing business. As Dan Wall of Live Nation admitted in 2023, "Ticketmaster was clearly a dominant firm in primary ticketing in 2009 when the investigation took place. It had no meaningful competition outside of the ticketing segment focused on smaller clubs and theaters."[5] Ticketmaster

---

[5] *See* https://news.pollstar.com/2023/02/23/grossly-negligent-setting-the-record-straight-on-the-2010-live-nation-ticketmaster-merger-guest-post/ , last visited May 29, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

is now a subsidiary of Live Nation due to a 2010 merger of the two companies. Ticketmaster has been the largest primary ticketing service provider for major concert venues in the United States for at least three decades. As a primary ticketing provider, Ticketmaster enters into exclusive contracts with venues to provide them with a range of services necessary for the initial sale of tickets to concertgoers, and earns significant profits from fees imposed on each ticket sold.

75. In February 2009, Live Nation and Ticketmaster entered into an agreement to merge the two companies into a combined Live Nation Entertainment. At the time, Live Nation was an emerging direct competitor to Ticketmaster in primary ticketing services. After spending nearly two years evaluating, licensing, and developing its own ticketing platform, Live Nation had rapidly become America's second-largest primary ticketer at major concert venues.

76. Throughout 2009, the Antitrust Division of the United States Department of Justice conducted a pre-complaint civil investigation into the proposed merger. The Division ultimately concluded that, without modifications, the proposed merger would likely harm competition in the primary ticketing market, resulting in higher fees and less innovation and services for venues and consumers, and making it difficult for smaller firms to compete against the merged company's combined offerings.

77. On January 25, 2010, the United States and multiple Plaintiff States filed a civil antitrust complaint in Washington, D.C. seeking to enjoin the proposed merger of Live Nation and Ticketmaster. At the same time, the parties agreed to a proposed Final Judgment designed to eliminate the acquisition's anticompetitive effects. That proposed Final Judgment contained a variety of terms and commitments negotiated between the parties. Both Ticketmaster and Live Nation stipulated that the Court could enter the Final Judgment and committed to comply with its terms.

78. In the proposed Final Judgment dated July 30, 2010 (the "2010 Consent

20

Decree"), Ticketmaster and Live Nation committed to refrain from several practices in exchange for permission to merge. Defendants agreed in Section IX of the Final Judgment not to:

1. Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Retaliation Provision"]; and

2. Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Conditioning Provision"]; or

3. Condition or threaten to Condition the provision of Primary Ticketing Services to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for the Provision of Live Entertainment Events.

*See* Ex. A at Section IX.A.1-3.

**B. Live Nation Repeatedly Violates the Consent Decree for a Decade, Causing the DOJ to Force Live Nation to Enter Into a Revised Agreement that Required the Board of Directors to Assume Direct Supervision of the Consent Decree**

79. After the 2010 Consent Decree was entered, however, the Defendants continued to cause Live Nation to violate the terms of the Consent Decree.

80. As a result, on January 8, 2020, the DOJ filed a motion to modify the 2010 Consent Decree and enter an Amended Final Judgment. *See* Exhibit B. In the motion, the DOJ alleged that "Defendants have repeatedly and over the course of several years violated this Court's July 30, 2010, Final Judgment." Specifically, the DOJ alleged that "Defendants have repeatedly conditioned and threatened to

condition Live Nation's provision of live concerts on a venue's purchase of Ticketmaster ticketing services, and they have retaliated against venues that opted to use competing ticketing services – all in violation of the plain language of the decree." *See* Ex. B at p. 1.

81.   Ticketmaster and Live Nation denied the allegations but ultimately agreed to the United States' and some state co-plaintiffs' proposed amendments to the consent decree. The court entered the amended consent decree as an amended final judgment dated January 28, 2020 that, among other things, partially extended the decree's effective date through December 31, 2025.  *See* Ex. C.

82.   Defendants also agreed to submit to certain monitoring provisions, including appointment of an independent Monitoring Trustee, designating an Antitrust Compliance Officer, reporting and investigating potential violations, and notifying employees and customers of Defendants' obligations under the Final Judgment and encouraging all parties to report potential violations to the Department of Justice.   The Company partially described these additional restrictions and requirements as follows in its Annual Report dated February 22, 2024:

> Under the Amended Final Judgment (i) we may not threaten to condition (or actually condition) the provision of Live Nation concerts on a venue choosing Ticketmaster, (ii) we may not retaliate (i.e., withhold any Live Nation concerts) in response to a venue choosing a ticketing services provider other than Ticketmaster, and (iii) Ticketmaster may not share with Live Nation promoters certain information about other concerts that Ticketmaster tickets. In addition, pursuant to the Amended Final Judgment, (i) an independent monitor has been appointed to monitor and report to the DOJ on our compliance with the Amended Final Judgment, and investigate any potential violations thereof, (ii) we appointed an internal antitrust compliance officer and have conducted

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(and will continue to annually conduct) internal trainings to ensure our employees fully comply with the Amended Final Judgment; (iii) we provided, and will continue to provide, notice to current or potential venue customers of the Amended Final Judgment and its restrictions on our business conduct; (iv) we are required to notify the DOJ of any ticket company acquisitions regardless of whether they would fall within the normal notification rules, and (v) we are subject to an automatic penalty of $1,000,000 for each violation. We agreed to pay costs and fees for the independent monitor and the DOJ's past investigation and enforcement.

*See* Form 10-K dated Feb. 22, 2024, at p. 22.

83.     Pursuant to the Amended Final Judgment, Live Nation's Board of Directors was required to be provided with reports about the amended consent decree, notice of any violations of the consent decree, and assume overall responsibility for ensuring compliance with the consent decree.  For example, the Antitrust Compliance Officer – a new position that was required to be established as part of entry of the Amended Final Judgment -- must "provide Defendants' Management and Relevant Employees reasonable notice of the meaning and requirements of this Amended Final Judgment."  *See* Ex. C at Section XVII.B.3(b).  The Amended Final Judgment specifically defines "Management" as including "all directors and officers of Defendants." *Id.* at Section II.W.

84.     Live Nation's officers and directors are also required by the Amended Final Judgment to provide  the Antitrust Compliance Officer with "a certification that the person (i) has read and understands and agrees to abide by the terms of this Amended Final Judgment; (ii) is not aware of any violation of this Amended Final Judgment that has not been reported to Defendants; and (iii) understands that failure to comply with this Amended Final Judgment may result in an enforcement action for civil or criminal contempt of court."  *See* Ex. C at p. 35.

85.     Live Nation's officers and directors are also obligated to notify the Monitoring Trustee immediately of any violations of the Amended Final Judgment and to take action to correct the violations:

> Defendants shall:
>
> a.  Upon Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Amended Final Judgment, (i) promptly notify the Monitoring Trustee and take appropriate action to investigate, and in the event of a violation, terminate or modify the activity so as to comply with this Amended Final Judgment, (ii) maintain all documents related to any violation or potential violation of this Amended Final Judgment for a period of five years or the duration of this Amended Final Judgment, whichever is shorter, and (iii) maintain, and furnish to Plaintiffs upon request, a log of (a) all such documents for which Defendants claim protection under the attorney-client privilege or the attorney work product doctrine, and (b) all potential and actual violations, even if no documentary evidence regarding the violations exist.

*See* Ex. C at p. 36.

86.     Live Nation's officers and directors are also obligated to submit a written report of violations to the DOJ and Monitoring Trustee of each violation of the consent decree and maintain any and all communications reflecting the violation:

> Within thirty days of Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Amended Final Judgment, provide to Plaintiffs and the Monitoring Trustee a statement describing the violation or potential violation, which

24

shall include a description of any communications constituting the violation or potential violation, including the date and place of the communication, the persons involved, and the subject matter of the communication.

*See* Ex. C at p. 37.

87.   As a result, the Board of Directors, as well as the Company's officers, received regular reports of the violations of the consent decree and were required by law and the Amended Final Judgment to promptly terminate any antitrust violations. They failed to do so, as alleged more particularly below.  In addition, as the DOJ complaint makes clear, far from complying with the Amended Final Judgment, the Individual Defendants have caused Live Nation and Ticketmaster to engage in additional and more expansive violations of the antitrust laws than the violations charged in the original 2010 DOJ and State Attorneys General lawsuit.  As the DOJ complaint demonstrates:

In the years since, **Live Nation and Ticketmaster have committed additional, different, and more expansive violations of the antitrust laws compared to the narrower scope of the Section 7 case**. As detailed below, **Live Nation and Ticketmaster have engaged in ongoing unlawful monopolization of markets across the concert industry in violation of Section 2 of the Sherman Act and state analogues**. For example, since 2020, Live Nation and Ticketmaster have unlawfully coopted actual and potential rivals to remove competitive threats and cement Live Nation's and Ticketmaster's dominance of the concert industry. **In addition, as also detailed below, Live Nation and Ticketmaster have violated Section 1 of the Sherman Act and state analogues**. For example, since 2020, Ticketmaster has entered into long-term exclusive ticketing agreements with venues. The Section 7

25

consent decree-which addressed a claim different from those at issue here-has failed to restrain Live Nation and Ticketmaster from violating other antitrust laws in increasingly serious ways.[6]

88.     These facts, detailed in more particularity below, demonstrate that the Individual Defendants have caused Live Nation to operate the Company based on an unlawful business model, thereby breaching their duties of good faith and loyalty to Live Nation and its shareholders.

**C. The Individual Defendants' Role in Overseeing Risk Management at Live Nation**

89.     According to Live Nation's Proxy Statements, the Board, together with the Audit Committee, the Nominating, and the Compensation Committee as well as four risk committees, which are the Credit, the IAR, the Operations and Technology, and the ALCO committees, coordinate with each other to provide enterprise-wide oversight of the Company's management and handling of risk.

90.      These committees report regularly to the Board on risk-related matters and provide the Board with insight about Live Nation's management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational, and reputational risks.

91.      In addition, at meetings of the Board and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management, among others. Furthermore, current risk management issues are discussed regularly with the Board and its committees.

92.     Live Nation's 2022 Proxy Statement represented that:

The Audit Committee periodically reviews our policies and practices

---

[6] *See* May 23, 2024 DOJ Complaint at ¶67.

with respect to risk assessment and risk management, including discussing with management our major risk exposures and the steps that have been taken to monitor and control such exposures. The Audit Committee reports the results of its review to the board of directors. Matters of risk management are brought to the attention of the Audit Committee by our President and Chief Executive Officer, our President and Chief Financial Officer, our General Counsel, our Chief Accounting Officer, our external auditors and our Senior Vice President of Governance, Risk & Compliance, who regularly reviews and assesses internal processes and controls for ongoing compliance with internal policies, as well as for potential weaknesses that could result in a failure of an internal control process. Management reviews and reports on potential areas of risk at the request of the Audit Committee or other members of the board of directors, including, without limitation, privacy; information security; physical security; health and safety; environmental, social and governance (ESG); and compliance with laws and regulations such as the United States Foreign Corrupt Practices Act.

We believe that our compensation policies and practices do not create inappropriate or unintended significant risk to the company as a whole. We also believe that our incentive compensation arrangements provide incentives that do not encourage risk-taking beyond the company's ability to effectively identify and manage significant risks, are compatible with effective internal controls and our risk management practices and are supported by the oversight and administration of the Compensation Committee with regard to executive compensation programs.[7]

---

[7] *See* 2022 Proxy Statement at p. 8.

**D. The Individual Defendants Cause the Company to Issue False and Misleading Statements**

93.     On February 23, 2022, the Individual Defendants caused Live Nation to file an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for 2021 (the "2021 Form 10-K").  The 2021 Form 10-K Annual Report was prepared and signed by Defendants Rapino, Capo, Berchtold, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Walden and Watkins.

94.     The 2021 Form 10-K stated that:

From time to time, federal, state and local authorities and/or consumers commence investigations, inquiries or litigation with respect to our compliance with applicable consumer protection, advertising, unfair business practice, antitrust (and similar or related laws) and other laws. ***Our businesses have historically cooperated with authorities in connection with these investigations and have satisfactorily resolved each such material investigation, inquiry or litigation***.

95.     The Individual Defendants knew this statement was false because it suggested that Live Nation was cooperating with the DOJ antitrust investigation when in fact the exact opposite was true.  Live Nation was not cooperating and was taking active steps to thwart the DOJ investigation and the Senate Subcommittee investigations.   Moreover, at the time the statement was made, the Individual Defendants knew that Live Nation was in violation of the 2010 Consent Decree and the January 28, 2020 Amended Final Judgment because it had committed many violations of the consent decree and failed to report many violations to the Monitoring Trustee and DOJ, as it was required to do.

96.     The 2021 Form 10-K also stated:

***All three of our segments reported revenue growth due to more events, higher ticket sales and increased sponsor fulfillment over the past twelve months***. … ***The improvement resulted from***

28

*increased events, ticket sales and sponsor client activation* partially offset by higher selling, general and administrative expenses as we brought employees back from furlough and began hiring new roles to execute 2021 events and prepare for 2022. …

*Our Concerts segment revenue for the full year increased by $3.3 billion, from $1.5 billion in 2020 to $4.7 billion in 2021. The revenue growth was a result of increased shows and fans during the year as well as higher ancillary spend per fan and pricing at our events. … The improvement was primarily due to more shows this year, an increase in net ancillary spend per fan at our amphitheater and festival events, and growth in pricing across all venue types*. …

*Our Ticketing segment revenue for the full year increased by $946 million*, from $188 million in 2020 to $1.1 billion in 2021. ***The improvement resulted from an increase in ticket sales, stronger pricing, and a reduction in ticket refunds this year***. … The improvement was almost entirely driven by sales in the United States and the United Kingdom, largely for concert and sporting events. Pricing on our fee-bearing tickets increased by double-digits, reflecting strong consumer demand, particularly for premium seats and VIP experiences. Our resale business bounced back dramatically in the second half of the year and Q4 was our highest resale gross transaction value quarter ever, at over $1 billion. … The improvement in operating results was largely driven by increased ticket sales, strong ticket pricing and higher ancillary revenue streams.

97.     These statements were misleading because the Individual Defendants failed to disclose that a material factor driving the Company's financial performance in the Concerts and Ticketing segments was the Company's anticompetitive conduct,

29

which was unsustainable due to regulatory scrutiny and investigations of the Company's violations of antitrust and unfair competition laws.

98.     The 2021 Form 10-K also stated:

**Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences.** …

… **We believe that barriers to entry into the promotion services business are low** and that certain local promoters are increasingly expanding the geographic scope of their operations.

\* \* \*

**We experience competition from other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events.** …

**We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers.** Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

99.     The above statements were false and misleading because the Individual Defendants concealed and failed to disclose: (1) that Live Nation engaged in anticompetitive conduct, including unlawfully tying its Live Nation concert promotion

30

services to its Ticketmaster ticketing services and retaliating against venues that refused to use Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm.

100.    The statements above were also false because it was highly misleading to call competition in the live music industry "intense" when Live Nation possessed monopolistic market power and abused that power to stifle competition. It was misleading to say that the Company competes "primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" because Defendants omitted that a material factor in how the Company "competes" in the live music industry is through anticompetitive behavior in violation of antitrust laws. It was false and misleading to say that barriers to entry in the promotion services business are low because Defendants failed to disclose that the Company took efforts to raise those barriers to dissuade potential market entrants by, among other things, using predatory bidding practices subsidized by the Company's much more profitable Ticketing and Sponsorship operations. Similarly, it was misleading to say the Company experiences competition from primary and secondary ticketing service providers when in truth the Company was engaged in anticompetitive conduct aimed squarely at reducing or eliminating competition in those spaces and maintaining the Company's monopolistic position.

101.    On November 19, 2022, the Individual Defendants caused Live Nation to issue a statement on its website in response to the reports about the DOJ investigation, stating as follows:

> As we have stated many times in the past, **Live Nation takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation, let alone**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*orders that would require it to alter fundamental business practices*.

\* \* \*

*Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system. The market is increasingly competitive nonetheless*, with rivals making aggressive offers to venues. *That Ticketmaster continues to be the leader in such an environment is a testament to the platform and those who operate it, not to any anticompetitive business practices*. …

*Secondary ticketing is extremely competitive*, with Ticketmaster competing with StubHub, SeatGeek, Vivid and many others. *No serious argument can be made that Ticketmaster has the kind of market position in secondary ticketing that supports antitrust claims*.

For the past 12 years Live Nation has operated under a Consent Decree that among other things seeks to prevent anticompetitive leveraging of Live Nation promoted content to advantage Ticketmaster. *Pursuant to the Amended Decree voluntarily entered in 2020, Live Nation's compliance is monitored by a former federal judge. There never has been and is not now any evidence of systemic violations of the Consent Decree. It remains against Live Nation policy to threaten venues that they won't get Live Nation shows if they do not use Ticketmaster, and Live Nation does not re-route content as retaliation for a lost ticketing deal*.

102.   These statements were false and misleading because Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct, including

32

improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. It was false and misleading to say that Ticketmaster's "significant" share of the primary ticketing services market was due to the inherent superiority of Ticketmaster's services, when it was actually due in material part to anticompetitive practices the Company was engaged in. It was also false and misleading to say that Ticketmaster lacks the market position in the secondary ticketing market that can support antitrust claims, when in truth the Company did hold such a position and did abuse its monopoly power to stymie competition in violation of antitrust laws. Finally, it was false and misleading to say that conditioning or retaliating against venues was against Live Nation's policy when it, in fact, had engaged and continued to engage in that very same conduct.

103.    On January 24, 2023, Defendant Berchtold testified before the U.S. Senate Judiciary Committee and made the following statements:

> **We hear people say that ticketing markets are less competitive today than they were at the time of the Live Nation-Ticketmaster merger. That is simply not true.** In 2009 the Department of Justice alleged that Ticketmaster's market share was over 80%. It is a different story today. The most obvious change is the emergence of the enormous secondary ticketing market, in which Ticketmaster has a modest market share and many strong competitors. **But also in primary ticketing, the Ticketmaster of 2010 did not face the level of competition we face today from new competitors** including SeatGeek, AEG's AXS, and Eventbrite, along with established competitors including Tickets.com and Paciolan. **Today, there is intense competition for every ticketing**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*contract that goes out to bid—far more than there was in 2010.* Ticketmaster has lost, not gained, market share, and *every year competitive bidding results in ticketing companies getting less of the economic value in a ticketing contract while venues and teams get more*. The bottom line is that *U.S. ticketing markets have never been more competitive than they are today*, and we read about new potential entrants all the time.

104.   These statements were false and misleading because Berchtold failed to disclose that: (1) Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Thus, it was false and misleading to say that "Ticketmaster has a modest market share and many strong competitors" in the secondary ticketing market because Ticketmaster has a large and growing share and actively engages in anticompetitive conduct aimed at thwarting its competitors in that market. It was likewise false and misleading to say that "there is intense competition for every ticketing contract that goes out to bid" because Ticketmaster's use of long-term exclusive contracts prevents many contracts from going out to competitive bidders, and the Company uses anticompetitive conduct like conditioning and retaliation to stymie competition in the primary ticketing services market. Similarly, it was false and misleading to say that "U.S. ticketing markets have never been more competitive than they are today, and we read about new potential entrants all the time," because the Company was actively engaged in anticompetitive conduct in the ticketing markets and purposefully imposing significant barriers to entry to dissuade new entrants that could compete with Live Nation in those markets.

105.    On February 23, 2023, Live Nation Executive Vice President Dan Wall stated:

> So let's set the record straight: **the DOJ did not bring a vertical challenge to the Live Nation-Ticketmaster merger because it rightly concluded that no such case would hold up based on the facts**. **To the contrary, the DOJ recognized that vertical integration in live entertainment is efficient**, and consumers would be well served by competition from two vertically-integrated firms, Live Nation and AEG, and from non-integrated ticketing companies as well.
>
> Nevertheless, an extraordinary feature of the Consent Decree the DOJ obtained in resolving the case was that **even though the DOJ did not have a viable vertical challenge, it demanded and extracted substantial vertical relief.** Specifically, the DOJ insisted on there being a prohibition against two practices: requiring customers to take a package of Live Nation and Ticketmaster services when they only wanted to buy one part of the package, and retaliating against customers that chose not to buy one or more of those services by denying them other services or degrading the terms on which other services would be offered. **Those came to be known as Conditioning and Retaliation, respectively**. **Live Nation thought that both terms were unnecessary because it had no intention of forcing anything on customers or retaliating against customers who worked with other firms**. **But the DOJ was insistent, so to resolve the matter we agreed to put both terms in the Consent Decree executed in January 2010**, after which the merger closed.[8]

---

[8] Wall's comments are available at https://news.pollstar.com/2023/02/23/grossly-negligent-setting-the-record-straight-on-the-2010-live-nation-ticketmaster-merger-guest-post/.

35

106.   In Defendant Wall's February 23, 2023 statement, he also represented that:

- "As the years passed, Live Nation and Ticketmaster's competitors made a regular business practice out of complaining to the DOJ that the companies were violating the Decree by linking content to ticketing in one way or another.  There are frequent opportunities to complain, because ticketing competitions are happening all the time and Ticketmaster often wins."

- "Eventually, the DOJ launched an investigation . . .  Live Nation nevertheless found itself in an impossible position, because **there was no way to defend itself against DOJ's allegations without looking like it wanted to engage in Conditioning and Retaliation, which was (a) not true** and (b) a terrible look.  For example, consent decrees are contracts subject to ordinary rules of contract interpretation, and most of the DOJ's allegations depended on dubious contract interpretation arguments.  **But making arguments about what "Retaliation" means inevitably implies that Live Nation wants to engage in Retaliation and bargained for some ability to do so, which was not true then and is not true now**.  Live Nation CEO Michael Rapino was very keen to this risk.  He did not want the company fighting the DOJ over practices that had no value to Live Nation and violated his and the company's business ethics.  He decided to settle the matter and not fight over the DOJ's demand to enlarge the Decree to eliminate ambiguities.  In fact, **Live Nation accepted several new requirements in extending the Decree — establishing internal and external monitors and increasing training — because the company wanted to reduce any chance of such behavior and eliminate any**

36

1    *doubt of its intentions*."

2    107.   On February 23, 2023, Live Nation filed its Form 10-K for 2022 (the

3    "2022 Form 10-K"). Rapino, Berchtold, Capo, and each of the Company's Directors

4    signed the 2022 Form 10-K, which stated in relevant part:

5         ***Competition in the live entertainment industry is intense***. We

6         believe that we compete primarily on the basis of our ability to deliver

7         quality music events, sell tickets and provide enhanced fan and artist

8         experiences. … … ***We believe that barriers to entry into the***

9         ***promotion services business are low*** and that certain local promoters

10        are increasingly expanding the geographic scope of their operations.

11                                     * * *

12        We experience competition from other national, regional and local

13        primary ticketing service providers to secure new venues and to reach

14        fans for events. …

15        ***We also face significant and increasing competition from***

16        ***companies that sell self-ticketing systems, as well as from venues***

17        ***that choose to integrate self-ticketing systems into their existing***

18        ***operations or acquire primary ticketing service providers***. Our

19        competitors include primary ticketing companies such as Tickets.com,

20        AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek,

21        Ticketek, See Tickets and Dice; secondary ticketing companies such as

22        StubHub, Vivid Seats, Viagogo and SeatGeek; and many others,

23        including large technology and ecommerce companies that we

24        understand have recently entered or could enter these markets.

25        108.   These statements, which repeated substantially the same statements as

26   those contained in the 2021 Form 10-K, were false and misleading for the same

27   reasons stated above in ¶¶99-100.

28                                     37

109.   The 2022 Form 10-K also stated:

From time to time, federal, state and local authorities and/or consumers commence investigations, inquiries or litigation with respect to our compliance with applicable consumer protection, advertising, unfair business practice, antitrust (and similar or related laws) and other laws. Our businesses have historically cooperated with authorities in connection with these investigations and have satisfactorily resolved each such material investigation, inquiry or litigation.

110.   This statement was false and misleading because Defendants failed to disclose that: (1) Live Nation engaged in anticompetitive conduct and was not cooperating fully with the ongoing DOJ and Senate Subcommittee investigations; and (2) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm. Thus, it was false and misleading to suggest to investors that Live Nation had a practice of full cooperation with investigations, or that the Company was likely to "satisfactorily resolve[]" the DOJ and Senate investigations and potential litigation.

111.   The 2022 Form 10-K also stated:

All three of our segments had revenue growth in the year, with the largest increase coming from our Concerts segment as discussed below. Exceptionally strong demand for live events in the year led to record fan count and ticket sales, powering the concerts center of our business flywheel.

* * *

Our Concerts segment revenue grew by $8.8 billion, from $4.7 billion in 2021 to $13.5 billion in 2022. The revenue growth was a result of more shows and fans coming back to venues to enjoy their favorite artists. …

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Our Ticketing segment revenue grew by $1.1 billion, from $1.1 billion in 2021 to $2.2 billion in 2022.* Ticketing AOI for the year increased by $407 million, from $421 million in 2021 to $828 million in 2022. Along with an increase in ticket sales, upward pricing momentum and revenue generated from non-service fee sources, while direct costs rose to support higher operations and enterprise growth. Our fee-bearing ticket sales for the year were a record breaking 281 million, over 50 million higher than our previous best year. *Our resale business continued to grow, with nearly $4.5 billion dollars in gross transaction value for 2022, more than doubling resale gross transaction value in 2019.* It was our highest resale year ever, powered by both Concerts and all the major sports leagues. … *This is a reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe, giving us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward.*

112.   Each of these statements were misleading because Defendants failed to disclose that a material factor driving the Company's strong performance in the Concerts and Ticketing segments was the Company's anticompetitive conduct, which was unsustainable due to regulatory scrutiny and investigations of the Company's violations of antitrust laws.

113.   On May 23, 2024 – the same day the DOJ filed suit -- the Company posted information about the DOJ's Complaint and the allegations therein in blog format entitled "Breaking Down the DOJ Lawsuit" on its corporate website at https://www.livenationentertainment.com/2024/05/breaking-down-the-doj-lawsuit/.  The Director Defendants approved the blog post, which doubled down on many of the false and misleading statements the Company had repeated throughout

39

the Relevant Time Period.  For example, the Company stated in the blog post that:

- THERE IS MORE COMPETITION THAN EVER IN THE LIVE EVENTS MARKET;
- NET PROFITS SHOW LIVE NATION AND TICKETMASTER DO NOT WIELD MONOPOLY POWER;
- The DOJ complaint "ignores everything that is actually responsible for higher ticket prices, from rising production costs, to artist popularity, to 24/7 online ticket scalping that reveals the public's willingness to pay far more than primary ticket prices";
- It is also absurd to claim that Live Nation and Ticketmaster wield monopoly power;
- Every year, competition in the industry drives Live Nation to earn lower take rates from both concert promotion and ticketing.  The company is profitable and growing because it helps grow the industry, not because it has market power that squeezes more profit from less output
- One of the most jaw-dropping parts of today's complaint is the assertion that there are "barriers to entry";
- The complaint makes two principal claims concerning Live Nation's relationship with the Oak View Group ("OVG"), a venue management company.  The first qualifies as disingenuous, in that it is premised on the idea that OVG was a serious potential rival to Live Nation;
- OVG's behavior as a venue operator is fully consistent with every major arena and stadium in the country;
- [F]or the past four years, a Monitor appointed by DOJ itself has been keeping close tabs on Ticketmaster's negotiations with venues and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

ensuring that the company is not using concert "content" to drive ticketing deals. During that period, covering thousands of such deals, exactly one instance of potential concern has come to the Monitor's attention. Otherwise, the Monitor has praised Live Nation for its compliance program and an exemplary record of compliance. The one instance of a potential violation is about the Barclays Center in Brooklyn (referenced but not named in the complaint). What the Complaint alleges about that drama is generally untrue.

• [V]iolating the consent decree with respect to one venue out of thousands would not amount to a violation of the antitrust laws.

114.    The statements referenced in ¶¶109–113 were materially false and misleading because the Individual Defendants caused the Company to make false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, prospects, and performance.  Specifically, during the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Live Nation engaged in anticompetitive conduct, including improperly tying its underpriced Live Nation concert promotion services to its Ticketmaster services and retaliating against venues that spurned Ticketmaster and improperly restricting consumers' ability to resell tickets using competing secondary ticketing services; (b) as a result, Live Nation was reasonably likely to incur regulatory scrutiny and face fines, penalties, and reputational harm.; and (c) as a result of the above, the Company's statements were materially false and misleading at all relevant times.

**E. The Individual Defendants Caused the Company to Issue False and Misleading Statements in the Company's Proxy Statements**

115.    During the Relevant Time Period, Defendants knew that Live Nation's stock price was artificially inflated due to the Company's violations of the antitrust

41

laws and consent decree. Notwithstanding such knowledge, the Individual Defendants caused Live Nation to award massive cash bonuses to the Company's Executives Officers that were tied to short-term financial results, not long-term performance. The Directors sought shareholder approval of these massive incentive-based bonuses in the 2023 and 2024 Proxy Statements through misrepresentations that the bonuses were warranted based on the Company's excellent financial performance and the representation that the Company's compensation policies "do not encourage risk-taking beyond the company's ability to effectively identify and manage significant risks, are compatible with effective internal controls and our risk management practices and are supported by the oversight and administration of the Compensation Committee with regard to executive compensation programs."

116. The 2023 Proxy stated that:

> **We believe that our compensation policies and practices do not create inappropriate or unintended significant risk to the company as a whole. We also believe that our incentive compensation arrangements provide incentives that do not encourage risk-taking beyond the company's ability to effectively identify and manage significant risks, are compatible with effective internal controls and our risk management practices** and are supported by the oversight and administration of the Compensation Committee with regard to executive compensation programs.[9]

117. The 2024 Proxy identically stated that:

> **We believe that our compensation policies and practices do not create inappropriate or unintended significant risk to the company as a whole**. We also believe that **our incentive compensation arrangements provide incentives that do not encourage risk-taking**

---

[9] *See* 2023 Proxy at p. 8.

*beyond the company's ability to effectively identify and manage significant risks, are compatible with effective internal controls and our risk management practices* and are supported by the oversight and administration of the Compensation Committee with regard to executive compensation programs.[10]

118.   The 2024 Proxy also sought shareholder approval of the amendment of the Company's 2005 Stock Incentive Plan, as amended and restated as of March 21, 2024, referred to as the "Amended 2005 Plan."  The Individual Defendants told shareholders amendment of the Amended 2005 Plan was necessary to increase the number of shares available to be issued by 5,000,000 shares:

> The Amended 2005 Plan amends the Existing 2005 Plan by, among other things, increasing the maximum number of shares of common stock that may be issued or awarded under the Amended 2005 Plan by 5,000,000 shares to a total of 38,900,000. We are asking our stockholders to approve the Amended 2005 Plan because **we believe the availability of an adequate reserve of shares under the Plan is important to our continued growth and success, and our ability to attract and retain the best talent to drive this growth and success**.[11]

119.   These statements in the 2023 and 2024 Proxy Statements were materially misleading.  First, it was false that the Company's "compensation policies and practices do not create inappropriate or unintended significant risk to the company as a whole" and that "our incentive compensation arrangements provide incentives that do not encourage risk-taking beyond the company's ability to effectively identify and manage significant risks, [and] are compatible with effective internal controls and our

---

[10] *See* 2024 Proxy at p. 7.  The Proxy also stated that "We are confident that our overall compensation levels for our executive officers are appropriate and necessary in order to attract and retain the best executive talent to lead and grow our company." *Id.* at 37-38.

[11] *Id.* at 22.

risk management practices."  In fact, the Company's compensation policies did and do encourage excessive risk-taking because they provide for massive, unreasonable, and non-market-based compensation to Rapino and the other senior executives when the relevant targets are hit.  Indeed, the shareholders rejected the say-on-pay compensation awarded to Rapino and others in 2022 because the compensation was so excessive and unnecessary.  Second, the compensation policies in fact encouraged excessive risk-taking because they provide the Company's senior executives with massive incentive-based compensation even if the financial results and targets are achieved at the cost of violation of the antitrust laws.  The Directors know full well the Company's executive clawback policy, called the "POLICY FOR RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION," made effective as of October 2, 2023, only provides for clawback of incentive compensation if the Company is forced to formally restate its earnings.[12]

120.   By not causing the clawback policy to require recoupment of incentive compensation where executives cause Live Nation to violate the antitrust laws, the Company's Directors encouraged the very risk taking that the Proxy claimed they discouraged and prevented.  Indeed, when the clawback policy was adopted on October 3, 2023, the Directors had been on notice for almost four years that the DOJ alleged that the Company's executives had been systematically and regularly violating the 2010 Consent Decree, as reflected by entry of the Amended Final Judgment on January 28, 2020 – for which the Directors bear the responsibility of compliance. Further, at the time they approved the clawback policy, the Directors and Company had been in negotiations for many months with the DOJ in an effort to try to dissuade the DOJ and State Attorney Generals from suing Live Nation for repeated violations of the Amended Final Judgment.  Under such circumstances, the Directors breached

---

[12] The policy is available at https://investors.livenationentertainment.com/sec-filings/annual-reports/content/0001335258-24-000017/lyv-20231231xex97policyfor.htm.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

their duty of loyalty and care by not including a provision in the Company's clawback policy providing for recoupment of incentive compensation under circumstances where an executive causes the Company to violate the antitrust laws or provisions of the Amended Final Judgment.  The Directors also breached their duty of candor by misrepresenting that the Company's compensation policies discouraged excessive risk taking when they knew that was not true.

121.    While the full board approved the clawback policy, the Compensation Committee and Defendant Rapino primarily directed the approval of the compensation of the Company's executives, as disclosed in the Proxy: "Compensation determinations made during 2023 affecting our named executive officers were based primarily on the Compensation Committee's assessments of the appropriate levels of compensation required to recruit and retain top-level executive talent, based on industry standards and input from our Chief Executive Officer with respect to our other named executive officers, as well as the Compensation Committee's review of what we had paid executives in such roles historically."[13]  The Director Defendants who made such decisions were therefore the members of the Compensation Committee (Defendants Hollingsworth, Iovine, Mays and Watkins) and Defendant Rapino.[14]

122.    The 2023 and 2024 Proxy Statements also asked shareholders to approve the compensation paid to Live Nation's executive officers.

123.    The 2023 Proxy stated:

"RESOLVED, that the stockholders approve, on an advisory basis, the compensation paid to the named executive officers, as disclosed in the

---

[13] *See* 2024 Proxy at p. 41.

[14] The Proxy also stated that "The Compensation Committee approves all material compensation decisions for the named executive officers, including the grant of all equity awards. Michael Rapino, our President and Chief Executive Officer, annually reviews the named executive officers' performance, other than his own performance, which is reviewed solely by the Compensation Committee." *Id.* at p. 42.

company's proxy statement for the 2023 Annual Meeting of Stockholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the 2022 Summary Compensation Table and the other related tables and disclosure."

As described more fully in the Compensation Discussion and Analysis section of this proxy statement beginning on page 28, **we believe that our executive compensation program is reasonable, competitive and strongly focused on pay for performance principles**. Since our first say-on-pay vote was held in 2011, we have carefully assessed the results and made changes accordingly. At the 2020 Annual Meeting of Stockholders where our last say on pay vote was held, over 94% of the votes cast (excluding abstentions and broker non-votes) were in favor of our say-on-pay proposal. We emphasize compensation opportunities that reward our executives when they deliver targeted financial results. The compensation paid to our named executive officers varies depending upon the achievement of pre-established performance goals, which may be both individual and corporate. **Through stock ownership requirements and equity incentives, we also align the interests of our executives with those of our stockholders and the long-term interests of Live Nation**. Our executive compensation policies have enabled Live Nation to attract and retain talented and experienced senior executives and have benefited the company over time. **We believe that the fiscal year 2022 compensation paid to our named executive officers was appropriate and aligned with Live Nation's fiscal year 2022 results**.

/ / /

124.   The 2024 Proxy stated:

"RESOLVED, that the stockholders approve, on an advisory basis, the compensation paid to the named executive officers, as disclosed in the company's proxy statement for the 2024 Annual Meeting of Stockholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the Compensation Discussion and Analysis, the 2023 Summary Compensation Table and the other related tables and disclosure."

As described more fully in the Compensation Discussion and Analysis section of this proxy statement beginning on page 35, **we believe that our executive compensation program is reasonable, competitive and strongly focused on pay for performance principles**. Since our first say-on-pay vote was held in 2011, we have carefully assessed the results and made changes accordingly. We emphasize compensation opportunities that reward our executives when they deliver targeted financial results. The compensation paid to our named executive officers varies depending upon the achievement of pre-established performance goals, which may be both individual and corporate. **Through stock ownership requirements and equity incentives, we also align the interests of our executives with those of our stockholders and the long-term interests of Live Nation**. Our executive compensation policies have enabled Live Nation to attract and retain talented and experienced senior executives and have benefited the company over time. **We believe that the fiscal year 2023 compensation paid to our named executive officers was appropriate and aligned with Live Nation's fiscal year 2023 results**.

125.   The Directors represented to shareholders in the 2024 Proxy that the compensation awarded to Defendants Rapino and other executive officers (Berchtold, Capo, Hopmans and Rowles) was justified due to the Company's financial performance, but failed to disclose that such performance was only realized through Rapino's and the other executives' violations of the antitrust and unfair competition laws (and also their violations of the Amended Final Judgment).  The Proxy stated:

**Record 2023 Results Support Our Compensation Program**

Live music reached new heights in 2023, and all of the company's business segments delivered double digit growth in revenue and adjusted operating income ("AOI"; as defined below under "Compensation Philosophy and Objectives"). Our digital world empowers artists to develop global followings, while inspiring fans to crave in-person experiences more than ever.

In Concerts, we saw demand on the rise globally, as we grew attendance by 20% versus the prior year to over 145 million fans at over 50,000 events, which drove revenue up 39% versus 2022 to $18.8 billion. This attendance growth came from all markets, venue types and price points, highlighted by International markets up 25%, North America up 17%, and stadium shows up 60%. Our investment in artists was up over 40% compared to 2022, to over $13 billion, as we promoted more artists at every level, from clubs to stadiums, with nearly 7,000 touring artists in 40+ countries.

Venue Nation continued to elevate on-site experiences in 2023, with over 55 million fans at our operated venues and festivals, up 13% compared to 2022. Ancillary per fan revenue grew double-digits at operated venues versus 2022 as fans prioritized spending on enhanced hospitality, with amphitheaters up 10% to over $40, arenas and theaters

and clubs up double-digits globally, and major festivals (over 100,000 attendees) up double-digits globally.

In Ticketing, global fan demand and client wins drove results, with total fee-bearing gross transaction value (GTV) was up 30% compared to 2022, to $36 billion, with North America up 26% and International markets up 42%. 85% of the growth was driven by global concert ticket sales. Total tickets were up 13% to over 620 million tickets, including fee-bearing tickets up 17% to 329 million. We added 21 million net new client tickets compared to 2022, with approximately 80% coming from International markets.

Our Sponsorship & Advertising business's growth reflected the scale and unique nature of our global platforms. Revenue was up 13% compared to 2022, to over $1 billion. Over 100 partners with multi-million dollar, multi-year commitments accounted for approximately 80% of this revenue, with growth led by beverages, technology, and financial services sectors.

Our consolidated 2023 financial highlights include (full-year comparisons versus 2022):

- Revenue was up 36% to $22.7 billion;
- Operating Income was up 46% to $1.07 billion;
- AOI was up 32% to over $1.86 billion, doubling since 2019; and
- Operating Free Cash Flow of nearly $1.4 billion.

***Overall, we believe that our 2023 results demonstrate the effectiveness of our business model and underlie the key compensation decisions made by the Compensation Committee with respect to our executive officers***. Our continued successful

49

execution on our strategic plan has additionally resulted in stockholder value that has outpaced relevant benchmarks over the past five years.[15]

126.   These statements were false and misleading because the Company's financial performance was only achieved through the executives' conduct in causing the Company to violate the Amended Final Judgment and relevant antitrust and unfair competition laws.  Rapino and others had repeatedly directed retaliation against venues that refused to use Ticketmaster by refusing to book musicians, artists, and sports events in venues which refused Live Nation's demands to use Ticketmaster to provide ticketing services.  The executives had also achieved the financial results referenced in the Proxy by other unlawful conduct, as set forth more particularly herein.  The Proxy was misleading for failing to disclose that the Company's business model was premised on these types of unlawful tying and retaliatory measures that the Company and its Board had agreed not to engage in.  The Company's compensation policies thus failed to discourage this type of excessive risk-taking, which put the Company at material risk of fines, lawsuits, material costs, fees, and a DOJ lawsuit seeking the very breakup of Live Nation.

127.   The Company's executives received very large cash payments tied to one-year, short-term results.  Indeed, most of the incentive compensation was comprised of non-equity compensation as reflected in the following chart:

[The remainder of this page is intentionally left blank.]

---

[15] *See* 2024 Proxy at p. 36.

50



128. The Proxy disclosed that Rapino, Berchtold, Capo, Hopmans and Rowles had been awarded large cash bonuses tied to short-term performance, rather that equity awards with longer vesting periods:

> In February 2024 each named executive officer was awarded a cash
> performance bonus in respect of performance in 2023 as follows:
>
> **Michael Rapino**. Under the terms of his employment agreement, Mr.
> Rapino is eligible to receive an annual cash performance bonus with a
> target amount equal to $17.0 million during the calendar year in which
> the bonus was earned based on the achievement of performance targets
> established by the Compensation Committee (with a range to be
> established for achievement above or below such targets). Mr. Rapino's
> performance bonus eligibility for 2023 was based on the achievement
> of a company Adjusted Operating Income target. **In March 2023, the
> Compensation Committee set for Mr. Rapino a target cash
> performance bonus of $17.0 million**, based on the achievement of
> $1,510 million of company Adjusted Operating Income for the year,
> with the actual bonus to range between $15.3 million and $18.7 million

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   for achievement of between 90% and 110% of such performance

2   target, scaled based on straight-line interpolation.

3   In February 2024, the Compensation Committee determined that the

4   company had achieved 120% of its Adjusted Operating Income

5   performance target on a pro-forma, constant-currency basis.

6   ***Accordingly, the Compensation Committee awarded Mr. Rapino***

7   ***a cash performance bonus of $18,700,000 for 2023***, representing the

8   bonus amount due for attainment of 110% (which was the maximum

9   upward scaling) of targeted Adjusted Operating Income for the year.

10   **Joe Berchtold**. Under the terms of his employment agreement, Mr.

11   Berchtold is eligible to receive an annual cash performance bonus with

12   a target equal to 200% of his base salary based on the achievement of

13   performance targets established by the Compensation Committee. Mr.

14   Berchtold's cash bonus eligibility for 2023 was based on the

15   achievement of company Adjusted Operating Income. In March 2023,

16   the Compensation Committee set a target bonus of $4,000,000 for Mr.

17   Berchtold based on the achievement of $1,510 million of company

18   Adjusted Operating Income for the year, with the actual bonus to range

19   between $3.6 million and $4.4 million for achievement of between 90%

20   and 110% of such performance target, scaled based on straight-line

21   interpolation.

22   In February 2024, the Compensation Committee determined that the

23   company had achieved 120% of its Adjusted Operating Income

24   performance target on a pro-forma, constant-currency basis. As a

25   result, ***the Compensation Committee awarded Mr. Berchtold a***

26   ***cash performance bonus of $4,400,000 for 2023***, representing the

52

bonus amount due for attainment of 110% (which was the maximum upward scaling) of targeted Adjusted Operating Income for the year.

**Brian Capo**. Mr. Capo is eligible to receive an annual cash performance bonus with a target equal to 50% of his base salary based on the achievement of performance targets established by the Compensation Committee. Mr. Capo's cash bonus eligibility for 2023 was based on the achievement of company Adjusted Operating Income. In March 2023, the Compensation Committee set a target bonus of $212,500 for Mr. Capo based on the achievement of $1,510 million of company Adjusted Operating Income for the year, with the actual bonus to range between $191,250 and $212,500 for achievement of between 90% and 100% of such performance target, scaled based on straight-line interpolation.

In February 2024, the Compensation Committee determined that the company had achieved 120% of its Adjusted Operating Income performance target on a pro-forma, constant-currency basis. As a result, ***the Compensation Committee awarded Mr. Capo a cash performance bonus of $212,500 for 2023***, representing 100% of his targeted cash bonus for the year. However, $75,000 of this amount was withheld as repayment of the remaining amount owed from a 2021 cash bonus advance Mr. Capo received. As the full amount of the cash bonus advance was previously reported as compensation for 2021, only the net amount Mr. Capo actually received after repayment ($137,500) is considered 2023 compensation.

**John Hopmans**. Under the terms of his employment agreement, Mr. Hopmans is eligible to receive an annual cash performance bonus with a target equal to 100% of his base salary based on the achievement of

performance targets established by the Compensation Committee. Mr.
Hopmans' cash bonus eligibility for 2023 was based on the
achievement of company Adjusted Operating Income. In March 2023,
the Compensation Committee set a target bonus of $981,725 for Mr.
Hopmans, based on the achievement of $1,510 million of company
Adjusted Operating Income for the year, with the actual bonus to range
between $883,553 and $981,725 for achievement of between 90% and
100% of such performance target, scaled based on straight-line
interpolation.

In February 2024, the Compensation Committee determined that the
company had achieved 120% of its Adjusted Operating Income
performance target on a pro-forma, constant-currency basis. As a
result, **the Compensation Committee awarded Mr. Hopmans a
cash performance bonus of $981,725 for 2023**, representing 100% of
his targeted cash bonus for the year.

**Michael Rowles**. Under the terms of his employment agreement, Mr.
Rowles is eligible to receive an annual cash performance bonus with a
target equal to 150% of his base salary based on the achievement of
performance targets established by the Compensation Committee. Mr.
Rowles' cash bonus eligibility for 2023 was based on the achievement
of company Adjusted Operating Income. In March 2023, the
Compensation Committee set a target bonus of $1,650,000 for Mr.
Rowles, based on the achievement of $1,510 million of company
Adjusted Operating Income for the year, with the actual bonus to range
between $1,485,000 and $1,650,000 for achievement of between 90%
and 100% of such performance target, scaled based on straight-line
interpolation.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In February 2024, the Compensation Committee determined that the company had achieved 120% of its Adjusted Operating Income performance target on a pro-forma, constant-currency basis. As a result, **the Compensation Committee awarded Mr. Rowles a cash performance bonus of $1,650,000 for 2023**, representing 100% of his targeted cash bonus for the year.

129.   As these facts demonstrate, the Directors lavished Rapino, Berchtold, Capo, Hopmans and Rowles with large cash bonuses that could be achieved through short-term goals.   The Proxy admitted that the Compensation Committee only "grant[s] long-term equity incentive awards to the named executive officers in an effort to reward long-term performance" from "time to time."[16]

130.   The Compensation Committee also awarded Rapino 103,941 shares of restricted common stock (having a value equal to $9,600,000) "based on the attainment of qualitative performance targets established annually by the Compensation Committee."   Fifty per cent of such shares vested immediately and 50% vest on February 28, 2025, subject to Rapino's continued employment with the company.   However, even though this was considered 2023 compensation for Rapino, it was not listed in the Summary Executive Compensation chart in the 2024 Proxy, as disclosed by the Company: "Notwithstanding that it was made in respect of 2023 performance, this grant is considered compensation in respect of 2024 under the SEC's rules, and thus is not included in the Summary Compensation Table below, but will instead be included in such table in respect of 2024 in the company's 2025 proxy statement."[17]

131.   The 2024 Proxy contained the following Summary Compensation Table, which again does not include the $9.6 million value of the restricted stock granted to

---

[16] *See* Proxy at 45.

[17] *Id.* at 46.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Rapino in February 2024:

The following table sets forth summary information concerning the compensation for each of Live Nation's named executive officers for all services rendered in all capacities during the fiscal years ended December 31, 2023, 2022 and 2021.

| Name and Principal Position | Year | Salary ($) (1) | Bonus ($) (2) | Stock Awards ($) (3) | Option Awards ($) (3) | Non-Equity Incentive Plan Compensation ($) (4) | All Other Compensation ($) (5) | Total ($) * |
|---|---|---|---|---|---|---|---|---|
| **Michael Rapino** | 2023 | 3,000,000 | — | — | — | 18,700,000 | 1,738,317 | 23,438,317 |
| President, Chief Executive | 2022 | 3,000,000 | 6,000,000 | 116,741,758 | — | 12,000,000 | 1,263,807 | 139,005,565 |
| Officer and Director | 2021 | 2,562,500 | — | 10,584,334 | — | — | 695,630 | 13,842,464 |
| **Joe Berchtold** | 2023 | 2,000,000 | — | — | — | 4,400,000 | 85,940 | 6,485,940 |
| President and | 2022 | 1,300,000 | 6,000,000 | 42,401,504 | — | 2,600,000 | 54,591 | 52,356,095 |
| Chief Financial Officer | 2021 | 1,108,645 | — | 3,804,450 | — | — | 123,821 | 5,036,916 |
| **Brian Capo** | 2023 | 425,000 | — | 152,523 | — | 137,500 | — | 715,023 |
| Chief Accounting Officer (6) | 2022 | 425,000 | — | — | — | 137,500 | — | 562,500 |
| | 2021 | 336,995 | 350,000 | 207,925 | — | — | — | 894,920 |
| **John Hopmans** | 2023 | 981,725 | — | 21,392,825 | — | 981,725 | 11,005 | 23,367,280 |
| Executive Vice President (7) | 2022 | 981,725 | — | 3,706,691 | — | 981,725 | — | 5,670,141 |
| | 2021 | 838,557 | — | 145,566 | — | — | — | 984,123 |
| **Michael Rowles** | 2023 | 1,100,000 | — | — | — | 1,650,000 | 78,768 | 2,828,768 |
| General Counsel and | 2022 | 800,000 | — | 5,495,096 | — | 800,000 | 52,489 | 7,147,585 |
| Secretary | 2021 | 683,333 | — | 368,730 | — | — | 54,212 | 1,106,275 |

## IX. DEFENDANTS' UNLAWFUL AGREEMENTS AND DEFENDANT LEIWEKE'S INVOLVEMENT IN THE WRONGDOING

132. Defendant Timothy J. Leiweke is the CEO of Oak View Group, LLC.

133. Live Nation and Oak View Group have colluded and established a

56

partnership to allocate business lines, avoid competing with each other, and chart a mutually beneficial plan to cement Live Nation's dominance. Oak View Group is a leading American venue development and management company uniquely positioned to compete against Live Nation. Oak View Group has a portfolio of over 200 venues in the United States, including more than 100 venues that it manages but does not own. It was founded in 2015 by two industry giants whose combined resumes include roles as the former CEO of AEG, the former CEO of Ticketmaster, the former chairman of Live Nation, and the owner of The Azoff Company, whose portfolio includes one of the world's leading artist management companies: Full Stop Management.

134.   Oak View Group's experience and relationships with venues and artists make it particularly well-suited to be a real competitor to Live Nation in the United States concert promotion business.  Oak View Group's ownership structure also gives it a key asset any would-be promotions rival needs to compete against Live Nation: access to capital.  In 2018, private equity firm Silver Lake invested $100 million in Oak View Group, in which it now holds a controlling stake.

135.   Unsurprisingly, then, Live Nation recognized Oak View Group's promotion capability by categorizing Oak View Group as one of its "Biggest Competitor Threats" shortly after Oak View Group was founded. Over time though, Oak View Group and Live Nation voluntarily changed from competitors into partners who found it easier and mutually beneficial to work together rather than compete. Oak View Group now operates as an agent and a self-described "pimp" and "hammer" for Live Nation, often influencing venues and artists for the benefit of Live Nation. As Oak View Group's CEO recently emphasized to Live Nation's CEO, "[j]ust like I tell our folks we 100% always protect you and LN on your lanes," and "I always protect you on rebates, promotor position, ticketing." The cozy relationship between Live Nation and Oak View Group covers several areas that ultimately impact

fans.

136.    First, Live Nation and Oak View Group have agreed to a competitive detente in concert promotions to avoid competition between the two companies over artists and tours. In 2016, for example, after learning that Oak View Group offered to promote an artist Live Nation had previously promoted, Live Nation's CEO immediately emailed Oak View Group, warning that such competition would only lead to artists demanding more compensation. He wrote: "whats up? We have done his [touring] and vegas[.] Let's make sure we don't let [the artist agency] now start playing us off." Leiweke backed down: "Our guys got a bit ahead. All know we don't promote and we only do tours with Live Nation." Oak View Group's other co-founder followed up: "Growing pains," later noting that Oak View Group's executives "should never discuss comp [for artists]," and Oak View Group's talent buyers would work for Live Nation.

137.    This was not a one-off episode. In 2022, Live Nation's CEO again challenged Leiweke after learning that Oak View Group made another direct promotions offer: "who would be so stupid to do this and play into [the artist agent's] arms?" Leiweke again backed down: "We have never promoted without you. Won't." Leiweke later added that he was "[m]ore than happy to do these deals thru LN as I have always been aligned," and that "I never want to be competitors."

138.    As a Senior Vice President at Oak View Group explained to a colleague in 2019 when approached about potentially bidding on a tour: "It has been our policy to stay on the sidelines when it comes to buying and specifically promoting tour dates as we are cognizant not to compete with our partner Live Nation in this side of the business."

139.    Second, just as Oak View Group effectively ceded the concert promotions space to Live Nation, Live Nation effectively ceded its arena consulting business to Oak View Group. Shortly after its founding, Oak View Group formed an

alliance with venues to provide "insights and access to premier sports and live entertainment content," a venture that encroached on Live Nation's own consulting business, Live Nation Arenas. To relieve this competitive friction, Oak View Group's CEO proposed that Live Nation Arenas combine with Oak View Group and that the head of Live Nation Arenas join Oak View Group's alliance board of advisors, which he did. In his proposal, Oak View Group's CEO warned the head of Live Nation Arenas, "[w]e are experiencing Arena's that want to play us off one another."

140. Live Nation identified three paths forward with regard to Oak View Group: "1) Lead 2) Follow 3) or get out of the way." Live Nation ultimately decided to "get out of the way" in deference to Oak View Group, just as Oak View Group agreed to get out of the way of Live Nation for promotions. In some instances, Live Nation Arenas and Oak View Group decided to partner with one another for agreements with venues, sharing the profits instead of competing for the contracts. The relationship between Live Nation and Oak View Group is so cozy that these venue partnerships were entered into on nothing more than verbal agreements. Through its venue development deals, venue management deals, and venue alliances, Oak View Group can help direct Live Nation content to venues across the country and demand or influence the use of Ticketmaster at these venues.

141. Third, Live Nation exploits its long-term relationship with Oak View Group to flip venues to Ticketmaster, further cementing Ticketmaster's power. In 2022, Live Nation and Oak View Group entered into a long-term agreement. Since then, Oak View Group has recognized it has a significant financial interest in maintaining existing Ticketmaster contracts at its venues and converting other venues to Ticketmaster. Oak View Group has pushed through these new contracts, subverting the ticketer selection process Oak View Group runs on behalf of its clients. As Oak View Group's CEO explained to Live Nation's CEO, the deal "allows us to tie up all Owned and Operated facilities to 10-year deals, develop a standard A and B

market deal for all future projects and to convert all OVG 360 deals to TM now or as they expire for 10 years... Appreciate the consideration and partnership and all of us will work diligently on this so we are always aligned with TM."

142.   Oak View Group projected it would flip at least 22 venues to Ticketmaster over the next four years. As venue manager, Oak View Group is able to control which non-incumbent ticketing services are invited to submit bids for ticketing service proposals and often only invites Ticketmaster. By advocating for Ticketmaster over rival ticketers, Oak View Group takes off the table several of the limited opportunities rival ticketers have to compete against Ticketmaster. So far, Oak View Group is on pace to hit its goal: in 2023 Oak View Group converted six venues to Ticketmaster.

143.   In addition to causing Live Nation to violate the 2010 Consent Decree and 2020 Amended Final Judgment by the conduct alleged herein, including threatening venues that refused to use Ticketmaster, the Defendants also caused Live Nation to engage in monopolistic conduct.   Defendant Leiweke engaged in a conspiracy with Live Nation's CEO and others at Live Nation to further such conduct by agreeing to divide up markets and agreeing not to compete with each other.

144.   Live Nation maintains and exercises its power through a coordinated pattern of anticompetitive conduct that serves a variety of ends: expanding its scope and reach into every crevice of an increasingly more complex and interconnected ecosystem, eliminating rivals, continuing to increase barriers to entry, and inhibiting competition on the merits.

145.   During the Relevant Period, the Defendants employed various strategies and engaged in a conspiracy and concerted, ongoing course of conduct over more than a decade that was (and continues to be) characterized by several forms of anticompetitive conduct, including but not limited to:

• Live Nation enters into agreements with rivals not only to remove

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

them, but also to cement and expand its dominance.

• Live Nation engages in threats (directly or through intermediaries) and pressure campaigns to nullify rivals or nascent threats.

• Live Nation relies on "carrots and sticks" to induce venues to sign long-term exclusive ticketing contracts that offer durable protection for Ticketmaster's dominance. Venues have seen that if they sign with a Ticketmaster competitor, they risk losing lucrative Live Nation concerts and may suffer other harmful retaliation.

• Live Nation conditions artists' access to its vast and desirable network of amphitheaters and other venues on choosing Live Nation as the promoter, which enables the company to expand its control over artists and third-party venues alike.

• Live Nation removes and neutralizes potential competitors and nascent threats via acquisitions, joint ventures, and other contractual agreements.

146.    In violation of federal and state antitrust and unfair competition laws, Defendants Rapino and Leiweke have colluded and established a partnership on behalf of Live Nation and Oak View to allocate business lines, avoid competing with each other, and chart a mutually beneficial plan to cement Live Nation's dominance.

147.    The Defendants have also caused Live Nation to abuse its market power to keep other rivals from expanding in the concert promotions market in the United States. For example, in 2021, Live Nation threatened commercial retaliation against private equity firm Silver Lake, unless one of its portfolio companies, TEG, stopped competing with Live Nation for artist promotion contracts in the United States. These threats ultimately succeeded, and Silver Lake has tried to sell TEG altogether.

148.    Prior to the TEG incident, Live Nation and Silver Lake had a relationship through Silver Lake's ownership of Oak View Group, which aided and

61

abetted Live Nation's anticompetitive scheme. But TEG's attempt to expand its role in the live music industry in the United States, which was a clear direct threat to Live Nation, quickly threatened to impair that relationship.

149.    Live Nation's effort to eliminate competition with TEG took place at the highest levels. In 2021, Defendant Rapino -- Live Nation's CEO -- complained to Oak View Group's co-founder that TEG was "[f]ull on competitors." Oak View Group, in response, told Silver Lake that Live Nation was "not happy." Defendant Rapino then escalated his complaints to Silver Lake directly, conveying: "I am all in on [Oak View Group] where the big play lies with venues - why insult me with this investment in ticketing/promotions etc."

150.    Later in 2021, Live Nation learned that TEG made offers to prominent artists in the United States and succeeded in securing a big-name artist for a concert at the Los Angeles Coliseum. In response, Live Nation used its exclusive ticketing deal with the venue to frustrate TEG's concert. For this concert, TEG reached an agreement with StubHub where TEG would sell a certain number of tickets on StubHub's platform. In response, Live Nation, through its subsidiary Ticketmaster, which purportedly was the exclusive ticketer for all shows at the venue, threatened to deny entry to any fan using a StubHub-issued ticket. Ultimately, StubHub stopped selling tickets and attempted to work with Ticketmaster to fulfill the tickets that it had already sold. But Ticketmaster failed to fulfill many of those tickets to StubHub's customers, and hundreds of StubHub's customers were refused entry to the event.

151.    After learning about the TEG concert, Defendant Rapino again threatened Silver Lake, TEG, and Oak View Group. As Rapino put it, he "fail[ed] to understand" why Silver Lake "continue[d] to invest in a business that competes with LN/OVG." Live Nation threatened to pull its support from Oak View Group and instead back an Oak View Group competitor unless TEG stopped competing with Live Nation in the United States:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

I can assure you the OVG investment is a much bigger win than T[E]G LN declared to back OVG vs other developers or going solo and it's been a huge win for both sides - we have over 20 global arenas in development that neither could do without the other ... do you really want LN backing [AEG's venue development and management company] . . . ? Seems like a dumb trade off??

152.   The co-founder of Oak View Group, who refused to allow TEG to promote any of his large roster of artist clients, thereafter informed Live Nation that he was going to demand that Silver Lake sell TEG. Defendant Rapino replied, "Love ya."

153.   TEG soon stopped competing for concert promotions in the United States. Silver Lake now seems "intent on dumping teg" and has asked, through the founder of Oak View Group, whether Live Nation would be interested in purchasing TEG.

154.   Defendants have also unlawfully caused Live Nation to employ a "carrot and stick" approach to eliminating competition.  Live Nation puts a "choice" to venues: use Ticketmaster and potentially receive a significant payment for long-term exclusivity or use another ticketer and risk losing access to the vast array of Live Nation assets, including lucrative concerts. Sometimes Live Nation is bold and communicates this threat directly. Other times, the expression of the threat may be implicit, but the meaning is self-evident. And in some circumstances, Live Nation deploys its extensive network of intermediaries to communicate this "choice." Sometimes, the "choice" does not have to be communicated at all. It is well understood across the live concert industry, as a result of Live Nation's historical conduct and exactly as Live Nation intended, that choosing ticketers other than Ticketmaster carries enormous risk and financial pain.

155.   Defendant Rapino told the industry in 2019 that Live Nation decides to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

host concerts "where we make the most economics," which usually means venues where Ticketmaster holds the primary ticketing contract. Venues considering primary ticketing options understand all too well the risks of switching to another ticketer, and some even model the loss they would suffer if they switched and lost access to some of Live Nation's concerts. The threat of steering shows away from venues allows Live Nation to exercise its monopoly power to get better promotions deals and impose Ticketmaster on venues.

156.   Live Nation has a number of punitive tools it can use to retaliate against venues, even without making good on the catastrophic threat of pulling or moving concerts completely. In addition to reducing the number of concerts it places at a venue, Live Nation has the power to move shows to less desirable and less lucrative dates, curtail promotional efforts, and force venues to disable secondary ticketing on non-Ticketmaster platforms (potentially making unsure fans less likely to commit to tickets in the first place and frustrating fans who do buy tickets but change plans).

157.   In 2021, Live Nation threatened retaliation against a venue that had decided to switch from Ticketmaster to SeatGeek for primary ticketing. That venue had decided to switch, in part, because SeatGeek offered to share a greater percentage of the fees associated with secondary ticketing.

158.   Upon learning about the potential switch, a senior Live Nation executive texted a not-so-subtle warning to the venue's CEO: "Apparently seatgeek are telling [nearby venue] and others that they have a contract deal with you guys already?? Anyways should think about bigger relationship with LN not just who is writing a bigger sponsorship check." A few days later, Defendant Rapino emailed the venue's owner that Live Nation "will be very concerned that seatgeek a secondary provider will be selling our LN artist tickets when not authorized by the artist."

159.   Once the venue switched to SeatGeek, Live Nation followed through on its threats, re-routing concerts to other venues. Live Nation's promotions business

64

also demanded that the venue disable secondary ticketing on SeatGeek's platform for all Live Nation-promoted concerts, depriving the venue and SeatGeek of secondary fee revenue.

160.  The Individual Defendants also caused Ticketmaster to employ long-term, exclusive agreements with venues to eliminate competition in the live concert industry, and on primary ticketing in particular. These agreements make Ticketmaster the sole provider of primary ticketing services for all or nearly all events held at a venue for multiple years, sometimes as long as 14 years.

161.  Ticketmaster's exclusive agreements cover more than 75% of concert ticket sales at major concert venues, foreclosing a substantial share of the primary ticketing market from rival ticketers. In 2022 alone, for example, Ticketmaster signed several lengthy deals with major concert venues.

162.  Ticketmaster is quite clear about why it focuses on these deals: they are, in Ticketmaster's own words, a "[h]edge against significant improvements by the competition or even a new competitor" because the "client is under contract for longer and not able to leave [Ticketmaster] or price the competition's offer into our new deal for an extended time." In other words, even if a rival ticketer were to offer a better price, a better product, or simply a better ticketing experience, a Ticketmaster-exclusive venue would not be able to choose the rival for a long time, often a decade.

163.  Before its long-term exclusive agreements expire, Ticketmaster also works defensively to deny rivals the opportunity to compete at all. Ticketmaster often renews or extends these ticketing agreements before they expire, thus preventing rivals like SeatGeek and AXS from being able to bid at all. This not only eliminates the chance Ticketmaster will lose the contract but also mitigates competitive pressure on Ticketmaster to improve the terms of the contract.

164.  To ensure their existing locked-in venues agree to early renewals and thereby block competition from a rival for the contract, Ticketmaster used COVID-

65

19 as an opportunity to extend the terms of its existing long-term venue ticketing agreements by one year. After one venue resisted, telling Ticketmaster that it disagreed and intended to sign with a rival, Ticketmaster's counsel wrote: "Any effort by [the venue] to switch ticketing service providers before [the extension date] would be a breach of contract, and any announced intention to do so would be an anticipatory breach." In a conversation between that venue's CEO and Live Nation executives, Defendant Rapino indicated Live Nation would "drop" the contractual dispute if the venue agreed to enter into a new ticketing contract with Ticketmaster, but not if the venue went with a rival.

165.   These strategies are part of a deliberate and defensive series of actions and decisions designed to lock up venues, lock out competitors, and hold the industry hostage from innovation and evolution.

166.   Live Nation's control over a significant number of concert venues not only facilitates maintenance of Ticketmaster's monopoly in ticketing but also serves to limit artists' options and exclude rival promoters. Live Nation has a longstanding policy going back more than a decade of preventing artists who prefer and choose third-party promoters from using its venues. In other words, if an artist wants to use a Live Nation venue as part of a tour, he or she almost always must contract with Live Nation as the tour's concert promoter.

167.   Live Nation's policy of restricting the use of its venues is particularly problematic for artists seeking to tour in large amphitheaters where Live Nation enjoys monopoly power. These artists – many of whom have well-established, dedicated fan bases but have not yet matured their fan base to play larger stadiums – are effectively forced to hire Live Nation as their promoter or risk being locked out of dozens of desirable Live Nation-controlled large amphitheaters in the United States. Live Nation's amphitheater portfolio includes at least 40 of the top 50, and more than 60 of the top 100 amphitheaters in the United States. No other entity owns more than a

handful of amphitheaters in either set. This network of large amphitheaters has allowed Live Nation to attain a greater than 70% market share in large amphitheater promotions and become by far the largest promoter of national amphitheater tours. Put differently, it is nearly impossible for an artist to create a tour that includes stops at amphitheaters without Live Nation.

168.    Live Nation senior executives know the Company has restricted the use of its amphitheaters and other venues for years and often makes the choice to sacrifice additional profits the Company could be earning as a venue owner by opening its venues to non-Live Nation promoted shows that are available to play at those venues. A 2018 internal Live Nation analysis found that its top 10 amphitheaters are "dark," or without shows, "on nearly 50% of their Saturdays in the summer," the highest performing day of the week during the primary performance season. Relatedly, a 2022 analysis found that Live Nation's top 15 amphitheaters are, on average, dark on eight Saturdays between June and September. Live Nation also recognizes its amphitheater portfolio gives it control over artists pursuing an amphitheater tour. For example, a senior Live Nation executive directed his employees not to increase guaranteed payments offered to artists they know are looking for "True Amp Tours." This is because Live Nation recognizes these artists almost certainly will need to play several shows at Live Nation's stable of top amphitheaters, and to do so, they will need to sign with Live Nation as their promoter: "we know [artists] are likely playing amphitheaters and we are going to get those in most cases." Because many artists sign with Live Nation to promote their entire tour – both amphitheater and non-amphitheater shows alike – Live Nation's restrictive amphitheater policies help the Company extend its reach to promoting artists in other venues as well. Further, because relationships are so important in the promotions business, once Live Nation uses its exclusionary amphitheater policy to lock in emerging artists early in their careers, they are able to keep some of those artists as they graduate to higher capacity

1    venues, such as arenas and stadiums.

2         169.   In order to unlawfully protect and expand its positions across the live

3    entertainment industry, the Individual Defendants have caused Live Nation to pursue

4    a strategy of acquiring nascent threats and neutralizing rivals. This strategy has

5    included acquiring promoters, amphitheaters, festivals, other venues, and even small

6    ticketers, as well as entering into long-term exclusive booking contracts with many

7    venues. Although many of these rivals were relatively small at the time of their

8    acquisitions, Live Nation's internal documents show that the Company viewed them

9    as some of its "biggest" threats. This is unsurprising given the lack of sizeable, scaled,

10   national competitors in the markets in which Live Nation operates. Live Nation's

11   conduct has thwarted growth of its rivals and disincentivized investment that might

12   have led to entry. Nonetheless, Live Nation viewed many of these acquisitions of

13   competitors on the "edge" as necessary to protect its "moat" around the live concert

14   ecosystem.

15        170.   Over the past decade, Live Nation has acquired dozens of companies

16   across the industry to expand its reach and entrench its positions.

17        171.   Live Nation has recognized that one of its "Biggest Competitor Threats"

18   is smaller and regional independent promoters that have the ability to "com[e] in from

19   the edges creating events, opening venues, and purchasing artist inventory." To

20   address this disruptive potential, the Individual Defendants have caused Live Nation

21   to pursue an aggressive plan to acquire or co-opt key independent promoters, even

22   when the economics of a particular deal did not make sense for its promotions

23   business.

24        172.   By causing Live Nation to engage in such unlawful conduct and/or

25   aiding and abetting such conduct, Defendants caused Live Nation to violate the

26   antitrust laws and the 2010 Consent Decree and 2020 Amended Final Judgment, thus

27   causing the DOJ and State Attorneys General to sue Live Nation and seek a break-up

28

                                        68

of Live Nation and Ticketmaster, thus harming the Company and its long-term shareholders.

## X. UNJUST COMPENSATION RECEIVED BY THE INDIVIDUAL DEFENDANTS

173.   During the time they were committing their breaches of fiduciary duty and unlawful conduct, the Individual Defendants caused Live Nation to award certain Defendants unjust compensation.  For example, Rapino was handsomely rewarded for his unlawful conduct in violation of the antitrust laws, receiving over $176 million in compensation between 2021 and 2023 alone:

| Name and Principal Position | Year | Salary ($) (1) | Bonus ($) (2) | Stock Awards ($) (3) | Option Awards ($) (3) | Non-Equity Incentive Plan Compensation ($) (4) | All Other Compensation ($) (5) | Total ($) * |
|---|---|---|---|---|---|---|---|---|
| **Michael Rapino** | 2023 | 3,000,000 | — | — | — | 18,700,000 | 1,738,317 | 23,438,317 |
| President, Chief Executive | 2022 | 3,000,000 | 6,000,000 | 116,741,758 | — | 12,000,000 | 1,263,807 | 139,005,565 |
| Officer and Director | 2021 | 2,562,500 | — | 10,584,334 | — | — | 695,630 | 13,842,464 |

174.   The Company's Directors – specifically Defendants Hollingsworth, Iovine, Mays, and Watkins, who serve on the Compensation Committee – awarded the following executives the following unjust compensation from 2021 to 2023:

| Name | Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity | All Other | Total |
|---|---|---|---|---|---|---|---|---|
| **Joe Berchtold** | 2023 | 2,000,000 | — | — | — | 4,400,000 | 85,940 | 6,485,940 |
| President and | 2022 | 1,300,000 | 6,000,000 | 42,401,504 | — | 2,600,000 | 54,591 | 52,356,095 |
| Chief Financial Officer | 2021 | 1,108,645 | — | 3,804,450 | — | — | 123,821 | 5,036,916 |
| **Brian Capo** | 2023 | 425,000 | — | 152,523 | — | 137,500 | — | 715,023 |
| Chief Accounting Officer (6) | 2022 | 425,000 | — | — | — | 137,500 | — | 562,500 |
| | 2021 | 336,995 | 350,000 | 207,925 | — | — | — | 894,920 |
| **John Hopmans** | 2023 | 981,725 | — | 21,392,825 | — | 981,725 | 11,005 | 23,367,280 |
| Executive Vice President (7) | 2022 | 981,725 | — | 3,706,691 | — | 981,725 | — | 5,670,141 |
| | 2021 | 838,557 | — | 145,566 | — | — | — | 984,123 |
| **Michael Rowles** | 2023 | 1,100,000 | — | — | — | 1,650,000 | 78,768 | 2,828,768 |
| General Counsel and | 2022 | 800,000 | — | 5,495,096 | — | 800,000 | 52,489 | 7,147,585 |
| Secretary | 2021 | 683,333 | — | 368,730 | — | — | 54,212 | 1,106,275 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

175.   The compensation awarded to such executives was also unjust because the executives caused Live Nation to commit egregious violations of the antitrust laws during 2021-2023, thus subjecting the Company to substantial fines, penalties, and a possible breakup by the Department of Justice.  Causing the Company to earn short-term and unlawful profits through antitrust violations was exactly the type of excessive risk-taking that the Directors and members of the Compensation Committee told shareholders that the Company's policies protected against.  Clearly, the Company's compensation policies encouraged excessive risk taking and unlawful conduct, not prevented it.   In addition, the available evidence suggests that the Company's executives were knowingly violating the Company's policies designed to prevent unlawful antitrust violations; the Directors were aware of the derogation of Company policies and failed to take corrective action against the executives.

176.   In addition, the 2022 compensation, which alone amounted to almost $200 million, was so excessive and unwarranted that 53% of the Company's shareholders voted against it at the 2023 Annual Meeting when the compensation was submitted for their approval.  *See, e.g.*, Dave Clark, "Live Nation Investors Slam Excessive Pay for Rapino, Executives," TICKET NEWS, June 21, 2023 ("The salaries for 2022 of CEO Michael Rapino and other key figures like Joe Berchtold drew fire from a majority of shareholders, who voted against ratifying the figures paid out in salary and bonuses.").

177.   Despite the fact that the Company's shareholders voted against the 2022 compensation to the Company's executive officers, Director Defendants Hollingsworth, Iovine, Mays, and Watkins, who serve on the Compensation Committee, refused to rescind the compensation or reduce it in any way.  In the Company's 2024 Proxy Statement, moreover, the Directors acknowledged the fact that the shareholders rejected the 2022 compensation but then simply ignored the shareholder vote, claiming that there were "unique circumstances" present in 2022:

70

"the Compensation Committee does not consider the 2023 say on pay results to be a rejection of the company's core compensation program, but rather a response to unique circumstances present in 2022 (the fiscal year covered by the 2023 say on pay vote)." *See* 2024 Proxy Statement at p. 39. Director Defendants Hollingsworth, Iovine, Mays, and Watkins breached their fiduciary duties by awarding the excessive and unjustified 2022 compensation and then later by completely ignoring the shareholder vote in 2023 that rejected the compensation.

## XI.   DAMAGES TO LIVE NATION

178. Live Nation has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

179. As a direct and proximate result of the Individual Defendants' conduct, Live Nation has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) The Amended Final Judgment required Live Nation to pay, and it paid, $3 million to the government to reimburse the government for its costs in bringing the motion. *See* Ex. C at p. 40;

(b) Live Nation has been forced to appoint and pay the Monitoring Trustee and Antitrust Compliance Officer as a result of its violations of the Consent Decree and Amended Final Judgment, which costs are substantial;

(c) Additional legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws and for violations of the antitrust laws, including the DOJ's May 23, 2024 lawsuit and many private civil lawsuits seeking damages under federal and state antitrust and unfair competition laws;

(d) loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual

71

Defendants' false statements and lack of candor to the marketplace;

(e)     amounts paid to outside lawyers, accountants, and investigators in connection with Live Nation's internal investigation; and

(f)     loss of revenues and profits due to the wrongdoing.

## XII.   DERIVATIVE ALLEGATIONS

180.   Plaintiff brings this action for the benefit of Live Nation to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

181.   Live Nation is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

182.   Plaintiff has continuously owned Live Nation common stock at all relevant times.  Plaintiff therefore will adequately and fairly represent the interests of Live Nation in enforcing and prosecuting its rights.

183.   Live Nation's Board at the time this action was initiated consisted of the following directors:  Maffei, Carter, Fu, Hollingsworth, Hinson, Iovine, Kahan, Mays, Paul, Rapino, and Watkins.   Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

184.   Where the board consists of an odd number of directors, plaintiff need only show that a majority of the directors lack independence or face a substantial likelihood of liability to establish that a demand on the board would be futile.  As shown below, the demand in this case would be futile because at least six of the Director Defendants lack independence and/or face a substantial likelihood of liability.

/ / /

/ / /

72

### A. Demand Is Futile Because a Majority of the Director Defendants Lacks Independence and Faces a Substantial Likelihood of Liability

#### (1) Rapino Lacks Independence

184. Demand is futile as to Rapino because he lacks independence. As admitted by Live Nation in its 2024 Proxy Statement, Rapino is not an independent director because he is the Company's President and Chief Executive Officer, and has continuously held such roles since 2005. This decision as to Rapino's lack of independence was made by the Board itself.

185. Rapino is also interested in this litigation for purposes of demand futility because he faces a substantial likelihood of liability for his individual misconduct. Rapino is a named defendant in the currently-pending federal securities class action, alleging that he violated § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements set forth above. The complaint in that action has already survived a motion to dismiss and been upheld under the stringent pleading standards of the PSLRA. Rapino's securities fraud has already exposed the Company to millions of dollars in potential liability, undermining his independence regarding the claims in this case, which involve many of the same facts.

186. If Rapino pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws. As such, Rapino is fatally conflicted and, therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Thus, demand is futile as to Rapino.

187. Additionally, Rapino is interested because he prepared, signed, or caused the Company to issue many of the false and misleading statements. In fact, Rapino prepared and/or signed the Company's SEC filings that contained false and misleading statements, including the relevant Annual Reports on Forms 10-K and the relevant Forms 10-Q. Moreover, in conjunction with the filing of each of the above

73

Forms 10-K and Forms 10-Q, Rapino signed certifications as required by SOX that, *inter alia*:

(a)    affirmed that he was "responsible for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting" for Live Nation;

(b)    certified that he has disclosed to Live Nation's auditors and the audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Live Nation's] ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Live Nation's] internal controls over financial reporting"; and

(c)    certified that, to the best of his knowledge:  (i) the Forms 10-K and Forms 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) "the financial statements, and other financial information included in [each] report, fairly present in all material respects the financial condition, results of operations and cash flows of [Live Nation]"; and (iii) the information contained in the Forms 10-K and Forms 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

The above representations were false and misleading (and thereby violated SOX) because, as noted above, during the Relevant Period, the Company's internal controls

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

were frequently disregarded, and the Company's statements regarding its internal controls and other financial statements were materially false and misleading.

188.    Rapino also lacks independence and faces a substantial likelihood of liability for the claims asserted in this action because he directly engaged in many of the unlawful acts that have subjected Live Nation to antitrust liability.  Though the DOJ did not name Rapino personally in its May 23, 2024 complaint, its complaint repeatedly refers to Rapino through reference to his role as CEO of Live Nation, and explicitly alleges that Rapino personally approved much of the unlawful conduct, including the retaliatory conduct against venues that refused to use Ticketmaster to provide ticketing services:

> Live Nation's topmost executives remain outspoken that Live Nation likely will steer concerts away from independent venues that do not select Ticketmaster as their ticketer. **Live Nation's CEO publicly acknowledged as much in not-so-subtle terms**:
> **We can't say to a Ticketmaster venue that says they want to use a different ticketing platform, "If you do that, we won't put shows in your building." ... [But] we have to put the show where we make the most economics, and maybe that venue [that wants to use a different ticketing platform] won't be the best economic place anymore because we don't hold the revenue**.[18]

189.    Rapino also participated in conference calls with analysts and investors during the Relevant Period.  Rapino therefore faces a substantial likelihood of liability for breaching his fiduciary duties.   Consequently, Rapino cannot disinterestedly consider a demand.

/ / /

---

[18] *See* DOJ Complaint at ¶58.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**(2)     Maffei and Hollingsworth Lack Independence**

190.    As Live Nation's 2024 Proxy admits, Liberty Media is one of the Company's largest shareholders, owning 69,645,033 shares of Live Nation common stock.  *See* 2024 Proxy at p. 9.  Liberty Media has appointed Directors Maffei and Hollingsworth to Live Nation's Board of Directors.  The Proxy states that "Two current members of our board of directors were originally nominated by Liberty Media pursuant to a stockholder agreement" and that those two directors are Maffei and Hollingsworth.  *Id.*

191.    The Company's 2024 Proxy admits Hollingsworth is not independent because Hollingsworth "is an executive officer of our largest stockholder [Liberty Media]."[19]  Hollingsworth currently serves as the Senior Vice President, Corporate Strategy, for Liberty Media.

192.    Pursuant to the Liberty Media Stockholder Agreement, Liberty has the right to directly or indirectly acquire (subject to certain exceptions), by means of a purchase, tender or exchange offer, business combination or otherwise, beneficial ownership of Live Nation equity securities up to 35% of the total voting power of all Live Nation equity securities. *See* 2024 Proxy Statement at p. 9.  The Proxy discloses that "we [Live Nation] agreed not to take certain actions that would materially adversely affect Liberty's ability to acquire Live Nation equity securities up to Liberty's applicable percentage or would otherwise impose material economic burdens on Liberty's ability to do so. We have approved Liberty Media and its affiliates and agreed to approve any of their permitted transferees as an "interested stockholder" of ours within the meaning of Section 203 of the Delaware General Corporation Law, or the DGCL, and to exempt such persons' acquisition of Live Nation equity securities from the restrictions on "business combinations" set forth in Section 203 of the DGCL."

193.    The Proxy also discloses that "Under certain circumstances, if a transferee of Liberty's Live Nation equity securities agrees to be bound by the Liberty

---

[19] *See* 2024 Proxy Statement at p. 5.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Stockholder Agreement, certain rights and obligations under the Liberty Stockholder Agreement may be transferred by Liberty to such transferee."

194.   Like Hollingsworth, Maffei is also not independent due to his affiliation with Liberty Media.  The DOJ lawsuit threatens a breakup of Live Nation and Liberty Media's interests in such context could differ materially from those of Live Nation. Liberty Media could also seek to take the Company over by partnering with a third party.  Since Liberty Media currently owns 30% of Live Nation's shares, it can buy another 5% under the Shareholder Agreement and then could partner with a third party on a buyout or divestiture of Ticketmaster.  Since Maffei and Hollingsworth are affiliated with Liberty Media and loyal to its interests, they lack independence with respect to the claims asserted herein since the antitrust violations could result in the breakup of Live Nation, in which Live Nation and Liberty's interests could be in conflict.

195.   Maffei is also not independent because, as the Proxy admits, "Mr. Maffei, is the Chairman of the Board, President and Chief Executive Officer of Atlanta Braves Holdings, Inc. ("Atlanta Braves"). We lease a venue from, and provide ticketing services to the Atlanta Braves and pay royalty fees and non-recoupable ticketing contract advances. We also receive transaction fees for tickets the Atlanta Braves sell using our ticketing software. These transactions are entered into in the ordinary course of business on an arms-length basis. During 2023, we recognized approximately $8.2 million in revenue and incurred approximately $0.6 million in expenses in connection with these transactions."   The antitrust violations at issue in this action involve allegations that Ticketmaster engaged in wrongdoing with respect to venue operators. As a result, Maffei could be called as a witness to testify about Live Nation's conduct with respect to the Atlanta Braves' contracts with Live Nation, including the ticketing and venue issues.  Maffei's involvement with the Braves' contracts with Live Nation and his potential testimony in the DOJ and/or private antitrust actions render him

interested in the claims.  Maffei therefore lacks independence.

### (3) The Entire Board Faces a Substantial Likelihood of Liability for Causing the Company to Violate the 2010 Consent Decree and 2020 Amended Final Judgment

196. After the 2010 Consent Decree was entered, the Director Defendants continued to cause Live Nation to violate the terms of the Consent Decree.

197. As a result, on January 8, 2020, the DOJ filed a motion to modify the 2010 Consent Decree and enter an Amended Final Judgment.  *See* Exhibit B.  In the motion, the DOJ alleged that "Defendants have repeatedly and over the course of several years violated this Court's July 30, 2010, Final Judgment."  Specifically, the DOJ alleged that "Defendants have repeatedly conditioned and threatened to condition Live Nation's provision of live concerts on a venue's purchase of Ticketmaster ticketing services, and they have retaliated against venues that opted to use competing ticketing services – all in violation of the plain language of the decree."  *See* Ex. B at p. 1.

198. Pursuant to the Amended Final Judgment, Live Nation's Board of Directors were required to be provided with reports about the amended consent decree, notice of any violations of the consent decree, and assume overall responsibility for ensuring compliance with the consent decree.  For example, the Antitrust Compliance Officer – a new position that was required to be established as part of entry of the Amended Final Judgment -- must "provide Defendants' Management and Relevant Employees reasonable notice of the meaning and requirements of this Amended Final Judgment."  *See* Ex. C at Section XVII.B.3(b). The Amended Final Judgment specifically defines "Management" as including "all directors and officers of Defendants."  *Id.* at Section II.W.

199. Live Nation's directors are also required by the Amended Final Judgment to provide  the Antitrust Compliance Officer with "a certification that the person (i) has read and understands and agrees to abide by the terms of this Amended Final

78

Judgment; (ii) is not aware of any violation of this Amended Final Judgment that has not been reported to Defendants; and (iii) understands that failure to comply with this Amended Final Judgment may result in an enforcement action for civil or criminal contempt of court." *See* Ex. C at p. 35.

200. Live Nation's directors are also obligated to notify the Monitoring Trustee immediately of any violations of the Amended Final Judgment and to take action to correct the violations. *See* Ex. C at p. 36.

201. Live Nation's directors are also obligated to submit a written report of violations to the DOJ and Monitoring Trustee of each violation of the consent decree and maintain any and all communications reflecting the violation. *See* Ex. C at p. 37.

202. As a result, each Director Defendant received regular reports of the violations of the consent decree and were required by law and the Amended Final Judgment to promptly terminate and discontinue any antitrust violations. They failed to do so, as alleged in detail *supra*. In addition, as the DOJ complaint makes clear, far from complying with the Amended Final Judgment, the Director Defendants have caused Live Nation and Ticketmaster to engage in additional and more expansive violations of the antitrust laws than the violations charged in the original 2010 DOJ and State Attorneys General lawsuit. As the DOJ complaint demonstrates:

> In the years since, **Live Nation and Ticketmaster have committed additional, different, and more expansive violations of the antitrust laws compared to the narrower scope of the Section 7 case**. As detailed below, **Live Nation and Ticketmaster have engaged in ongoing unlawful monopolization of markets across the concert industry in violation of Section 2 of the Sherman Act and state analogues**. For example, since 2020, Live Nation and Ticketmaster have unlawfully coopted actual and potential rivals to remove competitive threats and cement Live Nation's and Ticketmaster's dominance of the

79

concert industry. **In addition, as also detailed below, Live Nation and Ticketmaster have violated Section 1 of the Sherman Act and state analogues**. For example, since 2020, Ticketmaster has entered into long-term exclusive ticketing agreements with venues. The Section 7 consent decree-which addressed a claim different from those at issue here-has failed to restrain Live Nation and Ticketmaster from violating other antitrust laws in increasingly serious ways.[20]

203.    These facts, detailed in more particularity *supra*, demonstrate that the Director Defendants have caused Live Nation to operate the Company based on an unlawful business model, thereby breaching their duties of good faith and loyalty to Live Nation and its shareholders.  Demand as to each Director Defendant is thus futile.

204.    All Board members thus face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the 2010 Consent Decree and the January 28, 2020 Amended Final Judgment.

205.    Moreover, all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful antitrust activity alleged by the DOJ during the Relevant Period because the wrongdoing concerned the Company's core business — concert and sports promotion and ticketing products and services.

**B.    Additional Reasons Demonstrating Futility of Demand**

206.    The entire Board has demonstrated its inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein. Every Board member has acted in violation of their fiduciary duties to the Company's shareholders, as described herein.

207.    All the Directors were responsible for ensuring the Company's

---

[20] *See* May 23, 2024 DOJ Complaint at ¶67.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

compliance with the 2010 Consent Decree and 2020 Amended Final Judgment, and failed to do so.  All Directors also caused the Company to issue false and misleading statements in the Company's Annual Reports and Proxy Statements, including the statements that have already been upheld against a motion to dismiss by the United States District Court for the Central District of California in *Donley v. Live Nation Entertainment, Inc*., Case No. 2:23-cv-06343-KK-AS.  By so doing, the Directors breached their duty of loyalty and good faith.  Because such conduct cannot be indemnified, the Directors are interested in the claims and conduct alleged herein. Demand as to each director is thus futile.

208.   Every member of the Board either engaged in a knowing, intentional violation of the law, or knowingly declined to inform themselves of misconduct complained of herein, even when they had a reasonable basis to believe that further investigation was warranted, as is evidenced by the fact that the Board was directly responsible for reviewing the Company's compliance with the consent decrees.  Thus, demand is excused.  Intentionally causing the Company to violate the antitrust laws demonstrates the Board's disloyal and bad faith conduct.  Any conduct evidencing bad faith and a lack of loyalty to the Company is outside the protection of the business judgment rule and constitutes conduct that is non-indemnifiable.  Thus, demand is excused as to the entire Board.

209.   Defendants Hinson, Fu, and Kahan are members of the Audit Committee and therefore had a clear duty to be kept informed about the Company's internal controls and compliance with the consent decrees, and yet just as clearly, they disregarded such duties. Defendants Hinson, Fu, and Kahan have violated the terms of the Audit Committee Charter, which, among other things, required Defendants to review the Company's annual audited financial statements with management, including a review of major issues regarding accounting and auditing principles and practices, and evaluate the adequacy and effectiveness of internal controls that could

81

significantly affect the Company's financial statements, as well as the adequacy and effectiveness of the Company's disclosure controls and procedures and management's reports thereon.  As such, Defendants Hinson, Fu, and Kahan are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

210.   Although the Company has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing, the Board has not filed any lawsuits against any directors or officers who were responsible for the losses. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches.  Indeed, the Director Defendants are more interested in protecting themselves than they are in protecting the Company by bringing this action. Thus, demand on the Board is futile.

## XIII.  CAUSES OF ACTION

### COUNT I

**Breaches of Fiduciary Duties**
**Against All Individual Defendants**

211.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Live Nation's business and affairs, particularly with respect to issues regarding the Company's compliance with laws.

213.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

214.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or

82

negligently breached or disregarded their fiduciary duties to protect the rights and interests of Live Nation.

215.   In breach of their fiduciary duties owed to Live Nation, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee Live Nation's business, rendering them personally liable to the Company for breaching their fiduciary duties.

216.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and adequacy of the Company's internal controls and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Live Nation's securities and concealing the truth about the Company's violations of the 2010 Decree and 2020 Amended Final Judgment.

217.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Live Nation has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Abuse of Control
### Against All Individual Defendants

219.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

83

220. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Live Nation, for which they are legally responsible.

221. As a direct and proximate result of the Individual Defendants' abuse of control, Live Nation has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Live Nation has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## **COUNT III**

**Unjust Enrichment**
**Against Defendants Rapino, Berchtold, Capo, Hopmans and Rowles**

222. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223. By their wrongful acts and omissions, Individual Defendants Rapino, Berchtold, Capo, Hopmans and Rowles were unjustly enriched at the expense of, and to the detriment of, Live Nation.

224. During the Relevant Period, Individual Defendants Rapino, Berchtold, Capo, Hopmans and Rowles either received bonuses, stock options, or similar compensation from Live Nation that was tied to the financial performance of Live Nation or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

225. Plaintiff, as shareholder and representative of Live Nation, seeks restitution from Individual Defendants Rapino, Berchtold, Capo, Hopmans and Rowles and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

84

## COUNT IV

### Aiding and Abetting Breaches of Fiduciary Duties
### Against Defendant Leiweke

226.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

227.    This claim is brought derivatively on behalf of the Company against Defendant Leiweke for aiding and abetting breaches of fiduciary duties committed by Live Nation's officers and directors.

228.    The Individual Defendants who served as Live Nation's officers and directors during the Relevant Time Period owed fiduciary duties to Live Nation and its shareholders.

229.    Defendant Leiweke was aware at all relevant times that the Individual Defendants owed fiduciary duties to Live Nation and its shareholders.

230.    During the Relevant Period, Leiweke provided substantial assistance to the Individual Defendants to further and aid their breaches of fiduciary duties.  Among other things, as detailed by the Department of Justice, Leiweke controls Oak View Group and pledged and utilized Oak View Group to be Live Nation's "enforcer" with respect to its unlawful antitrust conduct.  Leiweke recently emphasized to Live Nation's CEO, Defendant Rapino, that "[j]ust like I tell our folks we 100% always protect you and LN on your lanes," and "I always protect you on rebates, promotor position, ticketing."

231.    Leiweke and Oak View Group aided and abetted the Individual Defendants' breaches of fiduciary duties out of financial self-interest, since the Individual Defendants' breaches of fiduciary duties and antitrust violations benefitted Oak View Group.  Leiweke earned substantially greater bonuses, incentive compensation, and profits as a result of the active assistance he provided to Rapino and the other Individual Defendants.

232.    The Company was harmed by Defendant Leiweke's aiding and abetting

85

breaches of fiduciary duties because it has suffered and will continue to suffer damages, fines, penalties and a potential breakup by the DOJ due to the breaches of fiduciary duties committed by the Individual Defendants.

233. By reason of the foregoing, the Company was harmed and will continue to suffer harm as described in greater detail above.

## COUNT V

### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against the Director Defendants)

234. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

235. SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

/ / /

236. Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to re-elect the members of the Board, approve executive compensation, and renew the contract of the Company's outside auditor. The Proxy Statements, however, misstated or failed to disclose the material information alleged *supra*.

237. By reasons of the conduct alleged herein, Defendants are in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company is misleading or deceiving its stockholders by making misleading statements that are an essential link in stockholders heeding the Company's recommendations to re-elect the current Board members up for election, approve the proposed executive compensation, and renew the contract of the outside auditor.

238. Plaintiff thereby seeks injunctive and equitable relief because the conduct of the Individual Defendants is interfering with Plaintiff's voting rights and choices at the annual meetings.

239. This action was timely commenced within three years of the date of the Proxy Statements and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Live Nation and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Live Nation;

87

C.     Determining and awarding to Live Nation the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.     Directing Live Nation and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Live Nation and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and the following actions as may be necessary to ensure proper corporate governance policies:

(1)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(2)     a provision to permit the shareholders of Live Nation to nominate at least two candidates for election to the Board;

(3)     a proposal to strengthen the Board's supervision of the Company's CEO;

(4)     a provision to appropriately test and then strengthen the internal audit and control functions; and

(5)     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E.     Awarding Live Nation restitution from the Individual Defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 21, 2024

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)

*s/ Francis A. Bottini, Jr.*

Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com

*Counsel for Plaintiff*

89

**VERIFICATION**

1

2       I, John Williams, verify that I am a shareholder of nominal defendant Live Nation

3   Entertainment, Inc. (the "Company"), and that I have continuously owned stock in the Company

4   since at least 2018.  I have reviewed the allegations in this Verified Shareholder Derivative

5   Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe

6   them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel

7   and counsel's investigation, and believe them to be true. Having received a copy of the Complaint

8   and reviewed it with counsel, I authorize its filing.

9

10   I declare under penalty of perjury that the foregoing is true and correct.

11   Dated: June 11, 2024

12                                                       John Williams

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFICATION

# EXHIBIT A

EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>TICKETMASTER ENTERTAINMENT,<br>INC., *et al.*,<br><br>*Defendants.* | Case: 1:10-cv-00139<br>Assigned to: Collyer, Rosemary M.<br>Assign. Date: 1/25/2010<br>Description: Antitrust |

## FINAL JUDGMENT

WHEREAS, plaintiffs, United States of America, and the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania ("Plaintiff States") filed their Complaint on January 25, 2010, and whereas the States of New Jersey and Washington joined as Plaintiff States pursuant to an Amended Complaint filed January 28, 2010, the United States, Plaintiff States, and defendants, Ticketmaster Entertainment, Inc. and Live Nation, Inc., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants and the imposition of certain conduct restrictions on defendants, to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. Definitions

As used in this Final Judgment:

A.      "AEG" means Anschutz Entertainment Group, Inc., a company with its headquarters in Los Angeles, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

2

B.      "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

C.      "Client Ticketing Data" means financial data relating to a ticketing client's events including on-sale dates for a client's events, the number of tickets sold for the specific event, the proceeds from those sales for a specific event, ticket inventory that is made available on the Ticketmaster system, the number and location of tickets that are sold, the amount for which the tickets are sold, pricing, marketing and promotions run for the event, the sales as a result of the marketing or promotions, and the status of the ticket inventory.  "Client ticketing data" does not include data that Defendants collect through other means (e.g., website tracking, user group surveys, public sources).  Client Ticketing Data does not include data that is made public by a client or third party.

D.      "Comcast-Spectacor" means Comcast-Spectacor, L.P., a company with its headquarters in Philadelphia, Pennsylvania, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E.      "Condition" means to explicitly or practically require buyers to take one product or set of services if they want to obtain a second product or set of services.  In the absence of explicit conditioning, providing the buyer with an opportunity to buy the two products or sets of services separately is only conditioning if no reasonable buyer would be expected to accept the terms of the separate offers.

3

F.    "Covered Employee" means any employee of Defendants whose principal job responsibility involves the operation or day-to-day management of Defendants' venues, concert promotions, or artist management services.

G.    "Defendants" means either defendant acting individually or both defendants acting collectively, as appropriate.  Where the Final Judgment imposes an obligation to engage in or refrain from engaging in certain conduct, that obligation shall apply as broadly as reasonable to each defendant individually, both defendants acting together, and the merged firm.

H.    "Divestiture Assets" means the Ticketmaster Host Platform (via the binding agreement to license and to provide private label ticketing services to the Ticketmaster Host Platform Acquirer as required in Section IV.A) and Paciolan.

I.    "Exempted Employee" means any employee of Defendants who is not a Covered Employee, including:  (a) any senior corporate officer, director or manager with responsibilities that include oversight of Defendants provision of Primary Ticketing Services; and (b) any employee whose primary responsibilities solely include accounting, human resources, legal, information systems, and/or finance.

J.    "Live Entertainment Event" means a live music concert for which tickets are sold to the public.

K.    "Live Nation" means defendant Live Nation, Inc., a Delaware corporation with its headquarters in Beverly Hills, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

L.    "Merger" means the merger of Ticketmaster and Live Nation.

4

Case 2:46-CV-00135-RMC Document 15 Filed 07/30/10 Page 8 of 27

M.    "Paciolan" means Paciolan, Inc., a Delaware corporation which is engaged in the provision of ticketing services to venues or other organizations under the Paciolan or Ticketmaster Irvine names, and which includes:

      1.      All tangible assets that comprise the Paciolan line of business, including servers and other computer hardware; research and development activities; all fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with Paciolan; all licenses, permits and authorizations issued by any governmental organization relating to Paciolan; all contracts, teaming arrangements, agreements, leases (including the lease to the Paciolan headquarters in Irvine, California), commitments, certifications, and understandings, relating to Paciolan, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to Paciolan;

      2.      All intangible assets used in the development, distribution, production, servicing and sale of Paciolan, including, but not limited to, all patents, contractual rights (including contractual rights to provide ticketing services and employment contracts), licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and

devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development relating to Paciolan, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to Paciolan, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments. Preexisting commitments to transfer contractual rights from Paciolan to another entity that are specifically identified in the Paciolan sales agreement are excluded from this definition.

N.      "Paciolan Acquirer" means the entity to whom defendants divest Paciolan.

O.      "Primary Ticketing Services" means a collection of services provided to venues or other customers to enable the initial sale of tickets for live entertainment events directly to customers and enable the validation of tickets at the venue to control access to the event.

P.      "Provide Live Entertainment Events" and "Provision of Live Entertainment Events" mean services reasonably necessary to plan, promote, market and settle a Live Entertainment Event, including but not limited to concert promotion services provided by firms such as Live Nation and the provision of artists managed by firms such as Front Line. The Promotion of Live Entertainment Events specifically does not include the provision of primary ticketing services, venue management services and/or tour design and construction services.

6

Q.     "Retaliate" means refusing to Provide Live Entertainment Events to a Venue

Owner, or Providing Live Entertainment Events to a Venue Owner on less favorable terms, for

the purpose of punishing or disciplining a Venue Owner because the Venue Owner has

contracted or is contemplating contracting with a company other than Defendants for Primary

Ticketing Services.  The term "Retaliate" does not mean pursuing a more advantageous deal with

a competing Venue Owner.

R.     "Ticket Buyer Data" means non-public identifying information for ticket buyers

for a specific event (including, if provided, the buyer's name, phone number, e-mail address, and

mailing address) that Defendants collect in the course of providing a ticketing client's Primary

Ticketing Services.  Ticket Buyer Data does not include data that Defendants collect solely

through other means (e.g., website tracking, user group surveys, public sources).

S.     "Ticketmaster" means defendant Ticketmaster Entertainment, Inc., a Delaware

corporation with its headquarters in West Hollywood, California, its successors and assigns, and

its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships,

and joint ventures, and their directors, officers, managers, agents, and employees.

T.     "Ticketmaster Host Platform" means the primary Ticketmaster software used by

Ticketmaster to sell primary tickets in the United States.  The Ticketmaster Host Platform

includes the following software:  Ticketmaster Classic Ticketing System (also called

Ticketmaster Host); Ticketmaster.com full website package; Access Management; payment

processing and settlements; and PCI point of sale system (for phone and outlets).

U.     "Ticketmaster Host Platform Acquirer" means AEG, the entity with whom

defendants will enter into a binding agreement to license the Ticketmaster Host Platform.

7

V.     "Venue Owner" means a person or company that owns, operates, or manages one or more venues that host Live Entertainment Events.

### III. Applicability

A.     This Final Judgment applies to Ticketmaster and Live Nation, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV and V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment.  Defendants need not obtain such an agreement from the Acquirers of the assets divested pursuant to this Final Judgment.

### IV. Divestiture

A.     Defendants are ordered and directed not to consummate the Merger until they have entered into a binding agreement to license the Ticketmaster Host Platform to the Ticketmaster Host Platform Acquirer and to provide private label ticketing services to the Ticketmaster Host Platform Acquirer in a manner consistent with this Final Judgment and with the following terms and conditions:

1.     The agreement shall include the option, exercisable at the discretion of the Ticketmaster Host Platform Acquirer, to acquire a non-exclusive, perpetual, fully-paid up license to the Ticketmaster Host Platform.  The license shall include a copy of the source code of the Ticketmaster Host Platform and shall permit the Ticketmaster Host Platform Acquirer to

8

modify the software in any manner without limitation and without any requirement to license back any improvements to Defendants. If the option is exercised, Defendants shall promptly begin the installation of a fully functional ticketing system and website in the facilities of the Ticketmaster Host Platform Acquirer and shall complete the installation within a reasonable time pursuant to a schedule subject to approval by the United States, after consultation with Plaintiff States. Defendants shall warrant that the system is current as of the time of installation and operational for use in providing Primary Ticketing Services. Defendants shall provide reasonable training and support to enable the Ticketmaster Host Platform Acquirer to operate the software and to understand the source code so that it can make independent changes to the code. The license shall permit the Ticketmaster Host Platform Acquirer to transfer the license following the complete installation of the Ticketmaster Host Platform. The scope of use of the license shall be at least the United States.

2.   The agreement shall include a private label ticketing agreement pursuant to which Ticketmaster shall provide private label ticketing services to the Ticketmaster Host Platform Acquirer for a period of no more than five years from the date of execution of the license. The private label ticketing agreement shall be on such reasonable terms and conditions that will enable the Ticketmaster Host Platform Acquirer to compete effectively

9

against Ticketmaster to secure contracts for the provision of Primary Ticketing Services. The private label ticketing agreement shall give the Ticketmaster Host Platform Acquirer all control over the ticketing fees charged individual consumers or clients of the Ticketmaster Host Platform Acquirer for tickets sold pursuant to the agreement and Defendants shall have no right or ability to set these ticketing fees. Ticketmaster shall, at the request of the Ticketmaster Host Platform Acquirer, post on the main Ticketmaster public website links to events sold under the private label ticketing agreement, subject to reasonable, non-discriminatory, and customary terms and conditions. Ticketmaster shall customize a separate website for the Ticketmaster Host Platform Acquirer with branding, look, and feel to be determined by the Ticketmaster Host Platform Acquirer. The private label ticketing services as described in this Section shall be operational within six months from the date that the binding agreement to license Ticketmaster Host Platform becomes effective.

B. Defendants shall implement the Ticketmaster Host Platform binding agreement required by Section IV.A and any resulting Ticketmaster Host Platform license in a manner consistent with the terms of Section IV.A. Defendants shall comply with the terms of the Ticketmaster Host Platform binding agreement required by Section IV.A and any resulting Ticketmaster Host Platform license, provided that nothing in the Ticketmaster Host Platform binding agreement or resulting Ticketmaster Host Platform license can relieve Defendants of any obligations imposed by this Final Judgment.

C.    Defendants shall, as soon as possible, but within one business day after completion of the relevant event, notify the United States and Plaintiff States of: (1) the effective date of the Merger and (2) the effective date of the binding agreement to license to the Ticketmaster Host Platform Acquirer.

D.    If the Ticketmaster Host Platform Acquirer exercises its option to license the Ticketmaster Host Platform, Defendants shall waive any non-compete agreements that would prevent any employee of Defendants whose primary responsibility is the development or operation of the Ticketmaster Host Platform from joining the Ticketmaster Host Platform Acquirer.

E.    Defendants are ordered and directed, concurrently with the closing of the Merger, to enter into a Letter of Intent to divest Paciolan to Comcast-Spectacor in a manner consistent with this Final Judgment. Within sixty (60) calendar days of closing the Merger, Defendants shall complete the divestiture of Paciolan in a manner consistent with this Final Judgment to Comcast-Spectacor or an alternative Acquirer acceptable to the United States, in its sole discretion, after consultation with Plaintiff States. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

F.    Defendants shall provide the United States and the Paciolan Acquirer information relating to the personnel involved in the production, operation, development and sale of Paciolan at any time since Ticketmaster acquired Paciolan to enable the Paciolan Acquirer to make offers of employment. Defendants will not interfere with any negotiations by the Paciolan Acquirer to employ any defendant employee whose primary responsibility is the production, operation, development, and sale of Paciolan, and shall waive any non-compete agreements that would

11

prevent any such employee from joining the Paciolan Acquirer. Nothing in this Section shall prohibit defendants from making offers of continued employment to, continuing to employ, or continuing to use the services of any of their employees, including personnel involved in the production, operation, development and marketing of Paciolan and its ticketing system, subject to the overarching limitation that the agreement to sell Paciolan to the Paciolan Acquirer must ensure that the Paciolan Acquirer will be able to adequately staff Paciolan in a manner that enables the Paciolan Acquirer to successfully compete as a provider of Primary Ticketing Services, as determined by United States in its sole discretion. In addition, nothing in this Section shall prohibit defendants from maintaining any reasonable restrictions on the disclosure by an employee who accepts an offer of employment with the Paciolan Acquirer of the defendants' proprietary non-public information that is (1) not otherwise required to be disclosed by this Final Judgment, (2) related solely to the defendants' businesses and clients, and (3) not related to the production, operation, development, and marketing of Paciolan and its ticketing system.

G.    Defendants shall permit the Paciolan Acquirer to have reasonable access to personnel and to make inspections of the physical facilities of Paciolan; access to any and all environmental, zoning, and other permit documents and information; access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

H.    Defendants shall warrant to the Paciolan Acquirer that each asset it acquires will be operational on the date of sale.

I.      Defendants shall warrant to the Paciolan Acquirer that there are no material

defects in the environmental, zoning, or other permits pertaining to the operation of Paciolan, and

that following the sale of Paciolan, defendants will not undertake, directly or indirectly, any

challenges to the environmental, zoning, or other permits relating to the operation of Paciolan.

J.      Defendants shall not take any action that will impede in any way the permitting,

operation, use, or divestiture of the Divestiture Assets.

K.      Unless the United States otherwise consents in writing, after consultation with

Plaintiff States, the divestitures pursuant to Section IV of this Final Judgment shall include the

entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States,

in its sole discretion, after consultation with Plaintiff States, that the Divestiture Assets can and

will be used by the Acquirer(s) as part of a viable, ongoing business, engaged in providing

Primary Ticketing Services.  Divestiture of the Divestiture Assets may be made to one or more

Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United

States, after consultation with Plaintiff States, that the Divestiture Assets will remain viable and

the divestiture of such assets will remedy the competitive harm alleged in the Complaint.  The

divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

1.      shall be made to an Acquirer(s) that, in the United States's sole judgment,

after consultation with Plaintiff States, has the intent and capability

(including the necessary managerial, operational, technical and financial

capability) of competing effectively in the business of providing Primary

Ticketing Services; and

13

2.      shall be accomplished so as to satisfy the United States, in its sole
discretion, after consultation with Plaintiff States, that none of the terms of
any agreement between an Acquirer(s) and Defendants give Defendants
the ability unreasonably to raise the Acquirer's costs, to lower the
Acquirer's efficiency, or otherwise to interfere in the ability of the
Acquirer to compete effectively.

### V. Appointment of Trustee to Effect Divestiture

A.      If Defendants have not divested Paciolan as specified in Section IV.E, defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to divest Paciolan in a manner consistent with this Final Judgment. Defendants consent to appointment of a trustee prior to entry of this Final Judgment if Paciolan has not been divested within the time periods provided in Section IV.E.

B.      After the appointment of a trustee becomes effective, only the trustee shall have the right to sell Paciolan. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States, after consultation with Plaintiff States, at such cash price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate.

C.      Subject to Section V.E of this Final Judgment, the trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

D.      Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

E.      The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of Paciolan and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

F.      Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, including any information provided to the United States during its investigation of the merger related to the business to be divested, and defendants shall

15

develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

G.     After its appointment, the trustee shall file monthly reports with the United States, Plaintiff States, and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in Paciolan, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest Paciolan.

H.     If the trustee has not accomplished the divestiture ordered under this Final Judgment within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final

16

Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

### VI. Notice of Proposed Divestiture

A.       Within two (2) business days following execution of a definitive divestiture agreement, defendants shall notify the United States and Plaintiff States of any proposed divestiture required by Section IV of this Final Judgment.  Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and Plaintiff States of any proposed divestiture required by Section V of this Final Judgment.  The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in Paciolan, together with full details of the same.

B.       Within fifteen (15) calendar days of receipt by the United States and Plaintiff States of such notice, the United States may request from defendants, the proposed Acquirer(s), any other third party, or the trustee if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), and any other potential Acquirer.  Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.       Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States and Plaintiff States has been provided the additional information requested from defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if

17

there is one, stating whether or not it objects to the proposed divestiture. If the United States, after consultation with Plaintiff States, provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V.C of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V.D, a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. Hold Separate

Until the divestiture required by this Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. Anti-Retaliation Provision and Other Provisions Designed to Promote Competition

A.    Defendants shall not:

1.    Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services;

2.    Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services; or

3.    Condition or threaten to Condition the provision of Primary Ticketing Services to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for the Provision of Live Entertainment Events.

Nothing in this Section prevents Defendants from bundling their services and products in any combination or from exercising their own business judgment in whether and how to pursue, develop, expand, or compete for any ticketing, venue, promotions, artist management, or any other business, so long as Defendants do so in a manner that is not inconsistent with the provisions of this Section.

Evidence that Defendants do or do not (a) bid for, contract with, win, or retain a venue, artist, or promoter as a client, and/or (b) promote a show or shows in particular buildings or group of buildings (even where similar shows historically have been promoted in those buildings) is not alone sufficient to establish, or create a presumption of, a violation of this

19

Section.

B.     Defendants shall not disclose to any Covered Employee any Client Ticketing
Data.  Defendants however: (1) may disclose Client Ticketing Data concerning a specific event to
any Covered Employee involved in the promotion of that event or the management of the artist
who performed at that event, if it does so on the same terms it generally provides such
information to other promoters or artist managers not affiliated with Defendants; (2) may
disclose Client Ticketing Data to an Exempted Employee who requires the information in order
to perform his or her job function(s); provided however, that such Exempted Employee may not
use Client Ticketing Data to perform any job function(s) that primarily involve(s) the day-to-day
operation or management of Defendants' venues, concert promotions, or artist management
services; and (3) may disclose Client Ticketing Data to any Defendant employee where so
required by law, government regulation, legal process, or court order, so long as such disclosure
is limited to fulfillment of that purpose.

C.     If any client of Defendants' primary ticketing services chooses not to renew a
contract for Primary Ticketing Services with Defendants for some or all of its venues, upon the
expiration of that contract and the written request of the client, Defendants shall within forty-five
(45) days provide the client with a complete copy of all Client Ticketing Data and all Ticket
Buyer Data historically maintained by Defendants for such venue(s) in the ordinary course of
business, in a form that is reasonably usable by the client.  Nothing in this provision shall be read
to: (1) alter any rights Defendants would otherwise have to Client Ticketing Data or Ticket Buyer
Data pursuant to the Primary Ticketing Services contract with the client, and/or its historical
custom, practice, and course of dealing with the client; or (2) limit any rights the client would

20

otherwise have to its Client Ticketing Data or Ticket Buyer Data pursuant to the Primary

Ticketing Services contract with Defendants and/or its historical custom, practice, and course of

dealing with Defendants. Defendants shall maintain Client Ticketing Data and Ticket Buyer

Data on behalf of its clients for no less than three (3) years. This provision only applies to

contracts for Primary Ticketing Services in effect prior to the entry of this Final Judgment.

## X. Affidavits

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and

every thirty (30) calendar days thereafter until the divestitures have been completed under

Section IV or Section V, defendants shall deliver to the United States and Plaintiff States an

affidavit as to the fact and manner of its compliance with Section IV or Section V of this Final

Judgment. Each such affidavit shall include the name, address, and telephone number of each

person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed

an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry

about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact

with any such person during that period. Each such affidavit shall also include a description of

the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide

required information to prospective Acquirers, including the limitations, if any, on such

information. Assuming the information set forth in the affidavit is true and complete, any

objection by the United States, after consultation with Plaintiff States, to information provided by

defendants, including limitation on information, shall be made within fourteen (14) calendar days

of receipt of such affidavit.

B.      Every two (2) months prior to the private label ticketing agreement described in

21

Section IV.A.2 becoming operational, and every six (6) months thereafter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IV.A and the terms of Ticketmaster Host Platform binding agreement.

C.      Defendants shall, in addition, deliver to the United States and Plaintiff States an affidavit describing any revised or amended agreements with the Ticketmaster Host Platform Acquirer relating to the agreement required by Section IV.A.  Such notice shall be delivered to the United States and Plaintiff States at least fifteen (15) calendar days prior to the effective date of the revised or amended agreement and Defendants shall not implement any amended agreement if the United States, after consultation with Plaintiff States, objects during the fifteen (15) day notice period.

D.      Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment.  Defendants shall deliver to the United States and Plaintiff States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change if implemented.

E.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

# XI. Compliance Inspection

A.     For purposes of determining or securing compliance with this Final Judgment, or

of determining whether the Final Judgment should be modified or vacated, and subject to any

legally recognized privilege, from time to time duly authorized representatives of the United

States Department of Justice, including consultants and other persons retained by the United

States, shall, upon written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1.     access during defendants' office hours to inspect and copy, or at the option

of the United States, to require defendants to provide hard copy or

electronic copies of, all books, ledgers, accounts, records, data, and

documents in the possession, custody, or control of defendants, relating to

any matters contained in this Final Judgment; and

2.     to interview, either informally or on the record, defendants' officers,

employees, or agents, who may have their individual counsel present,

regarding such matters.  The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by

defendants.

B.     Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, defendants shall submit written reports, under oath if

requested, relating to any of the matters contained in this Final Judgment as may be requested.

Written reports authorized under this paragraph may, at the sole discretion of the United States,

require Defendants to conduct, at Defendants' cost, an independent audit or analysis relating to

any of the matters contained in this Final Judgment.

C.      No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, or the Attorney General's Office of any other plaintiff, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XII. Notification

Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), defendants, without providing advance notification to the United States and Plaintiff States, shall not directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity or management interest, in any person that, at any time during the twelve (12) months immediately preceding such acquisition, was engaged in the United States in providing Primary Ticketing Services during the term of this Final Judgment.

Such notification shall be provided to the United States and Plaintiff States in the same format as, and per the instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended. Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction. If within the 30-day period after notification, representatives of the United States make a written request for additional information, defendants shall not consummate the proposed transaction or agreement until twenty (20) calendar days after submitting all such additional information. Early termination of the waiting periods in this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

## XIII. No Reacquisition

A.　　Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

B.　　Following the expiration of the private label ticketing agreement with the Ticketmaster Host Platform Acquirer required by Section IV.A.2: (1) Defendants shall not provide Primary Ticketing Services to any venues in North America for which, by virtue of an ownership interest, the Ticketmaster Host Platform Acquirer controls the rights to select the

25

Primary Ticketing Services provider; and (2) for all other venues in North America, Defendants shall not provide Primary Ticketing Services on behalf of or pursuant to a ticketing contract with the Ticketmaster Host Platform Acquirer. Nothing in this Section shall prevent Defendants from: (1) competing to provide Primary Ticketing Services to venues (including such venues managed by the Ticketmaster Host Platform Acquirer) other than those for which, by virtue of an ownership interest, the Ticketmaster Host Platform Acquirer controls the rights to select the Primary Ticketing Services provider; and (2) providing Primary Ticketing Services to artist fan clubs in venues owned, operated, or managed by the Ticketmaster Host Platform Acquirer.

## XIV. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XVI. Public Interest Determination

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any

comments thereon and the United States' responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: _30 July 2010_

                     Court approval subject to procedures of the Antitrust Procedures
                     and Penalties Act, 15 U.S.C. § 16.

                     Rosemary M Colly
                     United States District Judge

# EXHIBIT B

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.

               *Plaintiff,*

     v.

TICKETMASTER ENTERTAINMENT, INC., and LIVE NATION ENTERTAINMENT, INC.,

               *Respondents.*

Case: 1:10-cv-00139-RMC
Assigned to: Collyer, Rosemary M.
Assign. Date: 1/25/2010
Description: Antitrust

## MOTION TO MODIFY FINAL JUDGMENT AND ENTER AMENDED FINAL JUDGMENT

Plaintiff United States respectfully moves this Court to modify the Final Judgment and enter the proposed Amended Final Judgment. The United States and Defendants Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster Entertainment, Inc. ("Ticketmaster," collectively "Defendants"), have jointly agreed to modify the Final Judgment in this matter to address the United States' allegations that Defendants have repeatedly violated the Final Judgment since at least 2012, as set forth in the concurrently filed memorandum in support of this Motion, which Defendants deny.

Specifically, the United States and Defendants have agreed to: (i) extend certain provisions by five and one half years, to December 31, 2025; (ii) clarify the parties' obligations under Section IX of the Final Judgment; (iii) strengthen the compliance provisions, including appointment of an independent monitor and imposition of certain monitoring, notice and reporting obligations on Defendants; (iv) add new provisions intended to make future investigation and enforcement of the

1

Final Judgment more effective; and (v) order Defendants to pay the United States' fees and costs associated with investigation and prosecuting this Motion.

Notice and comment period is not required under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("Tunney Act"). The proposed modifications serve the purpose of the original Final Judgment by clarifying its terms and enhancing the United States' ability to monitor and enforce compliance; they do not alter the essence of the remedy. The Court may enter the proposed Amended Final Judgment upon a finding that the modifications are in the public interest. *United States v. Western Elec. Co.*, 900 F. 2d 283, 305 (D.C. Cir. 1990); *United States v. Baroid Corp.*, 130 F. Supp. 2d 101, 103 (D.D.C. 2001).

No Plaintiff State has indicated its opposition to the Motion at this time. The United States began meeting and conferring with Plaintiff States on December 5, 2019, regarding appropriate relief to seek in connection with the United States' allegations against Live Nation.[1] After subsequently meeting and conferring with Plaintiff States regarding the Proposed Amended Final Judgment on multiple occasions, the United States requested that any Plaintiff State that intended to oppose this Motion notify the United States no later than January 6, 2020.[2] In response, Plaintiff States Arizona, California, Iowa, Ohio, Tennessee, Wisconsin and Washington expressly declined to inform the United States whether or not they would oppose this Motion;[3] Texas and Nevada represented they do not oppose this Motion;[4] and, as of the time of this filing, no other State had indicated that it would oppose the Motion.[5]

[1] Declaration of Meagan K. Bellshaw ¶ 2.
[2] *Id.* ¶¶ 2-3.
[3] *Id.* ¶ 5-6.
[4] *Id.* ¶ 4.
[5] *Id.* ¶ 8.

2

The United States does not oppose the Moving States' motion to extend[6] the deadline by two weeks to allow the Moving States to pursue relief that does not undermine the modifications agreed to by the United States and Defendants as set forth in the Proposed Amended Final Judgment.

Dated: January 8, 2020                    Respectfully submitted,

                                          _____/s/ Meagan K. Bellshaw_____
                                          MEAGAN K. BELLSHAW (CA Bar #257875)
                                          MONA S. K. HAAR (DC Bar # 986789)
                                          LEE F. BERGER (DC Bar # 482435)
                                          SARAH LICHT (DC Bar #1021541)
                                          CRAIG D. MINERVA (DC Bar # 991020)
                                          U.S. Department of Justice
                                          Antitrust Division
                                          Media, Entertainment and Professional Services
                                          Section
                                          450 Fifth St., N.W., Suite 4000
                                          Washington, D.C. 20530

---

[6] Unopposed Motion to Extend Deadline to File Proposed Amendments to Final Judgment, Dkt. 20 (Jan. 8, 2020).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al.

*Plaintiff*,

v.

TICKETMASTER ENTERTAINMENT,
INC., and LIVE NATION
ENTERTAINMENT, INC.,

*Defendants*.

Case: 1:10-cv-00139-RMC
Assigned to: Collyer, Rosemary M.
Assign. Date: 1/25/2010
Description: Antitrust

## PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO MODIFY FINAL JUDGMENT AND ENTER AMENDED FINAL JUDGMENT

Defendants have repeatedly and over the course of several years violated this Court's July 30, 2010, Final Judgment. That Final Judgment permitted Live Nation Entertainment, Inc. ("Live Nation")[1] and Ticketmaster Entertainment, Inc. ("Ticketmaster") to merge, but prohibited the merged company from retaliating against concert venues for using another ticketing company, or conditioning or threatening to condition Live Nation's provision of concerts and other live events on a venue's purchase of Ticketmaster's ticketing services. While Defendants promptly consummated their merger, they have failed to live up to their end of the bargain. Specifically, Defendants have repeatedly conditioned and threatened to condition Live Nation's provision of live concerts on a venue's purchase of Ticketmaster ticketing services, and they have retaliated against venues that opted to use competing ticketing services – all in violation of the plain language of the decree. Indeed, Defendants' well-earned reputation for threatening behavior and retaliation

---

[1] Following the merger, Live Nation changed its name to Live Nation Entertainment, Inc.

1

in violation of the Final Judgment has so permeated the industry that venues are afraid to leave Ticketmaster lest they risk losing Live Nation concerts, hindering effective competition for primary ticketing services. To protect venues that have provided evidence regarding Live Nation's conditioning and retaliatory conduct, the United States does not identify the affected customers below.[2]

Defendants deny the United States' allegations. However, to address the United States' concerns and prevent violations of the Final Judgment in the future, Defendants have agreed to modify the Final Judgment as set forth in the concurrently filed Proposed Amended Final Judgment and do not oppose the United States' Motion. For the Court's convenience, a redline comparison of the July 30, 2010, Final Judgment and the Amended Final Judgment is attached hereto as Exhibit 1.

In short, although the United States believes the Final Judgment is clear as written, to put a stop to Defendants' conduct and to remove any doubt about Defendants' obligations under the Final Judgment going forward, the United States and Defendants propose to modify the Final Judgment to add certain clarifying language. In addition, to ensure that American consumers get the benefit of the bargain reached in 2010 and ordered by this Court, the parties propose to extend the term of the relevant provisions of the Final Judgment term by five- and one-half years, until December 31, 2025. Most primary ticketing contracts last for three to five years. Thus, a five-and one-half-year extension of the Final Judgment would ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

---

[2] The United States can provide additional information regarding the venues and evidence underlying Live Nation's alleged violations at the Court's request.

2

To ensure compliance with the Final Judgment going forward, Defendants have also agreed to submit to certain monitoring provisions, including appointment of an independent monitoring trustee, designating an antitrust compliance officer, reporting and investigating potential violations, and notifying employees and customers of Defendants' obligations under the Final Judgment and encouraging all parties to report potential violations to the Department of Justice. The United States believes these provisions are particularly important in this case in light of Defendants' disregard for the Final Judgment's prohibitions over the past seven years. Finally, to further encourage compliance, Defendants have also agreed to certain changes to make enforcement of the Final Judgment more efficient in the future, including lowering the standard of proof necessary to establish a violation and providing the United States with a four-year look back period to bring contempt actions against Defendants.

Together, these modifications will clarify and strengthen the Final Judgment while the extension gives it a chance to work as intended and promote competition in the primary ticketing industry. Notice and comment period is not required under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("Tunney Act").[3] The proposed modifications serve the purpose of the original Final Judgment by clarifying its terms and enhancing the United States' ability to monitor and enforce compliance; they do not alter the essence of the remedy.

No Plaintiff State has indicated its opposition to the Motion at this time. The United States began meeting and conferring with Plaintiff States on December 5, 2019, regarding appropriate relief to seek in connection with the United States' allegations against Live Nation.[4] After subsequently meeting and conferring with Plaintiff States regarding the Proposed Amended Final

---

[3] *See* discussion *infra* Part V.
[4] Declaration of Meagan K. Bellshaw ¶ 2.

Judgment on multiple occasions, the United States requested that any Plaintiff State that intended to oppose this Motion notify the United States no later than January 6, 2020.[5] In response, Plaintiff States Arizona, California, Iowa, Ohio, Tennessee, Wisconsin and Washington expressly declined to inform the United States whether or not they would oppose this Motion;[6] Texas and Nevada represented they do not oppose this Motion;[7] and, as of the time of this filing, no other State had indicated that it would oppose the Motion.[8]

The United States does not oppose the Moving States' motion to extend[9] the deadline by two weeks to allow the Moving States to pursue relief that does not undermine the modifications agreed to by the United States and Defendants as set forth in the Proposed Amended Final Judgment.

## I.      DEFENDANTS' COMMITMENT TO THE 2010 FINAL JUDGMENT

In 2009, Live Nation and Ticketmaster were separate companies leading different segments of the live entertainment industry. Live Nation was then and remains today the largest concert promoter in the United States. As a promoter, Live Nation contracts with artists to arrange and market their concerts, assuming the associated financial risks or gains from the concerts' success or failure, and frequently selects the venue at which to stage concerts. Ticketmaster has been the largest primary ticketing service provider for major concert venues in the United States for at least three decades. As a primary ticketing provider, Ticketmaster enters into exclusive contracts with

---

[5] *Id.* ¶¶ 2-3.
[6] *Id.* ¶ 5-6.
[7] *Id.* ¶ 4.
[8] *Id.* ¶ 8.
[9] Unopposed Motion to Extend Deadline to File Proposed Amendments to Final Judgment, Dkt. 20 (Jan. 8, 2020).

venues to provide them with a range of services necessary for the initial sale of tickets to concertgoers, and earns significant profits from fees imposed on each ticket sold.

In February 2009, Live Nation and Ticketmaster entered into an agreement to merge the two companies into a combined Live Nation Entertainment. Throughout 2009, the Division conducted a pre-complaint civil investigation into the proposed merger. The Division ultimately concluded that, without modifications, the proposed merger would likely harm competition in the primary ticketing market, resulting in higher fees and less innovation and services for venues and consumers and making it difficult for smaller firms to compete against the merged company's combined offerings.

On January 25, 2010, the United States and seventeen Plaintiff States filed a civil antitrust Complaint in this Court seeking to enjoin the proposed merger of Live Nation and Ticketmaster.[10] At the same time, the parties agreed to a proposed Final Judgment designed to eliminate the acquisition's anticompetitive effects.[11] That proposed Final Judgment contained a variety of terms and commitments negotiated between the parties. Both Ticketmaster and Live Nation stipulated that the Court could enter the Final Judgment and committed to comply with its terms.

In the proposed Final Judgment, Ticketmaster and Live Nation committed to refrain from several practices in exchange for permission to merge. As relevant here, Defendants agreed in Section IX of the Final Judgment not to:

1. Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Retaliation Provision"]; and

---

[10] Compl. (Dkt. 1). Seventeen states joined the initial complaint, which was later amended to add two additional Plaintiff States. *See* Am. Compl. (Dkt. 5).
[11] [Proposed] Final Judgment (Jan. 25, 2010) (Dkt. 1-1). A revised [Proposed] Final Judgment was filed June 29, 2010, to add two additional Plaintiff States. *See* Dkt. 14-1.

    2.   Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services [hereinafter "Anti-Conditioning Provision"].

On July 30, 2010, after conducting its independent review under the Tunney Act, this Court entered the Final Judgment, giving Defendants' commitments the force of law. In entering its order, the Court found "the essence of this Final Judgment is…the imposition of certain conduct restrictions on defendants, to assure that competition is not substantially lessened."[12] The Court also retained "jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate . . . to modify any of its provisions, to enforce compliance, and to punish violations of its provisions."[13]

## II.   DEFENDANTS' VIOLATIONS OF THE FINAL JUDGMENT

The United States has found that, since 2012, Defendants' executives have retaliated against or threatened venues throughout the United States in violation of the Final Judgment's Anti-Retaliation and Anti-Conditioning Provisions. These violations began shortly after the decree was entered in 2010 and have recurred throughout its term, with the most recent known violation occurring as late as March 2019. As a result of this conduct, venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all. Given the paramount importance of live event revenues to a venue's bottom line, this is a loss that most venues can ill-afford to risk. As a result, many venues are effectively required to contract with Ticketmaster to obtain Live Nation concerts on reasonable terms, limiting the ability of Ticketmaster's competitors to compete in the primary ticketing market and harming venues that would benefit from increased competition.

---

[12] Final Judgment at 2.
[13] Final Judgment § XIV.

6

Case 1:20-cv-00139-RMC Document 22 Filed 01/08/20 Page 10 of 24

*Venue A*

Defendants violated both the Anti-Conditioning and Anti-Retaliation Provisions during negotiations with Venue A by first threatening to withhold concerts from Venue A if Venue A did not contract with Ticketmaster, and then refusing to book concerts at Venue A for a year in retaliation for its selection of a competing ticketer.

In 2017, Venue A issued a request for proposals ("RFP") for a new, two-year exclusive primary ticketing contract. Ticketmaster submitted a proposal and met with Venue A's ticketing committee. Although Venue A's RFP included a request only for ticketing services and not for live content, the Live Nation promoter responsible for deciding where in the region to place Live Nation concerts attended the meeting with Venue A along with two Ticketmaster employees. At the meeting, the Live Nation promoter explicitly threatened to withhold concerts from Venue A if it did not select Ticketmaster. A few weeks later, when Venue A informed the Live Nation promoter that it planned to select a competing ticketer that had offered better financial terms, the promoter responded that the competitor's offer would not be better than Ticketmaster's if Venue A did not receive as many Live Nation shows. The Live Nation promoter went on to specify that Live Nation would not book shows at Venue A unless it had no other options in the market.

Before Venue A's decision not to contract with Ticketmaster, Live Nation estimated that for the next several years it would book three to four shows per year at Venue A. But in the year following Venue A's switch to Ticketmaster's competitor, Live Nation promoted zero shows at Venue A. Venue A understood that Live Nation's decision to book zero shows at Venue A was retaliation for not selecting Ticketmaster as its primary ticketer.

### *Venue B*

Defendants violated both the Anti-Conditioning and Anti-Retaliation Provisions during negotiations to provide primary ticketing services to Venue B.  In 2017, Venue B evaluated offers for primary ticketing services from Ticketmaster and several competitors.  When Venue B informed Live Nation that it was planning to choose Ticketmaster's competitor, Ticketmaster's Vice President for Client Development threatened to withhold all Live Nation concerts from Venue B if it did not renew its contract with Ticketmaster.  The Ticketmaster VP told Venue B that "if you move in that direction, you won't see any Live Nation shows."  Ticketmaster's Executive Vice President and Co-Head of Sports for NBA and NHL Arenas made a similar threat to Venue B, telling it that Live Nation's CEO would never put one of his shows on sale through that particular Ticketmaster competitor.

Despite Defendants' threats, Venue B initially selected a Ticketmaster competitor as its primary ticketing provider.  Before Venue B's ticketing decision, Live Nation and Venue B discussed potential bookings approximately once per week.  But when Venue B opted to go with Ticketmaster's competitor, Live Nation stopped contacting the arena about any possible concerts or booking shows at Venue B.  For unrelated reasons, one month later Venue B agreed to contract with Ticketmaster.  Immediately thereafter, Live Nation began to get "geared back up" to bring concerts to Venue B, because Venue B was "back in the family."

### *Venue C*

Defendants twice violated the Anti-Conditioning Provision by threatening to blacklist Venue C from all future Live Nation shows after Venue C decided to contract with Ticketmaster's competitor for primary ticketing services.  According to a Venue C executive, Ticketmaster's President warned the executive that if Venue C went with a competing ticketer, Ticketmaster's

response "would be 'nuclear'" and "though he would deny it if I repeated it, Live Nation would

never do a show in our building, that they would find other places for their content . . . ."  Following

a conversation with Ticketmaster's President, a second Venue C executive reported that

Ticketmaster and Live Nation "will not do any business whatsoever with our stadium" and that

Ticketmaster was "drawing a line in the sand and picking this as their 'hill to die on.'"  The Venue

C executive went on to state his understanding that Venue C was "now on 'the black list.'"

### *Venue D*

Defendants violated the Final Judgment when a senior Ticketmaster executive in charge of

Sports for NBA and NHL Arenas threatened to withhold concerts at Venue D if Ticketmaster was

not selected as its primary ticketing provider.   In September 2018, Venue D began evaluating

primary ticketing providers in advance of the expiration of its Ticketmaster contract.  When Venue

D told Ticketmaster that it was considering other primary ticketers, Ticketmaster's executive told

Venue D that if it chose another primary ticketer, its Live Nation concert volume would be put at

risk because Live Nation concerts would either skip the market altogether or play at another venue.

Later, the senior executive reiterated his threat if that Venue D went with another primary ticketing

provider, Live Nation would pull concerts from Venue D and reduce the volume of shows held

there.

Despite receiving a competitive bid from a Ticketmaster competitor, Venue B determined

that the risk of contracting with a ticketer other than Ticketmaster was too great.  Venue D renewed

its contract with Ticketmaster for primary ticketing services.

### *Venue E*

Defendants violated the Final Judgment by threatening to condition Venue E's access to

Live Nation concerts on the selection of Ticketmaster as the arena's ticketing provider and then

retaliating by withholding Live Nation content after Ticketmaster was not selected. Beginning in early 2012, the President of Live Nation Arenas threatened on multiple occasions to divert Live Nation concerts away from Venue E if it did not select Ticketmaster as its primary ticketer. After Venue E did not select Ticketmaster, two Live Nation executives – the President of Live Nation Arenas and the local Live Nation President in charge of placing concerts in the region – repeatedly threatened that Venue E would not get Live Nation shows unless it switched to Ticketmaster.

When Venue E refused to switch to Ticketmaster despite these threats, Live Nation followed through on its threats and retaliated against Venue E by reducing the number of concerts played there. Indeed, between 2011 and 2015, Live Nation shows playing at Venue E dropped by an average of almost fifty percent.

### Venue F

Defendants violated the Final Judgment by retaliating against Venue F after the arena switched from Ticketmaster to a competing ticketer. Immediately after learning that Venue F had switched ticketers, Ticketmaster's President contacted the local Live Nation President responsible for placing concerts in the region to suggest that Live Nation book more shows at Venue F's nearby rival venue. In the two years following Venue F's move to a Ticketmaster competitor for primary ticketing, Live Nation significantly reduced the number of shows promoted at Venue F in retaliation.

## III. THE UNITED STATES AND DEFENDANTS HAVE AGREED TO CLARIFY, MODIFY, AND EXTEND THE FINAL JUDGMENT TO ADDRESS THE UNITED STATES' CONCERNS

As set forth in the proposed Amended Final Judgment, Defendants have agreed to undertake certain steps to address the United States' concerns and help prevent future violations of the Final Judgment.

*First*, Live Nation has agreed to extend by five- and one-half years, until December 31, 2025, Section IX of the Final Judgment, as modified, as well as certain interrelated provisions: Section I (jurisdiction); Section II (definitions); Section III (applicability of the Final Judgment); Section XI (compliance inspection); Section XII (notification of related acquisitions), Section XIII.A.(no reacquisition of divested assets), Section XIV (retention of jurisdiction); Section XV (expiration as modified), and Section XVI (public interest determination). As explained above, because most primary ticketing contracts last for three to five years, a five- and one-half-year extension of the Final Judgment would ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

*Second*, Live Nation has agreed to modify the decree to add language clarifying the specific conduct prohibited by the Anti-Retaliation and Anti-Conditioning Provisions. While the United States believes these provisions were always clear and unambiguous, for the avoidance of doubt, these revisions make even clearer that Live Nation is not merely prohibited from withholding or threatening to withhold *all* concerts as a condition of Section IX; rather, conditioning, threatening to condition, or retaliating with respect to one or more concerts is sufficient to violate the Final Judgment. The definition of "Provision of Live Entertainment Events" has been similarly modified to make clear that the definition encompasses not only the services necessary to put on a concert at a venue, but also the concerts themselves – an interpretation supported by the plain language of the original decree but that Defendants nevertheless have disputed. The Anti-Conditioning Provision has been modified so that in the future there can be no doubt that Defendants are prohibited from threatening to withhold one or more concerts from a venue if the venue does not use Ticketmaster for primary ticketing services. Finally, the proposed modification

to the last paragraph of Section IX.A. makes clear that Plaintiffs do not need to identify particular shows that have been withheld to establish retaliation. None of these proposed modifications changes the conduct prohibited by the Final Judgment; they simply serve to clarify pre-existing parameters of the prohibited conduct for avoidance of doubt in the future.

*Third*, Live Nation has agreed to appointment of an independent Monitoring Trustee charged with "the power and authority to monitor Defendants' compliance with the terms of" the Proposed Amended Final Judgment, as well as "other powers as the Court deems appropriate." To that end, the Monitoring Trustee's responsibilities include investigating and reporting on Defendants' compliance with the Proposed Final Judgment, including providing periodic reports to Plaintiffs, and recommending appropriate remedies should violations occur. The Monitoring Trustee shall be selected by the United States, after consultation with Defendants and Plaintiff States, and approved by the Court upon application by the United States.

*Fourth*, Live Nation has agreed to take certain steps to help ensure future compliance with the Final Judgment, including:

(i)      Appoint an Antitrust Compliance Officer;

(ii)      Provide a copy of the Amended Final Judgment to relevant employees along with a cover letter explaining the prohibited conduct and requiring each employee to certify that he or she has read, understands and will abide by the terms of the Amended Final Judgment and that he or she is unaware of any violations;

(iii)      For the first year, conduct semi-annual compliance training programs, followed by annual training thereafter, with all training programs to be approved by the Department of Justice in its sole discretion;

(iv)      Annually communicate to relevant employees that they may disclose information regarding actual or potential violations to the Antitrust Compliance Officer or the Monitoring Trustee without reprisal or adverse consequences;

(v)      Provide notice and a copy of the Amended Final Judgment to every actual or potential venue customer within thirty days of entry along with a cover letter encouraging customers to contact the Department of Justice if they are or become

12

aware of any potential violations and waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts;

(vi)    Provide notice and a copy of the Amended Final Judgment to every actual or potential venue customer at the beginning of any negotiation related in whole or in part to primary ticketing services along with a cover letter encouraging the venue to contact the Department of Justice if they are or become aware of any potential violations and waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts;

(vii)   Notify Plaintiffs and the Monitoring Trustee within seven days of learning of any violations or potential violations of the Amended Final Judgment;

(viii)  If the Antitrust Compliance Officer or Defendants' management learn of a potential violation, promptly notify the Monitoring Trustee, investigate and, if necessary, terminate or appropriately modify any violative conduct;

(ix)    Within thirty days of Defendants' management or the Antitrust Compliance Officer's learning of any violation or potential violation, provide Plaintiffs a statement describing the violation or potential violation;

(x)     Maintain all documents related to violation or potential violation for a period of five years;

(xi)    Establish a whistleblower protection policy;

(xii)   Annually certify in writing to Plaintiffs Defendants' compliance with the Final Judgment; and

(xiii)  Maintain and produce to Plaintiffs upon request a list of all employees who received the annual compliance training and a copy of all materials distributed as part of that training.

Together, these steps are intended to promote compliance with the Proposed Amended Final Judgment's provisions and to make the enforcement of this Court's Order as effective as possible. Similar provisions are now generally included as a matter of course in Antitrust Division consent decrees aimed at preventing anticompetitive conduct.[14]

_____

[14] *See, e.g.* Final Judgment, *United States v. Sinclair Broadcast Group, Inc., et al.*, 1:18-cv-02609-TSC, Dkt. 34 (D.D.C. May 22, 2019); Final Judgment, *United States v. Knorr-Bremse AG, et al.*, 1:18-cv-00747-CKK, Dkt. 19 (D.D.C. July 11, 2018); Final Judgment, *United States v. DirecTV Group Holdings, LLC, et al.*, 2:16-cv-08150-MWF-E, Dkt. 41 (C.D. Cal. Oct. 2, 2017); Final Judgment, *United States v. Apple, Inc. et al.*, 1:12-cv-02826-DLC, Dkt. 119 (S.D.N.Y. Sept. 6, 2012).

Case 4:10-cv-00139-RMC  Document 22  Filed 01/03/20  Page 137 of 24

*Fifth*, Live Nation has agreed to incorporate four new procedural provisions designed to promote compliance and make the enforcement of the Amended Final Judgment as effective as possible.  With the exception of the penalty provision, the United States is seeking to include these provisions in all newly proposed final judgments in antitrust matters, and it has already included them by agreement with parties in 7 of its recent proposed consent decrees in civil merger and civil non-merger cases.[15]  As part of these modifications, Defendants have agreed that in any future civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Amended Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence.

The parties also affirm that the Proposed Amended Final Judgment was drafted to restore competition that would otherwise have been harmed by the underlying merger between Ticketmaster and Live Nation.  Defendants agree that they may be held in contempt if they fail to comply with any provision of the proposed Amended Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Moreover, Defendants have agreed to pay a penalty of one million dollars per violation of each of the Anti-Retaliation and Anti-Conditioning Provisions in relation to negotiations with a venue during a single contracting cycle.  This penalty is intended to incentivize Live Nation's

---

[15] *See, e.g.,* [Proposed] Final Judgment, *U.S. et al. v. Deutsche Telekom AG, et al.,* 1:19-cv-2232, Dkt. 2-2 (D.D.C. July 26, 2019); Proposed Final Judgment, *U.S. et al., v. Nexstar Media Group, Inc., et al.*, 1:19-cv-2295, Dkt. 2-2 (D.D.C. July 31, 2019); Final Judgment, *U.S. v. Amcor Ltd., et al.*, 1:19-cv-1592, Dkt. 21 (D.D.C. Sept. 11, 2019); Final Judgment, *U.S. v. Canon Inc., et al.*, 1:19-cv-1680, Dkt. 12 (D.D.C. Oct. 8, 2019); Final Judgment, *U.S. v. Harris Corp., et al.*, 1:19-cv-1809, Dkt. 10 (D.D.C. Oct. 10, 2019); [Proposed] Final Judgment, *U.S. v. Symrise AG, et al.*, 1:19-cv-3263, Dkt. 2-2 (D.D.C. Oct. 30, 2019); Proposed Final Judgment, *U.S. v. NACAC*, 1:19:cv-3706, Dkt. 2-2 (D.D.C. Dec. 12, 2019).

compliance with the Amended Final Judgment while lowering the United States' burden to prove specific damages resulting from any specific violation.

Finally, the parties have agreed that the United States may file an action against Defendants for violating the Amended Final Judgment for up to four years after the Amended Final Judgment has expired or been terminated. This provision is meant to address, *inter alia*, instances where evidence that a violation of the Amended Final Judgment occurred during the term of the Amended Final Judgment is not discovered until after the Amended Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Amended Final Judgment has expired or been terminated. This provision, therefore, makes clear that the United States may still challenge a violation that occurred during the term of the Amended Final Judgment for four years after the Amended Final Judgment has expired or been terminated.

*Sixth*, Live Nation has agreed to reimburse the United States $3 million for its costs and attorney fees incurred in investigating and prosecuting this action.

## IV. MODIFICATION OF THE FINAL JUDGMENT IS IN THE PUBLIC INTEREST

### A. Legal Standard

On July 30, 2010, the Court held that entry of the Final Judgment was in the public interest and entered its Order.[16] This Court has jurisdiction to modify the Final Judgment pursuant to Section XIV of the Final Judgment,[17] Federal Rule of Civil Procedure 60(b)(5), and its inherent

---

[16] Final Judgment § XVI ("Entry of this Final Judgment is in the public interest.")

[17] Section XIV of the Final Judgment states that the Court "retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary and appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions."

authority to enforce its lawful orders, including "the power to construe and interpret the language of the judgment"[18] and to modify a decree of injunctive relief.[19] Moreover, the Final Judgment expressly contemplates the Court's authority to grant an extension, providing that the decree would expire ten years from the date of entry "[u]nless this Court grants an extension."[20]

Where, as here, the parties have consented to a proposed modification of an antitrust judgment, the issue before the Court is whether modification is in the public interest.[21] The Court should "approve an uncontested modification so long as the resulting array of rights and obligations is within the zone of settlements consonant with the public interest today."[22] The "district court may reject an uncontested modification only if it has exceptional confidence that adverse antitrust consequences will result – perhaps akin to the confidence that would justify a court in overturning the predictive judgments of an administrative agency."[23]

---

[18] *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 12 (D.D.C. 2004).

[19] *New York v. Microsoft*, 531 F. Supp. 2d 141, 167 (2008) (quoting *United States v. Western Elec. Co.*, 46 F.3d 1198, 1202 (D.C.Cir.1995) (finding that in addition to authority under a final judgment, "[t]he Court may also modify the Final Judgments under its power in 'equity to modify a decree of injunctive relief," which the D.C. Circuit has described as "long-established, broad, and flexible.").

[20] Final Judgment § XV.

[21] As discussed below in Section VI, the requirements of the Tunney Act, 15 U.S.C. §§ 16(b)-(h), do not apply to actions such as this one. Courts nevertheless should apply in this context a "public interest" standard of review akin to the review standard embodied in the Tunney Act because that standard pre-dates the Tunney Act and therefore applies even where the Act does not. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995) (In passing the Tunney Act, "Congress did not purport to alter antitrust precedent applying the public interest in reviewing consent decrees."); *cf. also United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 & n. 7 (2d Cir. 1983) (the "court must, of course, consider protection of the 'public interest'"; the "Tunney Act… provides useful guidance to the courts in deciding how modification procedures should be addressed"); *United States v. Swift & Co.*, No. 58 C 613, 1975 WL 864, at *3 (N.D. Ill. Jan. 17, 1975) (applying "public interest" review – but not the Tunney Act – to a jointly proposed modification to antitrust consent decree).

[22] *United States v. Western Elec. Co.*, 900 F. 2d 283, 307 (D.C. Cir. 1990) ("*Western Elec. I*").

[23] *United States v. Western Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) ("*Western Elec. II*").

The public interest standard to be applied by the district court is the same one used in reviewing an initial proposed consent judgment in a government antitrust case.[24]  It has long been recognized that the United States has broad discretion in settling antitrust litigation on terms that will best serve the public interest in competition.[25]

Respectfully, the Court's role in determining whether the initial entry of a consent decree is in the public interest is not to determine what decree would best serve society, but only to determine whether entering the proposed decree would be in the public interest.  It should so determine and enter the proposed decree unless it cannot find that the government's explanation of why the proposed decree would be in the public interest is reasonable, or finds that the government has abused its discretion or failed to discharge its duty to the public.[26]  The Court's role is to "insur[e] that the government has not breached its duty to the public in consenting to the decree."[27]  As the public interest standard for reviewing a modification to a consent decree is the same as for deciding whether initially to enter the decree, the Court should conclude that modifying the Final Judgment is in the public interest if the United States has offered a reasonable explanation

---

[24] *See Western Elec. I*, 900 F.2d at 295; *United States v. American Telephone & Telegraph Co.*, 552 F. Supp. 131,147 n.67 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 406 U.S. 1001 (1983).

[25] *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (stating that government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest").

[26] *See Microsoft*, 56 F.3d at 146062; *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).

[27] *Bechtel*, 648 F.2d at 666; *see also Microsoft*, 56 F.3d at 1461 (examining whether "the remedies [obtained in the Final Judgment] were not so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

of why the modification vindicates the public interest in competitive markets, and there is no showing of abuse of discretion affecting the United States' recommendation.

   **B.**  **The Proposed Modification Will Advance the Public Interest**

   To date, Live Nation's repeated violations of the Final Judgment's prohibitions against retaliatory and threatening behavior have undermined Section IX's purpose – namely, to promote competition in the primary ticketing industry.[28]  Many venues depend on revenue generated by live events, including concerts, and a single concert can generate hundreds of thousands of dollars in revenue for a venue, including dollars earned from concessions, parking, merchandise, and ticketing fees.  As the largest concert promoter in the country, Live Nation is thus a critical source of live concerts that many venues can ill afford to alienate.  Even when Ticketmaster's competitors make competitive offers for a venue's primary ticketing contract, they are often unsuccessful, in part because venues know that by selecting a Ticketmaster competitor for primary ticketing services they risk having their show counts reduced or eliminated in retaliation.

   Indeed, Defendants' violations have so permeated the industry that venues now fear retaliation and expect conditioning from Live Nation as a matter of course if they do not contract with Ticketmaster.  As a result, Defendants' actions have deterred entry into primary ticketing and foreclosed current competitors from winning venues' primary ticketing contracts.  At the same time, the presence of competitors in the primary ticketing market, even hamstrung as they are by Defendants' actions, has already resulted in better pricing and terms for venues by forcing Ticketmaster to improve its offer in response to competition.

   The proposed modifications to the Final Judgment are in the public interest.  Extending Section IX and other relevant provisions by five- and one-half years will finally give the Final

---

[28] Final Judgment § IX, entitled "Promote Competition."

Judgment a chance to work as intended. Most primary ticketing contracts last for three to five years. A five- and one-half-year extension of the Final Judgment would therefore ensure that at least one full cycle of most venue ticketing contracts would be free from Defendants' coercive tactics and give true competition a chance to take hold.

The remaining modifications are also in the public interest because they clarify the prohibited conduct, strengthen the penalties associated with non-compliance while simultaneously lowering the United States' burden to seek relief in the future, and improve all parties' ability to monitor and enforce compliance by instituting notice and investigation obligations and appointing both internal (Antitrust Compliance Officer) and external (Monitoring Trustee) monitors to oversee Defendants' conduct. Moreover, requiring Defendants to provide notice of the Amended Final Judgment's prohibitions to venues should help educate venues and reduce fear of retaliation, allowing venues to feel increased freedom to choose a non-Ticketmaster primary ticketer. By forcing Defendants to actually adhere to the Final Judgment, it is likely that Ticketmaster's actual and potential competitors will be more likely and able to compete successfully for venue clients, engendering better deals for venues as a result of increased competition.

## V.    A PUBLIC COMMENT PERIOD IS UNNECESSARY

Consistent with the recent practice of courts in this district,[29] the United States does not propose to publish the proposed Amended Final Judgment for notice and public comment. The

---

[29] In certain past cases, the United States has voluntarily applied – with agreement from the parties – procedures consistent with the Tunney Act to major modifications of consent decrees because those procedures can help facilitate thorough exposition and review. *See, e.g., United States v. Western Elec. Co.*, 900 F. 2d 283, 305 (D.C. Cir. 1990) ("*Western Elec. I*") (in which the parties voluntarily agreed to apply Tunney Act procedures to the modification at issue). Courts in this district, however, have modified final judgments without requiring a period for public notice and comment. *See, e.g., United States et al. v. Verizon Communications, Inc., et al.,* Civil Action No. 1:08-cv-01878 (D.D.C. April 8, 2011, Judge Emmet Sullivan) (extending

Tunney Act requires, among other things, that "any proposal for a consent judgment submitted by the United States" be filed with the court and published in the Federal Register, as well as in newspapers of general circulation, at least 60 days prior to the effective date of such judgment.[30] The Tunney Act further requires that any written comments relating to the proposed consent judgment, and any responses by the United States to those comments, be filed with the court and published in the Federal Register prior to entry of the proposed consent judgment.[31] These procedures are designed to facilitate a public interest determination "[b]efore entering any consent judgment proposed by the United States."[32] The language of the Tunney Act does not require that modifications to a consent judgment be subject to these same procedures.

In this case, prior to the entry of the original Final Judgment, the United States complied with the procedures of the Tunney Act and certified its compliance with the Court.[33]

Here, the proposed modifications are intended only to clarify the prohibitions on Defendants' conduct that are already contained in the Final Judgment entered by this Court. Similarly, the new enforcement and monitoring provisions simply strengthen the United States'

---

the term of transition services agreements); *United States v. Cemex, S.A.B. de C.V. and Rinker Group Ltd*, Civil Action No. 1:07-cv-00640 (D.D.C. November 28, 2007, Judge Royce Lamberth) (substituting a 40-year lease of real property for a sale of that property); *United States v. Halliburton and Dresser Industries*, Civil Action No. 98-2340 (D.D.C. March 13, 2000, Judge Thomas Penfield Jackson) (substituting access to one test well for access to a different test well). Two courts outside of this district have further held that the Tunney Act is not applicable to judgment termination proceedings, suggesting that those courts would not view the Tunney Act as applicable to minor judgment modifications. *United States v. American Cyanamid Co.*, 719 F.2d, 558, 565 n.7 (2d Cir. 1983); *United States v. General Motors Corp.*, 1983-2 Trade Cas. ¶ 65,614 at 69,093 (N.D. Ill. 1983). *But see United States v. Motor Vehicle Mfrs. Ass'n*, 1981-2 Trade Cas. ¶ 64,370 (C.D. Cal. 1981).

[30] 15 U.S.C. § 16(b)-(c).
[31] 15 U.S.C. § 16(d).
[32] 15 U.S.C. § 16(e).
[33] Certificate of Compliance with Provisions of the Antitrust Procedures and Penalties Act, Dkt. 14-2 (June 29, 2010).

ability to monitor Defendants' conduct and to challenge that conduct in the future, discouraging future violations.  Moreover, extending the Final Judgment by five- and one-half-years is intended to effectuate the parties' original bargain by making up for time lost to Defendants' violative conduct.  Finally, the Court previously found the underlying Final Judgment to be in the public interest.  Thus, no notice or public comment period is necessary for a determination that the proposed modification is in the public interest.

## VI.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court enter the proposed Amended Final Judgment submitted with this motion.

Dated:  January 8, 2020                          Respectfully submitted,

    /s/ Meagan K. Bellshaw
MEAGAN K. BELLSHAW (CA Bar #257875)
MONA S. K. HAAR (DC Bar # 986789)
LEE F. BERGER (DC Bar # 482435)
SARAH LICHT (DC Bar #1021541)
CRAIG D. MINERVA (DC Bar # 991020)
U.S. Department of Justice
Antitrust Division
Media, Entertainment and Professional Services Section
450 Fifth St., N.W., Suite 4000
Washington, D.C. 20530

# EXHIBIT C

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　　　*Plaintiffs*,<br><br>v.<br><br>TICKETMASTER ENTERTAINMENT,<br>INC., and LIVE NATION<br>ENTERTAINMENT, INC.,<br><br>　　　　　　　*Defendants*. | Case: 1:10-cv-00139-RMC<br>Assigned to: Collyer, Rosemary M.<br>Assign. Date: 1/25/2010<br>Description: Antitrust |

## AMENDED FINAL JUDGMENT

WHEREAS, plaintiffs, United States of America, and the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania ("Plaintiff States") filed their Complaint on January 25, 2010, and whereas the States of New Jersey and Washington joined as Plaintiff States pursuant to an Amended Complaint filed January 28, 2010, the United States, Plaintiff States, and defendants, Ticketmaster Entertainment, Inc. and Live Nation, Inc., by their respective attorneys, consented to the entry of the Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, the United States, Plaintiff States and Defendants have consented to the entry of this Amended Final Judgment;

AND WHEREAS, defendants agree to be bound by the provisions of this Amended Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Amended Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants and the imposition of certain conduct restrictions on defendants, to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. Definitions

As used in this Amended Final Judgment:

A.    "AEG" means Anschutz Entertainment Group, Inc., a company with its headquarters in Los Angeles, California, its successors and assigns, and its subsidiaries,

divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.     "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

C.     "Client Ticketing Data" means financial data relating to a ticketing client's events including on-sale dates for a client's events, the number of tickets sold for the specific event, the proceeds from those sales for a specific event, ticket inventory that is made available on the Ticketmaster system, the number and location of tickets that are sold, the amount for which the tickets are sold, pricing, marketing and promotions run for the event, the sales as a result of the marketing or promotions, and the status of the ticket inventory. "Client ticketing data" does not include data that Defendants collect through other means (e.g., website tracking, user group surveys, public sources). Client Ticketing Data does not include data that is made public by a client or third party.

D.     "Comcast-Spectacor" means Comcast-Spectacor, L.P., a company with its headquarters in Philadelphia, Pennsylvania, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E.     "Condition" means to explicitly or practically require buyers to take one product or set of services if they want to obtain a second product or set of services. In the absence of explicit conditioning, providing the buyer with an opportunity to buy the two products or sets of services separately is only conditioning if no reasonable buyer would be expected to accept the terms of the separate offers.

F.      "Covered Employee" means any employee of Defendants whose principal job responsibility involves the operation or day-to-day management of Defendants' venues, concert promotions, or artist management services.

G.      "Defendants" means either defendant acting individually or both defendants acting collectively, as appropriate. Where the Amended Final Judgment imposes an obligation to engage in or refrain from engaging in certain conduct, that obligation shall apply as broadly as reasonable to each defendant individually, both defendants acting together, and the merged firm.

H.      "Divestiture Assets" means the Ticketmaster Host Platform (via the binding agreement to license and to provide private label ticketing services to the Ticketmaster Host Platform Acquirer as required in Section IV.A) and Paciolan.

I.      "Exempted Employee" means any employee of Defendants who is not a Covered Employee, including: (a) any senior corporate officer, director or manager with responsibilities that include oversight of Defendants provision of Primary Ticketing Services; and (b) any employee whose primary responsibilities solely include accounting, human resources, legal, information systems, and/or finance.

J.      "Live Entertainment Event" means a live music concert for which tickets are sold to the public.

K.      "Live Nation" means defendant Live Nation, Inc., a Delaware corporation with its headquarters in Beverly Hills, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

L.      "Merger" means the merger of Ticketmaster and Live Nation.

M.     "Paciolan" means Paciolan, Inc., a Delaware corporation which is engaged in the
provision of ticketing services to venues or other organizations under the Paciolan or
Ticketmaster Irvine names, and which includes:

1.     All tangible assets that comprise the Paciolan line of business, including
servers and other computer hardware; research and development activities;
all fixed assets, personal property, inventory, office furniture, materials,
supplies, and other tangible property and all assets used exclusively in
connection with Paciolan; all licenses, permits and authorizations issued
by any governmental organization relating to Paciolan; all contracts,
teaming arrangements, agreements, leases (including the lease to the
Paciolan headquarters in Irvine, California), commitments, certifications,
and understandings, relating to Paciolan, including supply agreements; all
customer lists, contracts, accounts, and credit records; all repair and
performance records and all other records relating to Paciolan;

2.     All intangible assets used in the development, distribution, production,
servicing and sale of Paciolan, including, but not limited to, all patents,
contractual rights (including contractual rights to provide ticketing
services and employment contracts), licenses and sublicenses, intellectual
property, copyrights, trademarks, trade names, service marks, service
names, technical information, computer software and related
documentation, know-how, trade secrets, drawings, blueprints, designs,
design protocols, specifications for materials, specifications for parts and
devices, safety procedures for the handling of materials and substances, all

research data concerning historic and current research and development

relating to Paciolan, quality assurance and control procedures, design tools

and simulation capability, all manuals and technical information

defendants provide to their own employees, customers, suppliers, agents

or licensees, and all research data concerning historic and current research

and development efforts relating to Paciolan, including, but not limited to,

designs of experiments, and the results of successful and unsuccessful

designs and experiments. Preexisting commitments to transfer contractual

rights from Paciolan to another entity that are specifically identified in the

Paciolan sales agreement are excluded from this definition.

N.     "Paciolan Acquirer" means the entity to whom defendants divest Paciolan.

O.     "Primary Ticketing Services" means a collection of services provided to venues

or other customers to enable the initial sale of tickets for live entertainment events directly to

customers and enable the validation of tickets at the venue to control access to the event.

P.     "Provide Live Entertainment Events" and "Provision of Live Entertainment

Events" mean to supply a Live Entertainment Event, Live Entertainment Events and/or services

reasonably necessary to plan, promote, market and settle a Live Entertainment Event, including

but not limited to concert promotion services provided by firms such as Live Nation and the

provision of artists managed by firms such as Front Line. The Promotion of Live Entertainment

Events specifically does not include the provision of primary ticketing services, venue

management services and/or tour design and construction services.

Q.     "Retaliate" means refusing to Provide Live Entertainment Events to a Venue

Owner, or Providing Live Entertainment Events to a Venue Owner on less favorable terms, for

the purpose of punishing or disciplining a Venue Owner because the Venue Owner has contracted or is contemplating contracting with a company other than Defendants for Primary Ticketing Services. The term "Retaliate" does not mean pursuing a more advantageous deal with a competing Venue Owner.

  R. "Ticket Buyer Data" means non-public identifying information for ticket buyers for a specific event (including, if provided, the buyer's name, phone number, e-mail address, and mailing address) that Defendants collect in the course of providing a ticketing client's Primary Ticketing Services. Ticket Buyer Data does not include data that Defendants collect solely through other means (e.g., website tracking, user group surveys, public sources).

  S. "Ticketmaster" means defendant Ticketmaster Entertainment, Inc., a Delaware corporation with its headquarters in West Hollywood, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

  T. "Ticketmaster Host Platform" means the primary Ticketmaster software used by Ticketmaster to sell primary tickets in the United States. The Ticketmaster Host Platform includes the following software: Ticketmaster Classic Ticketing System (also called Ticketmaster Host); Ticketmaster.com full website package; Access Management; payment processing and settlements; and PCI point of sale system (for phone and outlets).

  U. "Ticketmaster Host Platform Acquirer" means AEG, the entity with whom defendants will enter into a binding agreement to license the Ticketmaster Host Platform.

  V. "Venue Owner" means a person or company that owns, operates, or manages one or more venues that host Live Entertainment Events.

W.     "Management" means all directors and officers of Defendants, or any other employee with management or supervisory responsibilities for Defendants' business or operations related to negotiating the provision of Primary Ticketing Services or the Provision of Live Entertainment Events.

Z.     "Relevant Employees" means Defendants' employees with responsibility for negotiating the provision of Primary Ticketing Services or the Provision of Live Entertainment Events.

### III. Applicability

A.     This Amended Final Judgment applies to Ticketmaster and Live Nation, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Amended Final Judgment by personal service or otherwise.

B.     If, prior to complying with Sections IV and V of this Amended Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Amended Final Judgment. Defendants need not obtain such an agreement from the Acquirers of the assets divested pursuant to this Amended Final Judgment.

### IV. Divestiture

A.     Defendants are ordered and directed not to consummate the Merger until they have entered into a binding agreement to license the Ticketmaster Host Platform to the Ticketmaster Host Platform Acquirer and to provide private label ticketing services to the Ticketmaster Host Platform Acquirer in a manner consistent with this Amended Final Judgment and with the following terms and conditions:

1.    The agreement shall include the option, exercisable at the discretion of the Ticketmaster Host Platform Acquirer, to acquire a non-exclusive, perpetual, fully-paid up license to the Ticketmaster Host Platform. The license shall include a copy of the source code of the Ticketmaster Host Platform and shall permit the Ticketmaster Host Platform Acquirer to modify the software in any manner without limitation and without any requirement to license back any improvements to Defendants. If the option is exercised, Defendants shall promptly begin the installation of a fully functional ticketing system and website in the facilities of the Ticketmaster Host Platform Acquirer and shall complete the installation within a reasonable time pursuant to a schedule subject to approval by the United States, after consultation with Plaintiff States. Defendants shall warrant that the system is current as of the time of installation and operational for use in providing Primary Ticketing Services. Defendants shall provide reasonable training and support to enable the Ticketmaster Host Platform Acquirer to operate the software and to understand the source code so that it can make independent changes to the code. The license shall permit the Ticketmaster Host Platform Acquirer to transfer the license following the complete installation of the Ticketmaster Host Platform. The scope of use of the license shall be at least the United States.

2.    The agreement shall include a private label ticketing agreement pursuant to which Ticketmaster shall provide private label ticketing services to the

Ticketmaster Host Platform Acquirer for a period of no more than five years from the date of execution of the license. The private label ticketing agreement shall be on such reasonable terms and conditions that will enable the Ticketmaster Host Platform Acquirer to compete effectively against Ticketmaster to secure contracts for the provision of Primary Ticketing Services. The private label ticketing agreement shall give the Ticketmaster Host Platform Acquirer all control over the ticketing fees charged individual consumers or clients of the Ticketmaster Host Platform Acquirer for tickets sold pursuant to the agreement and Defendants shall have no right or ability to set these ticketing fees. Ticketmaster shall, at the request of the Ticketmaster Host Platform Acquirer, post on the main Ticketmaster public website links to events sold under the private label ticketing agreement, subject to reasonable, non-discriminatory, and customary terms and conditions. Ticketmaster shall customize a separate website for the Ticketmaster Host Platform Acquirer with branding, look, and feel to be determined by the Ticketmaster Host Platform Acquirer. The private label ticketing services as described in this Section shall be operational within six months from the date that the binding agreement to license Ticketmaster Host Platform becomes effective.

B.      Defendants shall implement the Ticketmaster Host Platform binding agreement required by Section IV.A and any resulting Ticketmaster Host Platform license in a manner consistent with the terms of Section IV.A. Defendants shall comply with the terms of the Ticketmaster Host Platform binding agreement required by Section IV.A and any resulting

Ticketmaster Host Platform license, provided that nothing in the Ticketmaster Host Platform

binding agreement or resulting Ticketmaster Host Platform license can relieve Defendants of any

obligations imposed by this Amended Final Judgment.

C.      Defendants shall, as soon as possible, but within one business day after

completion of the relevant event, notify the United States and Plaintiff States of: (1) the effective

date of the Merger and (2) the effective date of the binding agreement to license to the

Ticketmaster Host Platform Acquirer.

D.      If the Ticketmaster Host Platform Acquirer exercises its option to license the

Ticketmaster Host Platform, Defendants shall waive any non-compete agreements that would

prevent any employee of Defendants whose primary responsibility is the development or

operation of the Ticketmaster Host Platform from joining the Ticketmaster Host Platform

Acquirer.

E.      Defendants are ordered and directed, concurrently with the closing of the Merger,

to enter into a Letter of Intent to divest Paciolan to Comcast-Spectacor in a manner consistent

with this Amended Final Judgment. Within sixty (60) calendar days of closing the Merger,

Defendants shall complete the divestiture of Paciolan in a manner consistent with this Amended

Final Judgment to Comcast-Spectacor or an alternative Acquirer acceptable to the United States,

in its sole discretion, after consultation with Plaintiff States. Defendants agree to use their best

efforts to divest the Divestiture Assets as expeditiously as possible.

F.      Defendants shall provide the United States and the Paciolan Acquirer information

relating to the personnel involved in the production, operation, development and sale of Paciolan

at any time since Ticketmaster acquired Paciolan to enable the Paciolan Acquirer to make offers

of employment. Defendants will not interfere with any negotiations by the Paciolan Acquirer to

employ any defendant employee whose primary responsibility is the production, operation,
development, and sale of Paciolan, and shall waive any non-compete agreements that would
prevent any such employee from joining the Paciolan Acquirer. Nothing in this Section shall
prohibit defendants from making offers of continued employment to, continuing to employ, or
continuing to use the services of any of their employees, including personnel involved in the
production, operation, development and marketing of Paciolan and its ticketing system, subject
to the overarching limitation that the agreement to sell Paciolan to the Paciolan Acquirer must
ensure that the Paciolan Acquirer will be able to adequately staff Paciolan in a manner that
enables the Paciolan Acquirer to successfully compete as a provider of Primary Ticketing
Services, as determined by United States in its sole discretion. In addition, nothing in this Section
shall prohibit defendants from maintaining any reasonable restrictions on the disclosure by an
employee who accepts an offer of employment with the Paciolan Acquirer of the defendants'
proprietary non-public information that is (1) not otherwise required to be disclosed by this
Amended Final Judgment, (2) related solely to the defendants' businesses and clients, and (3) not
related to the production, operation, development, and marketing of Paciolan and its ticketing
system.

     G.    Defendants shall permit the Paciolan Acquirer to have reasonable access to
personnel and to make inspections of the physical facilities of Paciolan; access to any and all
environmental, zoning, and other permit documents and information; access to any and all
financial, operational, or other documents and information customarily provided as part of a due
diligence process.

     H.    Defendants shall warrant to the Paciolan Acquirer that each asset it acquires will
be operational on the date of sale.

I.      Defendants shall warrant to the Paciolan Acquirer that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of Paciolan, and that following the sale of Paciolan, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of Paciolan.

J.      Defendants shall not take any action that will impede in any way the permitting, operation, use, or divestiture of the Divestiture Assets.

K.      Unless the United States otherwise consents in writing, after consultation with Plaintiff States, the divestitures pursuant to Section IV of this Amended Final Judgment shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, after consultation with Plaintiff States, that the Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business, engaged in providing Primary Ticketing Services. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States, after consultation with Plaintiff States, that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Amended Final Judgment,

1.      shall be made to an Acquirer(s) that, in the United States' sole judgment, after consultation with Plaintiff States, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of providing Primary Ticketing Services; and

13

2.       shall be accomplished so as to satisfy the United States, in its sole

discretion, after consultation with Plaintiff States, that none of the terms of

any agreement between an Acquirer(s) and Defendants give Defendants

the ability unreasonably to raise the Acquirer's costs, to lower the

Acquirer's efficiency, or otherwise to interfere in the ability of the

Acquirer to compete effectively.

### V. Appointment of Trustee to Effect Divestiture

A.      If Defendants have not divested Paciolan as specified in Section IV.E, defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to divest Paciolan in a manner consistent with this Amended Final Judgment. Defendants consent to appointment of a trustee prior to entry of this Amended Final Judgment if Paciolan has not been divested within the time periods provided in Section IV.E.

B.      After the appointment of a trustee becomes effective, only the trustee shall have the right to sell Paciolan. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States, after consultation with Plaintiff States, at such cash price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Amended Final Judgment, and shall have such other powers as this Court deems appropriate.

C.      Subject to Section V.E of this Amended Final Judgment, the trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

D.      Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

E.      The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of Paciolan and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

F.      Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, including any information provided to the United States during its investigation of the merger related to the business to be divested, and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

G.     After its appointment, the trustee shall file monthly reports with the United States,

Plaintiff States, and the Court setting forth the trustee's efforts to accomplish the divestiture

ordered under this Amended Final Judgment. To the extent such reports contain information that

the trustee deems confidential, such reports shall not be filed in the public docket of the Court.

Such reports shall include the name, address, and telephone number of each person who, during

the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into

negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in

Paciolan, and shall describe in detail each contact with any such person. The trustee shall

maintain full records of all efforts made to divest Paciolan.

H.     If the trustee has not accomplished the divestiture ordered under this Amended

Final Judgment within six (6) months after its appointment, the trustee shall promptly file with

the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2)

the reasons, in the trustee's judgment, why the required divestiture has not been accomplished,

and (3) the trustee's recommendations. To the extent such reports contain information that the

trustee deems confidential, such reports shall not be filed in the public docket of the Court. The

trustee shall at the same time furnish such report to the United States which shall have the right

to make additional recommendations consistent with the purpose of the trust. The Court

thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the

Amended Final Judgment, which may, if necessary, include extending the trust and the term of

the trustee's appointment by a period requested by the United States.

### VI. Notice of Proposed Divestiture

A.     Within two (2) business days following execution of a definitive divestiture

agreement, defendants shall notify the United States and Plaintiff States of any proposed

divestiture required by Section IV of this Amended Final Judgment. Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and Plaintiff States of any proposed divestiture required by Section V of this Amended Final Judgment. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in Paciolan, together with full details of the same.

B.    Within fifteen (15) calendar days of receipt by the United States and Plaintiff States of such notice, the United States may request from defendants, the proposed Acquirer(s), any other third party, or the trustee if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.    Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States and Plaintiff States has been provided the additional information requested from defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States, after consultation with Plaintiff States, provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V.C of this Amended Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by

defendants under Section V.D, a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Amended Final Judgment.

## VIII. Hold Separate

Until the divestiture required by this Amended Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. Anti-Retaliation Provision and Other Provisions Designed to Promote Competition

A.    Defendants shall not:

    1.    Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services;

    2.    Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services. For the avoidance of doubt, this provision prohibits Defendants from threatening to withhold the Provision of Live Entertainment Events if a Venue decides to contract with a company other than Defendants for Primary Ticketing Services; or

18

3.      Condition or threaten to Condition the provision of Primary Ticketing

Services to a Venue Owner based on that Venue Owner refraining from

contracting with a company other than Defendants for the Provision of

Live Entertainment Events.

For the avoidance of doubt, Section IX prohibits Defendants from Conditioning,

Retaliating, or threatening to Condition with respect to the provision of one or more Live

Entertainment Events. Live Nation waives any argument that this Amended Final Judgment only

prohibits Retaliation or Conditioning with respect to all Live Nation content. Particular conduct

may violate more than one provision of this Amended Final Judgment, e.g., Sections IX.A.1. and

IX.A.2. of this Amended Final Judgment are not mutually exclusive.

Nothing in this Section prevents Defendants from bundling their services and products in

any combination or from exercising their own business judgment in whether and how to pursue,

develop, expand, or compete for any ticketing, venue, promotions, artist management, or any

other business, so long as Defendants do so in a manner that is not inconsistent with the

provisions of this Section.

Evidence that Defendants do or do not (a) bid for, contract with, win, or retain a venue,

artist, or promoter as a client, and/or (b) promote a show or shows in particular buildings or

group of buildings (even where similar shows historically have been promoted in those

buildings) is not alone sufficient to establish, or create a presumption of, a violation of this

Section. For the avoidance of doubt, Live Nation waives any argument that Plaintiffs must

identify particular shows that have been withheld in order to prevail on a claim of Retaliation.

B.      Defendants shall not disclose to any Covered Employee any Client Ticketing

Data. Defendants however: (1) may disclose Client Ticketing Data concerning a specific event to

any Covered Employee involved in the promotion of that event or the management of the artist who performed at that event, if it does so on the same terms it generally provides such information to other promoters or artist managers not affiliated with Defendants; (2) may disclose Client Ticketing Data to an Exempted Employee who requires the information in order to perform his or her job function(s); provided however, that such Exempted Employee may not use Client Ticketing Data to perform any job function(s) that primarily involve(s) the day-to-day operation or management of Defendants' venues, concert promotions, or artist management services; and (3) may disclose Client Ticketing Data to any Defendant employee where so required by law, government regulation, legal process, or court order, so long as such disclosure is limited to fulfillment of that purpose.

C.      If any client of Defendants' primary ticketing services chooses not to renew a contract for Primary Ticketing Services with Defendants for some or all of its venues, upon the expiration of that contract and the written request of the client, Defendants shall within forty-five (45) days provide the client with a complete copy of all Client Ticketing Data and all Ticket Buyer Data historically maintained by Defendants for such venue(s) in the ordinary course of business, in a form that is reasonably usable by the client. Nothing in this provision shall be read to: (1) alter any rights Defendants would otherwise have to Client Ticketing Data or Ticket Buyer Data pursuant to the Primary Ticketing Services contract with the client, and/or its historical custom, practice, and course of dealing with the client; or (2) limit any rights the client would otherwise have to its Client Ticketing Data or Ticket Buyer Data pursuant to the Primary Ticketing Services contract with Defendants and/or its historical custom, practice, and course of dealing with Defendants. Defendants shall maintain Client Ticketing Data and Ticket Buyer Data

on behalf of its clients for no less than three (3) years. This provision only applies to contracts for Primary Ticketing Services in effect prior to the entry of this Amended Final Judgment.

## X. Affidavits

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or Section V, defendants shall deliver to the United States and Plaintiff States an affidavit as to the fact and manner of its compliance with Section IV or Section V of this Amended Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States, after consultation with Plaintiff States, to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Every two (2) months prior to the private label ticketing agreement described in Section IV.A.2 becoming operational, and every six (6) months thereafter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IV.A and the terms of Ticketmaster Host Platform binding agreement.

C.      Defendants shall, in addition, deliver to the United States and Plaintiff States an affidavit describing any revised or amended agreements with the Ticketmaster Host Platform Acquirer relating to the agreement required by Section IV.A. Such notice shall be delivered to the United States and Plaintiff States at least fifteen (15) calendar days prior to the effective date of the revised or amended agreement and Defendants shall not implement any amended agreement if the United States, after consultation with Plaintiff States, objects during the fifteen (15) day notice period.

D.      Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Amended Final Judgment. Defendants shall deliver to the United States and Plaintiff States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change if implemented.

E.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## XI. Compliance Inspection

A.      For purposes of determining or securing compliance with this Amended Final Judgment, or of determining whether the Amended Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States or an Interested Plaintiff State, including consultants and other persons retained by the United States or an Interested Plaintiff State, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the

Antitrust Division and/or of any Interested Plaintiff State, and on reasonable notice to defendants, be permitted:

      1.      access during defendants' office hours to inspect and copy, or at the option of the United States or an Interested Plaintiff State, to require defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of defendants, relating to any matters contained in this Amended Final Judgment; and

      2.      to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division and/or an Interested Plaintiff State, defendants shall submit written reports, under oath if requested, relating to any of the matters contained in this Amended Final Judgment as may be requested. Written reports authorized under this paragraph may, at the sole discretion of the United States and/or of any Interested Plaintiff State, require Defendants to conduct, at Defendants' cost, an independent audit or analysis relating to any of the matters contained in this Amended Final Judgment.

C.      No information or documents obtained by the means provided in this section shall be divulged by the United States or an Interested Plaintiff State to any person other than an authorized representative of the executive branch of the United States, or of the Attorney

General's Office of an Interested Plaintiff State, except in the course of legal proceedings to which any Plaintiff is a party (including grand jury proceedings), or for the purpose of securing compliance with this Amended Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by defendants to the United States or an Interested Plaintiff State, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States or the Interested Plaintiff State shall give defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

E. "Interested Plaintiff State" as used herein means the state in which a potential violation of this Amended Final Judgment is believed to have occurred and any state within 125 miles of that venue.  For illustrative purposes only, the State of California would be an Interested Plaintiff State with respect to a potential violation at a venue in Stateline, Nevada, but not as to potential violations at a venue in Portland, Oregon.

## XII. Notification

Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), defendants, without providing advance notification to the United States and Plaintiff States, shall not directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity or management interest, in any person that, at any time during the twelve (12) months immediately preceding such acquisition, was engaged in the

United States in providing Primary Ticketing Services during the term of this Amended Final Judgment.

Such notification shall be provided to the United States and Plaintiff States in the same format as, and per the instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended. Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction. If within the 30-day period after notification, representatives of the United States make a written request for additional information, defendants shall not consummate the proposed transaction or agreement until twenty (20) calendar days after submitting all such additional information. Early termination of the waiting periods in this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

For purposes of this Amended Final Judgment, any notice or other communication required to be provided to Plaintiffs shall be sent to the person at the address and emails set forth below (or such other addresses as a Plaintiff may specify in writing to Defendants):

<u>United States</u>
Owen Kendler
Chief
Media, Entertainment, and Professional Services Section
U.S. Department of Justice
Antitrust Division

450 Fifth Street, NW, Suite 4000
Washington, D.C. 20530
Owen.Kendler@usdoj.gov

Arizona
Unit Chief Counsel
Arizona Attorney General's Office
Antitrust Unit
2005 N. Central Ave.
Phoenix, AZ 85004
Dana.Vogel@azag.gov

Arkansas
Public Protection Department
Arkansas Office of the Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
johnathan.carter@arkansasag.gov

California
Antitrust Law Section
State of California Department of Justice
300 S. Spring Street, Suite 1720
Los Angeles, CA 90013
Paula.Gibson@doj.ca.gov

Florida
Antitrust Division
Office of the Attorney General of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050
lee.istrail@myfloridalegal.com

Illinois
Antitrust Bureau
Office of the Illinois Attorney General
100 W Randolph St., Floor 13
Chicago, IL, 60601-3397
JChervin@atg.state.il.us

Iowa
Max M. Miller
Consumer Protection Division
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319

Max.Miller@ag.iowa.gov

Louisiana
Stacie Lambert deBlieux
Chief, Complex Litigation Section
Louisiana Department of Justice
1885 N. 3rd Street
Baton Rouge, LA 70802
deblieuxs@ag.state.la.us

Massachusetts
Chief, Antitrust Division
Massachusetts Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
michael.mackenzie@state.ma.us

Nebraska
Chief, Consumer Protection Division
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
meghan.stoppel@nebraska.gov

Nevada
Bureau of Consumer Protection
Office of the Nevada Attorney General
8945 W. Russell Road, Suite 204
Las Vegas, Nevada 89148
LTucker@ag.nv.gov

New Jersey
Consumer Fraud Prosecution Section
Department of Law & Public Safety – Division of Law
State of New Jersey Office of the Attorney General
124 Halsey Street, P.O. Box 45029
Newark, New Jersey 07101
patricia.schiripo@law.njoag.gov

Ohio
Chief
Antitrust Section
Ohio Attorney General's Office
150 East Gay Street, 22nd Floor
Columbus, Ohio 43215
jennifer.pratt@ohioattorneygeneral.gov

Oregon
Civil Enforcement Division
Oregon Department of Justice
1162 Court St NE, Salem, OR 97301-4096
Tim.D.Nord@doj.state.or.us

Pennsylvania
Commonwealth of Pennsylvania
Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120
jbetsko@attorneygeneral.gov

Rhode Island
Chief, Civil Division
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
KHoffmann@riag.ri.gov

Tennessee
Deputy, Consumer Protection Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
David.McDowell@ag.tn.gov

Texas
Division Chief
Antitrust Division
Office of the Texas Attorney General
300 W. 15th Street
Austin, Texas 78701
David.Ashton@oag.texas.gov

Wisconsin
Unit Director
Division of Legal Services – Public Protection Unit
State of Wisconsin Department of Justice
17 West Main Street
PO Box 7857
Madison, WI 53707-7857
CooleyGJ@DOJ.STATE.WI.US

Washington
Paula Pera C.
Assistant Attorney General, Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
paula.pera@atg.wa.gov

## XIII. No Reacquisition

A.    Defendants may not reacquire any part of the Divestiture Assets during the term of this Amended Final Judgment.

B.    Following the expiration of the private label ticketing agreement with the Ticketmaster Host Platform Acquirer required by Section IV.A.2: (1) Defendants shall not provide Primary Ticketing Services to any venues in North America for which, by virtue of an ownership interest, the Ticketmaster Host Platform Acquirer controls the rights to select the Primary Ticketing Services provider; and (2) for all other venues in North America, Defendants shall not provide Primary Ticketing Services on behalf of or pursuant to a ticketing contract with the Ticketmaster Host Platform Acquirer. Nothing in this Section shall prevent Defendants from: (1) competing to provide Primary Ticketing Services to venues (including such venues managed by the Ticketmaster Host Platform Acquirer) other than those for which, by virtue of an ownership interest, the Ticketmaster Host Platform Acquirer controls the rights to select the Primary Ticketing Services provider; and (2) providing Primary Ticketing Services to artist fan clubs in venues owned, operated, or managed by the Ticketmaster Host Platform Acquirer.

## XIV. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Amended Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or

appropriate to carry out or construe this Amended Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV. Expiration of Amended Final Judgment

Sections I, II, III, IX, XI, XII, XIII.A., XIV, XV, XVI, XVII, XVIII, and XIX of this Amended Final Judgment are extended and shall expire on December 31, 2025, unless the Court grants further extension. All other provisions in this Amended Final Judgment shall expire on July 30, 2020.

## XVI. Public Interest Determination

Entry of this Amended Final Judgment is in the public interest. The parties previously complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of the Final Judgment entered by the Court on July 30, 2010 (the "2010 Final Judgment"), the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before the Court, entry of this Amended Final Judgment is in the public interest.

## XVII. Compliance Provisions

A.      Appointment of an Independent Monitoring Trustee

1.      Upon application of the United States, after consultation with Plaintiff States and with Defendants, the Court will appoint an independent Monitoring Trustee selected by the United States and approved by the Court.

2.      The Monitoring Trustee will have the power and authority to monitor Defendants' compliance with the terms of this Amended Final Judgment and will have other powers as the Court deems appropriate.  If the

Monitoring Trustee determines that any violation of this Amended Final Judgment has occurred, the Monitoring Trustee shall promptly report its findings and recommend an appropriate remedy to the United States, which, in its sole discretion, can accept, modify, or reject a recommendation to pursue a remedy. The United States will provide to Plaintiff States a copy of any report provided by the Monitoring Trustee. Nothing in this provision prevents any Plaintiff State from pursuing its own remedy for violations of the Amended Final Judgment.

3.      Defendants may not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities pursuant to this Amended Final Judgment or any other Order of the Court on any ground other than malfeasance by the Monitoring Trustee. Objections by Defendants to actions taken by the Monitoring Trustee must be conveyed in writing to the United States and the Monitoring Trustee within ten calendar days of the Monitoring Trustee's action that gives rise to Defendants' objection.

4.      The Monitoring Trustee will serve at the cost and expense of Defendants as detailed in a written agreement, on terms and conditions, including terms and conditions governing confidentiality requirements and conflict-of-interest certifications, that are approved by the United States after consultation with Defendants.

5.      The Monitoring Trustee may hire, at the cost and expense of Defendants, agents or consultants, including investment bankers, attorneys, and

accountants, reasonably necessary in the Monitoring Trustee's judgment to assist with the Monitoring Trustee's duties. Agents or consultants will be accountable solely to the Monitoring Trustee and will serve on terms and conditions, including terms and conditions governing confidentiality requirements and conflict-of-interest certifications, that are approved by the United States after consultation with Defendants.

6. The compensation of the Monitoring Trustee and agents or consultants retained by the Monitoring Trustee must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the Monitoring Trustee and Defendants are unable to reach agreement on the Monitoring Trustee's compensation or other terms and conditions of engagement within twenty-one calendar days of the appointment of the Monitoring Trustee, the United States, in its sole discretion, may take appropriate action, including by making a recommendation to the Court. Within three business days of hiring an agent or consultant, the Monitoring Trustee must provide written notice of the hiring and the rate of compensation to Defendants and the United States.

7. The Monitoring Trustee must account for all costs and expenses incurred.

8. Defendants must use their best efforts to assist the Monitoring Trustee to monitor Defendants' compliance with their obligations under this Amended Final Judgment. The Monitoring Trustee and agents or consultants retained by the Monitoring Trustee must, subject to protections for trade secrets, other confidential research, development, or commercial

information, and any applicable privileges, have full and complete access to all personnel, books, records, and facilities relating to compliance with this Amended Final Judgment. Defendants may not take any action to interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

9. The Monitoring Trustee must investigate and report on Defendants' compliance with this Amended Final Judgment. The Monitoring Trustee must provide periodic reports to Plaintiffs setting forth Defendants' efforts to comply with Defendants' obligations under this Amended Final Judgment. The United States, in its sole discretion, will set the frequency of the Monitoring Trustee reports.

10. The Monitoring Trustee will serve until the expiration of this Amended Final Judgment.

11. If the United States, after consultation with Plaintiff States, determines that the Monitoring Trustee is not acting diligently or in a reasonably cost-effective manner, the United States may recommend that the Court appoint a substitute.

B. Antitrust Compliance Officer.

1. Within twenty-one days of entry of this Amended Final Judgment, Defendants shall appoint an Antitrust Compliance Officer who is an internal employee or officer of one of Defendants, and identify to Plaintiffs the Antitrust Compliance Officer's name, business address, telephone number, and email address. Within forty-five days of a vacancy

in the Antitrust Compliance Officer position, Defendants shall appoint a replacement, and shall identify to Plaintiffs the replacement Antitrust Compliance Officer's name, business address, telephone number, and email address. In all events, Defendants' appointment of any Antitrust Compliance Officer is subject to the approval of the United States, in its sole discretion.

2.    The Antitrust Compliance Officer shall have the following minimum qualifications:

a.    be an active member in good standing of the bar in any U.S. jurisdiction; and

b.    have at least five years' experience in legal practice, including experience with antitrust, regulatory or compliance matters.

3.    The Antitrust Compliance Officer shall, directly or through the employees or counsel working under the Antitrust Compliance Officer's authority and direction:

a.    Within twenty-one days after the Antitrust Compliance Officer's appointment, furnish to all of Defendants' Management and Relevant Employees a copy of this Amended Final Judgment;

b.    Within thirty days after the Antitrust Compliance Officer's appointment, in a manner to be devised by Defendants and approved by the United States, provide Defendants' Management and Relevant Employees reasonable notice of the meaning and requirements of this Amended Final Judgment;

c.     Twice during the first year, then annually thereafter, brief Defendants' Management and Relevant Employees on the meaning and requirements of this Amended Final Judgment, with written materials for each briefing to be approved by the United States in its sole discretion;

d.     Brief any person who succeeds a person identified as Management or a Relevant Employee within sixty days of such succession;

e.     Obtain from each person designated as Management or a Relevant Employee, within thirty days of that person's receipt of this Amended Final Judgment, a certification that the person (i) has read and understands and agrees to abide by the terms of this Amended Final Judgment; (ii) is not aware of any violation of this Amended Final Judgment that has not been reported to Defendants; and (iii) understands that failure to comply with this Amended Final Judgment may result in an enforcement action for civil or criminal contempt of court; and

f.     Annually communicate to Defendants' Management and Relevant Employees that they may disclose to the Antitrust Compliance Officer or Monitoring Trustee, without reprisal or adverse consequence for such disclosure, information concerning any violation or potential violation of this Amended Final Judgment or the U.S. antitrust laws by Defendants.

C.     Venue Disclosure. Defendants shall provide notice and a copy of this Amended Final Judgment, in a form and manner to be proposed by Defendants and approved by the United States in its sole discretion, to: (1) every Venue Owner for whom Ticketmaster provides Primary Ticketing Services, or with whom Ticketmaster is negotiating or discussing the provision of

Primary Ticketing Services, within thirty days of entry of this Amended Final Judgment; and (2) every Venue Owner at the beginning of any negotiation with Ticketmaster and/or Live Nation related in whole or in part to Primary Ticketing Services. Defendants shall provide Plaintiffs with its proposed notice, including the list of recipients, within ten days of the filing of this Amended Final Judgment. The notice shall include an explanation of the requirements of Section IX of this Amended Final Judgment, a statement encouraging Venue Owners to contact the Department of Justice and any Plaintiff State if they are or become aware of any potential violations of this Amended Final Judgment, and a statement waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts.

       D.     Reporting, Investigation, and Certification Requirements

           1.     Defendants shall:

                    a.     Upon Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Amended Final Judgment, (i) promptly notify the Monitoring Trustee and take appropriate action to investigate, and in the event of a violation, terminate or modify the activity so as to comply with this Amended Final Judgment, (ii) maintain all documents related to any violation or potential violation of this Amended Final Judgment for a period of five years or the duration of this Amended Final Judgment, whichever is shorter, and (iii) maintain, and furnish to Plaintiffs upon request, a log of (a) all such documents for which Defendants claim protection under the attorney-client privilege or the attorney work product doctrine, and (b) all potential and actual violations, even if no documentary evidence regarding the violations exist;

b.       Within seven days of Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Amended Final Judgment, notify Plaintiffs and the Monitoring Trustee of the violation or potential violation;

c.       Within thirty days of Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Amended Final Judgment, provide to Plaintiffs and the Monitoring Trustee a statement describing the violation or potential violation, which shall include a description of any communications constituting the violation or potential violation, including the date and place of the communication, the persons involved, and the subject matter of the communication;

d.       Establish a whistleblower protection policy, which provides that any employee may disclose, without reprisal or adverse consequence for such disclosure, to the Antitrust Compliance Officer or the Monitoring Trustee information concerning any violation or potential violation by the Defendants of this Amended Final Judgment or the U.S. antitrust laws;

e.       Have Live Nation's CEO certify in writing to Plaintiffs 180 days after entry of this Amended Final Judgment, and thereafter annually on the anniversary date of the entry of this Amended Final Judgment, that Defendants have complied with the provisions of this Amended Final Judgment; and

f.      Maintain and produce to Plaintiffs upon request: (i) a list identifying all employees having received the compliance training required under Sections XVII.B.3.c and XVII.B.3.d of this Amended Final Judgment, and the dates on which the employees received the training; and (ii) copies of all materials distributed as part of the annual antitrust compliance training required under XVII.B.3.c and XVII.B.3.d of this Amended Final Judgment. For all materials requested to be produced pursuant to this paragraph for which Defendants claim protection under the attorney-client privilege or the attorney work product doctrine, Defendants shall furnish to Plaintiffs a privilege log.

### XVIII. Future Enforcement

A.      In any future civil contempt action, any motion to show cause, or any similar civil action brought by any Plaintiff regarding an alleged violation of this Amended Final Judgment, Plaintiff(s) may establish a violation of this Amended Final Judgment and the appropriateness of any remedy therefor by a preponderance of the evidence.

B.      This Amended Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition Plaintiffs alleged was harmed by the challenged conduct in this Amended Complaint. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Amended Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Amended Final Judgment should not be construed against either party as the drafter.

C.      Defendants will pay a penalty of $1,000,000 per violation of each enumerated paragraph of Section IX, as modified, payable to the United States of America.   For the avoidance of doubt, a single violation for purposes of calculating this penalty refers to any and all conduct prohibited by this Amended Final Judgment that occurs in relation to a Venue Owner's ticketing contract cycle, except that a violation of Section IX.A.1. shall be deemed a separate violation than a violation of Section IX.A.2. and will be subject to a separate penalty. If, for example, there are multiple threats to Condition during the same contracting cycle, Live Nation would pay $1,000,000. If, for example, there are multiple threats to Condition and Live Nation Retaliates during the same contracting cycle, Live Nation would pay $2,000,000. For the avoidance of doubt, for these purposes, a new ticketing contract cycle begins when the previous contract is signed such that a ticketing contract cycle exists at all times for each Venue Owner.

D.      For a period of four years following the expiration of this Amended Final Judgment, if any Plaintiff has evidence that a Defendant violated this Amended Final Judgment before expiration, any Plaintiff may file an action against that Defendant in this Court requesting that the Court order (1) Defendant to comply with the terms of this Amended Final Judgment for an additional term of at least four years following the filing of the enforcement action under this Section, (2) any appropriate contempt remedies, (3) an extension of this Amended Final Judgment, (4) any additional relief needed to ensure the Defendant complies with the terms of this Amended Final Judgment, and (5) fees or expenses.

E.      For future disputes regarding Defendants' compliance with the terms of this Amended Final Judgment, the parties may agree that any such dispute may be referred to a third-party arbiter.

### XIX. Fees and Costs

Defendants shall pay the United States its reasonable costs and attorney fees incurred in investigating Defendants' conduct and in connection with its investigation of violation of the 2010 Final Judgment, in an amount of $3 million, to be paid within 60 days of entry of this Amended Final Judgment.

Date: January 28, 2020

Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

_____

United States District Judge